AK MEDIA/MA
(D/B/A CLEAR CHANNEL OUTDOOR)

COLLECTIVE BARGAINING AGREEMENT

WITH

DISTRICT COUNCIL #35,
INTERNATIONAL UNION
OF PAINTERS AND ALLIED TRADES,
AFL-CIO, CLC

AUGUST 1, 2001
THROUGH
JULY 31, 2005

~~EMPLOYER~~ JOINT

EXHIBIT NO. 1

TABLE OF CONTENTS

| ARTICLE | TITLE PAGE | PAGE |
|---------|-----------|------|
| | PREAMBLE | 5 |
| 1. | RECOGNITION | 5 |
| 2. | SUCCESSORSHIP | 5 |
| 3. | UNION SECURITY | 6 |
| 4. | CHECK OFF | 6 |
| 5. | UNION LABEL | 7 |
| 6. | MANAGEMENT RIGHTS | 7 |
| 7. | PICKET LINES, STRUCK WORK SUPPORT OF PRIMARY ACTIVITY | 7 |
| 8. | WORKER'S COMPENSATION, ILLNESS | 8 |
| 9. | UNION AGENTS AND STEWARD | 9 |
| 10. | SUPREMACY | 9 |
| 11. | SAFETY | 10 |
| 12. | JURY DUTY | 11 |
| 13. | CREDIT UNION | 11 |
| 14. | FUNERAL BENEFITS | 11 |
| 15. | MILITARY SERVICE | 11 |
| 16. | NO DISCRIMINATION | 12 |
| 17. | WORK RULES, DISCIPLINE, DISCHARGE | 12 |
| 18. | GRIEVANCE AND ARBITRATION | 13 |
| 19. | LOCKOUT AND STRIKE | 14 |
| 20. | ALCOHOLISM, DRUG ABUSE | 14 |
| 21. | UNIFORMS, TOOLS, EQUIPMENT, LICENSES | 15 |
| 22. | TRAVEL | 16 |
| 23. | HOURS AND DAYS OF EMPLOYMENT | 16 |

2

| 24. | CLASSIFICATION, RATES OF PAY VACANT POSITIONS | 18 |
| 25. | APPRENTICESHIP | 18 |
| 26. | WORK PRESERVATION | 20 |
| 27. | BILLPOSTING ROUTE ASSIGNMENTS AND PRODUCTION STANDARDS | 21 |
| 28. | WEEKLY GUARANTEE | 23 |
| 29. | WEATHER CONDITIONS | 23 |
| 30. | JOB GUARANTEE | 24 |
| 31. | SENIORITY | 25 |
| 32. | LOSS OF JOB | 26 |
| 33. | RECALL | 27 |
| 34. | DUTIES | 27 |
| 35. | INTERCHANGEABILITY | 28 |
| 36. | NIGHT SHIFT | 28 |
| 37. | HOLIDAYS | 29 |
| 38. | VACATIONS AND SICK DAYS | 30 |
| 39. | HEALTH AND WELFARE | 33 |
| 40. | PENSION | 34 |
| 41. | L.M.C.F. | 35 |
| 42. | ADDENDA | 36 |
| 43. | SEVERABILITY | 36 |
| 44. | TERM REOPENING | 36 |
| 45. | COMPLETE AGREEMENT AND WAIVER | 37 |

3

ADDENDUM A      WAGES-CLASSIFICATIONS-FRINGES                    38

ADDENDUM B      CONSTRUCTION JOURNEYMAN EVALUATION               42

ADDENDUM C      RESPONSIBILITIES OF WORKING SHOP
                FOREMAN                                          45

ADDENDUM D      SENIORITY LISTS                                  46

ADDENDUM E      TRAINING REQUIREMENTS                            49

                EMPLOYER WORK RULES AND DISCIPLINE               51

## AK MEDIA/MA COLLECTIVE BARGAINING AGREEMENT

Entered into effective August 1, 2001 by and between the following two (2) "parties": AK MEDIA/MA (a division of the ACKERLEY Group) hereinafter referred to as the "EMPLOYER and/or "AK MEDIA", and/or the "COMPANY" and Sign and Pictorial Workers Union, District Council #35 affiliated with the International Union of Painters and Allied Trades, AFL-CIO, hereinafter referred to as the "UNION" and/or "District Council #35".

With respect to the wages, hours and other conditions of employment of the EMPLOYER'S Billposting, Construction, and Garage department employees, the parties hereby agree to as follows:

## ARTICLE 1 – RECOGNITION

SECTION 1:   AK Media recognizes DC #35 as the exclusive collective bargaining representative of all of its Construction, Garage and Billposting employees ("bargaining unit"). The COMPANY agrees that any person hired during the term of this Agreement to perform bargaining unit work within the jurisdiction of DC #35 shall also be employed in the Local 391 bargaining unit and covered by this Agreement. The COMPANY also agrees that as to such bargaining unit work any new positions created as a result of technological changes and/or the introduction of new posting, painting and/or construction methods shall be within the DC #35 bargaining unit. Excluded from the bargaining unit are managers (such as., Operations Manager) and Program Directors (e.g., Safety), supervisors, confidential employees, and all other employees not performing painting, posting, garage and/or construction work (e.g., office-clerical staff).

SECTION 2:   DC #35 shall have the exclusive right to determine by which forum any "jurisdictional disputes" involving its members shall be settled. The No Strike, No Lockout provision of this Agreement shall apply during the interim of resolution.

The EMPLOYER recognizes the jurisdictional area of Local 391 of DC #35 as New England.

## ARTICLE 2 – SUCCESSORSHIP

SECTION 1:   This Agreement shall be binding upon and inure to the benefit of present and future employees of the COMPANY, the UNION and its successors.

SECTION 2:   In the event the COMPANY'S business is, in whole or in part, sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceeding, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

## ARTICLE 3 – UNION SECURITY

SECTION 1:   The EMPLOYER agrees to operate a "Union Shop" in conformity with the National Labor Relations Act.  Therefore, all present employees who are members of the UNION on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the UNION in good standing as a condition of employment.  All present employees who are not members of the UNION and all employees who are hired hereafter shall become and remain members in good standing of the UNION as a condition of employment on and after the thirty-first (31st) day following the beginning of their employment or the thirty-first (31st) day following the effective date of this Agreement, whichever is the later.

## ARTICLE 4 – CHECKOFF

SECTION 1:   UNION DUES – The COMPANY agrees to deduct the sum of money from the wages of each bargaining unit employee as directed by the Secretary Treasurer of the UNION, for UNION dues, provided no such sums shall be deducted by the COMPANY from any employee's wage unless and until the employee has voluntarily signed an authorization form authorizing the deduction and delivered said form to the COMPANY.  Such authorization and assignment shall not be irrevocable for a period longer than one (1) year or the termination of this Agreement, whichever occurs first, at which time it may be revoked by written notice which is to be given by the employee to the COMPANY and the UNION at any time during a period of ten (10) days prior to the one (1) year anniversary of the authorization or ten (10) days prior to the expiration of this Agreement, whichever occurs first. If no such notice is given, the authorization shall automatically be renewed for successive period of one (1) year thereafter with the same privilege of revocation at the end of such period.

The COMPANY will keep appropriate records of the dues deductions, including an accounting or data process statement of same.  The UNION shall undertake to indemnify and hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.  A copy of the deduction statement will be sent to the Financial Secretary of the UNION by the fifteenth (15th) of each month, along with a check for the amount of dues withheld during the previous month.

SECTION 2:   POLITICAL ACTION – the EMPLOYER agrees to check off from the weekly wages of covered employees twenty-five cents ($.25) per week for Political Action Fund employee voluntary contribution.  The twenty-five cents ($.25) per week "PAT" check off shall be only for employees who have authorized the EMPLOYER to do . so by a legal voluntary authorization form supplied by the UNION. The UNION shall undertake to hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.

The EMPLOYER further agrees to remit by the fifteenth (15th) of each month to the address designated by the UNION party hereto the "PAT" contribution deducted in the previous month together with an accounting of same by data process report or by hand a form supplied by the UNION.

6

SECTION 3:   INDUSTRY BETTERMENT – The EMPLOYER may also deduct seventy-five cents ($.75) per week from each employee's wages who has executed a voluntary authorization form to that effect.  Such deductions will be contributed to a political action fund to promote the billboard industry within the Commonwealth of Massachusetts.  Such deductions and contributions will be made only in accordance with applicable State and Federal laws. . The UNION shall undertake to indemnify and hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.

## ARTICLE 5 – UNION LABEL

SECTION 1:   AK MEDIA may instruct its DC #35 represented employees to paint and affix the "Sign/Display" Union label of Local 391 to billboards, signs, and the like, provided the COMPANY first executes the UNION's standard Union Label Agreement. The UNION has reserved shop identification number (#6) for AK MEDIA.

## ARTICLE 6 – MANAGEMENT RIGHTS

SECTION 1:   Except as specifically limited by the express provisions of this Agreement, the COMPANY retains exclusively to itself all rights to manage and operate the business, and to direct, plan and control the operation of the facilities; the right to change, alter, abolish, improve, or introduce new materials, equipment, facilities, accounting practices, and procedures in general; the right to utilize suppliers, contractors and subcontractors; the right to determine what products shall be manufactured, serviced and distributed, and to determine their design, marketing, advertising, and pricing; the right to determine the number of hours per day or number of hours per week operations shall be carried on; the right to hire, select, and determine the number of employees required; the right to assign work to such employees as determined by management; the right to reasonably establish, change, and abolish work schedules and assignments (including overtime work); the right to transfer or promote the employees; the right to demote, suspend, discharge, or otherwise discipline employees for just cause (or, in the case of probationary employees, without cause); the right to promulgate and enforce all reasonable rules relating to safety, operations, and other matters not inconsistent with the terms of this Agreement, the right to layoff employees because of loss of billboards, and otherwise to take such measures as management may determine to be necessary for the orderly, safe, and efficient conduct of the business.  The COMPANY agrees that the above prerogatives will not be exercised in a discriminatory manner.

## ARTICLE 7 – PICKET LINES, STRUCK WORK,
## SUPPORT OF PRIMARY ACTIVITY

SECTION 1:   Notwithstanding the no strike provisions detailed in ARTICLE 19 herein, it shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action, in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful primary picket line, including the lawful primary picket line of the UNION party to this Agreement, and including any lawful primary picket lines at the EMPLOYER'S own places of business or job sites and:

It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action, if any employee refuses to perform any services which AK MEDIA undertakes to perform for any employer or person whose employees are on strike, and which service(s), but for the strike, would be performed by the employees of the employer or person on strike; and

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the UNION party to this Agreement has a right to request its member-covered employees to withdraw whenever their EMPLOYER party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

SECTION 2:   Notwithstanding Article 7, Section 1 above, the UNION and employees covered by this Agreement shall not honor any picket line established at or around the EMPLOYER'S Stoneham, Massachusetts facility if the picket line does not involve a labor dispute with AK MEDIA.

## ARTICLE 8 – WORKER'S COMPENSATION, ILLNESS

SECTION 1:   The EMPLOYER agrees to insure all employees with Worker's Compensation Insurance.  A copy of the actual worker's compensation certificate shall be furnished to the UNION.  The UNION shall be advised of any change of worker's compensation carriers.

SECTION 2:   Any employee who receives minor work connected injuries and is unable to return to work as a result of such injury shall receive not less than eight (8) hours wages for the work performed on the day of such injury, provided the employee's resulting absence from work does not exceed four (4) calendar days.  An employee will make his best efforts to schedule a follow-up visit with his physician during non-working hours.  Should he be unable to do so, the EMPLOYER will agree to give him the necessary time off for a single follow-up visit.  Abuse of this policy Section can subject an employee discipline.

SECTION 3:   Any employee suffering personal injury arising out of or in the course of his employment, shall notify the immediate supervisor as soon as possible thereafter, which barring any extraordinary circumstances, shall be before the close of the work day on which the injury occurs.  Failure to do so without reasonable excuse therefore shall be cause for disciplinary action.  Each employee who has a work related injury and seeks medical attention must show his/her worker's compensation medical card to the medical provider. During a recuperation period for a work related injury, the COMPANY agrees to make reasonable efforts to assign temporarily, for a period of up to four (4) weeks, any employee to inside duties, and in accordance to state law.

SECTION 4:   An employee shall notify the immediate supervisor of sickness as soon as practicable before the employee's starting time, but no later than or furnish reasonable excuse for failure to do so.  It is intended that in most cases this can be accomplished within one-half (½) hour before the employee's starting time.

## ARTICLE 9 – UNION AGENTS AND STEWARDS

SECTION 1:   The Union Business Manager or designee shall be privileged to enter upon the premises of the EMPLOYER during working hours and to confer with EMPLOYER representatives and/or the employees on matters affecting the employees or conditions of this Agreement, provided such discussions with employees do not significantly or deliberately interfere with employee production, reasonable notice of intended visit to be given.

SECTION 2:   The UNION shall have the right to appoint shop stewards, each of whom shall have top seniority in his/her respective department, in accordance with the following schedule:

    20-29 employees:  one (1) steward
    30-39 employees:  two (2) stewards
    40-49 employees:  three (3) stewards
    50 or more employees: four (4) stewards.

SECTION 3:   Whenever possible, stewards shall be notified of overtime worked or to be worked by employees in their respective departments.

SECTION 4:   Shop Stewards shall at all times, have a copy of this Agreement and shall represent the UNION in the absence of the Business Representative.  Shop Stewards shall have full protection of the UNION, shall not be discriminated against for services rendered in behalf of the UNION, and shall not suffer lost wages for time spent during working hours policing the terms of this Agreement, including  time spent with the EMPLOYER or a representative of the EMPLOYER during any "Step One" grievance proceeding as outlined in this Agreement, but excluding any time spent at any formal Arbitration Hearing.

SECTION 5:   The UNION has the right to post in each shop UNION notices, newsletters and related material

SECTION 6:   The COMPANY agrees to consider a request for unpaid time off from any duly accredited Union Official who is a full time employee for the COMPANY and requires time off from regularly scheduled work in order to perform necessary work for the UNION. Management will consider such request and grant same providing the reason is valid and necessary and such time off will not significantly interfere with the operations of the plant.

SECTION 7:   In the event a shop steward resigns or is removed from the position of steward he/she will automatically resume his/her rightful place on the seniority list.

## ARTICLE 10 – SUPREMACY

SECTION 1:   The EMPLOYER agrees not to enter into any agreement or contract with employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

9

## ARTICLE 11 – SAFETY

SECTION 1:   In the interest of promoting safety, the EMPLOYER and the UNION agree to form a "Safety Committee" composed of one (1) bargaining unit employee designated by the UNION from each major department (Construction, and Billposting), together with the EMPLOYER's Safety Director (or management designee).  The Safety Committee will meet on company time at times mutually convenient, but in no event less often than once every month.  The COMPANY will supply dates and notice of meetings January 1st of each year of the Agreement.  The garage mechanic shall attend monthly meetings only when requested by the Safety Committee.

The Committee shall endeavor to develop plausible solutions for whatever safety problems are brought to the attention of same either by employees input or from any other source.  The Safety Committee shall have full access to all EMPLOYER records concerning safety and accidents.  The Business Manager or designee of the UNION shall be permitted to attend meetings of the Safety Committee.

Adequate Safety Committee meeting minutes shall be taken and maintained on EMPLOYER files.

SECTION 2:   Notwithstanding Section 1 above, in accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the responsibility of the EMPLOYER as opposed to the UNION to insure the safety of its employees and compliance by them with any safety rules contained herein or established by the EMPLOYER.  Nothing in this Agreement will make the UNION liable to any employee or to any other persons in the event that work related disease, sickness, death, injury, or accident occurs.

The EMPLOYER will not allege the participation of UNION Safety Committee designees as grounds for any litigation against the UNION on a subrogation theory, contribution theory or otherwise, so as to obtain a money judgment from it in connection with any work related disease, sickness, death, injury or accident.

SECTION 3:   The EMPLOYER shall at all times, provide safe tools, materials and equipment and safe working conditions.  If at any time, in the opinion of the crew chief, the crew's tools, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the crew's employees shall not be required to work with such tools, materials and equipment under such conditions unless or until they are made safe.  Irrespective, no employee shall be dismissed or otherwise disciplined for a reasonable refusal to work with unsafe tools, materials or equipment or under unsafe working conditions

If a question arises concerning the safety of any EMPLOYER owned or controlled vehicle, the garage mechanic shall make the final determination.  The employees agree to cooperate insofar as making minor equipment and/or location repairs necessary to insure safe working conditions.

SECTION 4:   It shall be the duties of the employees to report unsafe conditions to their supervisor who shall advise the Safety Director, who will then report to the Committee of the same and post such report in a noticeable location in the shop.  Upon being made aware of an "unsafe report", the EMPLOYER may independently institute corrective measures as needed.

Pending corrective action by the EMPLOYER (as above) and/or determination by the Safety Committee, no employees shall be assigned or required to work on a panel reported as "unsafe". It shall be the responsibility of each employee to check his daily assignment(s) against the posted list of unsafe panel to insure that he has not inadvertently been assigned a reported "unsafe" panel, and to notify the Supervisor in the event of such an erroneous assignment.

## ARTICLE 12 – JURY DUTY

SECTION 1:   In the event it becomes necessary for any employee covered by this Agreement to serve as a juror or appear in court in any case for the COMPANY, the COMPANY agrees to pay all "fringes" provided in this Agreement on behalf of said employee at a rate of eight (8) hours per day and the COMPANY also agrees to pay the difference between straight time wages and any juror's or witness' compensation.

## ARTICLE 13 – CREDIT UNION

SECTION 1: The EMPLOYER agrees that during the term of this Agreement it will make a credit union available to its employees on a payroll deduction basis.

## ARTICLE 14 – FUNERAL BENEFITS

SECTION 1:  Up to three (3) working days off with pay at the applicable rate shall be paid to an employee for attending the funeral of a member of his immediate family: mother, father, current wife or husband, son, daughter, brother, sister, current mother-in-law or father-in-law.  One (1) day off with pay will be paid to an employee for attending the funeral of a grandparent or grandchild.  No employee will be denied the use of a vacation or sick day or an unpaid day off, if the employee is ineligible for a paid day off, to attend the funeral of any other relative.

## ARTICLE 15 – MILITARY SERVICE

SECTION 1:   AK MEDIA shall, upon presentation of official orders, grant time off to any employee who is a member of the National Guard or of any reserve component of the armed forces of the United States and who is called to perform short-term duty of thirty-one (31) calendar days or less.

SECTION 2:   Employees who are ordered to military duty associated with a state of emergency, annual training or extended active duty shall be granted a military leave of absence for the necessary period allowed by law.

SECTION 3:   During any calendar year, an employee on an approved military leave shall be paid the difference between the employee's regular pay and the pay received by the employee for such service, but to a maximum of fifteen (15) calendar days per year.  In order to receive payment for military leave of absence, an employee, upon returning to work must submit to the COMPANY a copy of military orders and a statement of military pay for the period for which pay is claimed.

SECTION 4:   While on military leave of absence, an employee shall be entitled to all rights and benefits as though the employee were at work.  Any employer contributions to fringe benefits shall be processed according to normal practices, meaning and intending

11

thereby that contributions to all fringe benefit funds shall be remitted on behalf of the employee on military leave on the basis of eight (8) hours per day for the maximum fifteen (15) calendar days per year.

SECTION 5:  Employees shall not receive pay for time off associated with weekend military training duty.

SECTION 6:  Employees who become members of any branch of the armed forces of the United States and become obligated to extended active duty shall be guaranteed re-employment rights, providing they apply for re-employment within thirty-one (31) days after their release from duty.

## ARTICLE 16 - NO DISCRIMINATION

SECTION 1:    Neither the UNION, nor the EMPLOYER, shall discriminate against any employee or applicant for employment because of the employee's race, color, religion, national origin, sex, age, handicap, sexual orientation, or status as a special disabled veteran or veteran of the Vietnam Era.  The use of such words as "he", "his", "himself", "man", "workman" or "steward" in this Agreement shall include a person of the female gender as well as a person of the male gender unless the Agreement clearly required a different construction.

## ARTICLE 17 – WORK RULES, DISCIPLINE, DISCHARGE

SECTION 1:    The EMPLOYER shall have the right to post reasonable rules and regulations provided they are not in conflict with the terms of this Agreement.

SECTION 2:    No employee shall be discharged, suspended, or disciplined without just cause.

SECTION 3:    The COMPANY agrees that any employee who receives a disciplinary action will have it expunged after 18 months, provided he/she has not committed any further disciplinary offenses.

SECTION 4:    During the term of this Agreement, copies of any statement(s) of oral warning(s), written reprimand(s), suspension(s), or discharge(s) issued to an employee covered by this Agreement shall be given simultaneously to the employee, with duplicate copy to the employee's shop steward. A copy shall also be sent to the Local Union office.  Such statement(s) shall be signed by the Operations Manager and shall set forth the nature of same.

SECTION 5:    Employees shall not be held responsible for damage caused by paint carried by wind or any other unavoidable accident while in the employ of the EMPLOYER.  However, this Article 17, Section 5 will not operate as an endorsement of callous work habits which may be the subject of disciplinary action.

SECTION 6:    In the event it becomes necessary to prohibit an employee from operating a COMPANY vehicle per a demand of same by EMPLOYER'S liability insurance carrier or, an employee loses his drivers license, the EMPLOYER agrees to use every reasonable effort to assign such an employee to a non-driving assignment. In the event no such assignment is available, then the EMPLOYER shall have the right to suspend such an employee for the period of prohibition and/or such loss of license

and until there

is an open and available position for the employee to return to. The UNION will not challenge the EMPLOYER'S right to invoke such a work-availability suspension provided the EMPLOYER was in fact unable to reassign the employee to a non-driving position after reasonable efforts to do so as above.

In the event that an employee loses his/her license or had his/her license suspended, he/she must report it immediately to his/her supervisor. Failure to do so will result in disciplinary action in accordance with the Work Rules and Discipline section of this Agreement.

## ARTICLE 18 – GRIEVANCE AND ARBITRATION

SECTION 1:  Any and all grievances and disputes shall be adjusted by the parties in the following manner:

STEP ONE:   Within five (5) working days of known occurrence of the incident giving rise to the grievance or dispute, the Union Shop Steward, Business Representative and/or Business Manager shall meet with the EMPLOYER or the EMPLOYER'S authorized representative to adjust same.  During such five (5) day period, the UNION or the COMPANY may, or may not, reduce said grievance or dispute to writing and serve notice to the opposite party.

STEP TWO:  If the grievance is not satisfactorily adjusted in Step One, then the UNION or the COMPANY shall reduce said grievance to writing within an additional ten (10) working days, fifteen (15) days from known occurrence of the incident, and forward or deliver a copy of said written grievance to the opposite party.  The Business Representative or Business Manager of the UNION and the EMPLOYER, or like representative, shall meet within the aforementioned additional ten (10) working day period to resolve the matter.

STEP THREE:  If the grievance is not satisfactorily adjusted in Step Two, then the COMPANY or the UNION may submit the matter to mediation with the Federal Mediation and Conciliation Service within an additional ten (10) working days, twenty-five (25) days from the known occurrence of the incident giving rise to the grievance.

STEP FOUR:  If the grievance is not satisfactorily adjusted in Step Three, either the COMPANY or the UNION may submit the matter to expedited arbitration within an additional ten (10) working days, thirty five (35) day from the known occurrence of the incident giving rise to the grievance. The parties agree that should the grievance be submitted to arbitration, the arbitration shall be in accordance with the rules of the American Arbitration Association.

SECTION 2:   The arbitration shall be expedited and both parties will reserve the right to present briefs to the arbitrator unless it is otherwise mutually agreed.  The arbitration will be otherwise conducted in accordance with the American Arbitration Association. The arbitrator shall not have power or authority to add to, subtract from or modify the terms of this Agreement.  The decision of the arbitrator shall be final and binding on both parties, subject only to the applicable standards for judicial review of arbitration decisions.  The cost of the Arbitration, except that incurred by either party in presenting its side of the case, shall be shared equally by both parties.  Both the EMPLOYER and

the UNION agree to waive the right to appeal the arbitrator's decision, except as otherwise provided by law.

SECTION 3:  Either party may waive Step One and proceed directly to Step Two of the grievance procedure. Should the grievance not be satisfactorily adjusted either party may then proceed directly to mediation and/or directly to arbitration, as outlined in Steps Three and Four.

SECTION 4:   If either party fails to abide by the terms of the arbitrator's award within twenty (20) days after receiving notice of the award, the arbitrator may reconvene the arbitration for the purpose of assessing legal penalties on either party.  If the arbitrator's award must be enforced by a lawsuit, attorney's fees may be assessed.

## ARTICLE 19 - LOCKOUT AND STRIKE

SECTION 1. The grievance and arbitration procedure set forth above is the exclusive means of resolving grievances, and the procedures before appropriate governmental administrative agencies and courts are the exclusive means of resolving a dispute of any other kind between the employee (or the UNION) and the EMPLOYER. Accordingly, during the term of this Agreement there shall not be nor shall the UNION encourage or sanction, any strike (including a sympathy strike), picketing, sit-down, stay-in, slow-down, curtailment of work, restriction of production, intentional interference with operations, or boycott.

SECTION 2:   During the term of this Agreement, the EMPLOYER will not institute a lockout over a dispute with the UNION as long as there is good faith compliance by the UNION with this Section; unless the EMPLOYER cannot efficiently operate due to a breach of this Section.

SECTION 3:    A breach of this Section by the UNION (or employees) or by the EMPLOYER shall not be subject to the grievance and arbitration procedure of this Agreement, other than as specifically provided in this Section.

## ARTICLE 20 – ALCOHOLISM, DRUG ABUSE

SECTION 1:   Alcoholism and, drug abuse and emotional illness are to be recognized by the EMPLOYER as health problems and are to be treated by the parties as any other disease, provided the employee accepts assistance.  However, the EMPLOYER shall have the right to terminate an employee so afflicted who refuses to acknowledge such a health problem and accept assistance, or who has received assistance for two treatments after the effective date of this Agreement and yet continues to demonstrate signs of active alcoholism or substance abuse. Provided such a health problem significantly impairs such an employee's work performance and the UNION is satisfied that the employee was made aware of his condition and refused assistance, the UNION shall not challenge the EMPLOYER'S termination of such an employee.  Any employee shall have the right to refuse to work with another employee who is under the influence of alcohol or drugs.

SECTION 2:  AK MEDIA  endorses the UNION'S "Brotherhood Assistance Program" and agrees to cooperate and work with the staff of "Modern Assistance Programs"; and/or any successor alcoholism/substance abuse benefit management entity contracted with by the District Council #35 Health and Welfare Fund.

14

DH
ef

## ARTICLE 21— UNIFORMS, TOOLS, EQUIPMENT, LICENSES

SECTION 1:   TOOLS – With respect to billposting and paint department employees, AK MEDIA shall continue to furnish all necessary tools and equipment for such employees to perform their respective jobs.  Garage mechanics shall receive a tool allowance of $300.00 per year for the first two (2) years, and $400.00 for the third (3rd) of this Agreement.  AK MEDIA shall furnish all construction department employees with an initial set of required hand tools on a one time basis, which tools must be replaced by and at the employee's expense if lost or broken as a result of the employee's personal negligence.  In all cases, employees will take reasonable care of all tools and equipment entrusted to them.

SECTION 2:   Employees required to perform welding and/or burning will be required to wear protective clothing supplied by the EMPLOYER.  The EMPLOYER agrees to supply all safety equipment and clothes, including gloves, as necessary and to supply rain gear and boots for yard work and/or brush cutting on inclement days.

SECTION 3:   For each employee covered by this Agreement, the EMPLOYER will during the month of September give each employee the choice of either one (1) jacket, one (1) pair of boots or one pair of coveralls, which will not exceed a maximum cost of seventy-five dollars ($75.00) per employee; on each November first (1st) of this Agreement, employees will receive their aforementioned selection and four (4) pairs of denim type jeans, two (2) company sweatshirts and five (5) company jersey type tee shirts.  On November 1 of the first year of this Agreement, the COMPANY will supply five (5) jersey type tee shirts and two (2) mock turtle necks.  The COMPANY at its discretion will determine the supplier as well as the selection of the aforementioned clothing allotments and will make every reasonable effort to insure good quality as well as American made goods.  Employees are required to wear complete AK Media uniforms and only such uniforms at all times while on the job. Any employee who fails to report to work dressed in his/her AK Media uniform will be subject to discipline in accordance with the work rules of Category A.

SECTION 4:   The EMPLOYER will pay the cost of any license renewal or certificate renewal required by the State, Federal or Local law or this Collective Bargaining Agreement.  Employees will be permitted to use employer vehicles and/or equipment on COMPANY time for license examination(s).  The EMPLOYER will pay the employee the difference between his Class II license and the cost of a Class III Massachusetts Driver's License. The COMPANY will pay for the Builders License application fee, training cost and license renewal.

SECTION 5(A):       The following licenses are mandatory for all new journeyman and for all apprentices to be upgraded to journeyman:

Construction Employees – A crane operator's license coded for "Sign Hanger" from the Massachusetts Division of Public Safety; a class II Massachusetts drivers license and Welding certificate satisfactory to the COMPANY and District Council #35 Joint Apprenticeship and Training Committee.

Mechanics – A class II Massachusetts driver's license.

SECTION 5(B):       Current employees without the licenses and/or certification required above will make continuing efforts to obtain same.

15

If a current construction employee fails to obtain a Class B driver's license and a crane operators' license within three (3) years from August 1, 2001 or, for new employees, within three (3) years of hire, then he/she will no longer be eligible for Journeyman status and shall have his/her pay reduced to 90% of the Journeyman's rate until said license is obtained.

SECTION 6:   No employee shall work alone on a swing stage.

SECTION 7:   Apprentices and Helpers shall be supervised by Journeymen except when performing simple tasks not requiring such supervision.

## ARTICLE 22 - TRAVEL

Section 1: Employees shall normally report to and work out of the EMPLOYER's Stoneham, Massachusetts shop.

The EMPLOYER will regulate and pay for all necessary parking fee(s) and tolls incurred by the employee during the work day with the COMPANY vehicles or from a "report to the job site" directive. The Employee shall make every effort when parking a COMPANY vehicle to do so legally. The employee shall pay for parking meters but shall be reimbursed for such expenditures. If an employee receives a parking violation, he/she shall timely submit the ticket to his/her supervisor. The COMPANY shall pay for parking tickets, provided, however, that a ticket for parking in a handicapped space, parking near a fire hydrant or other emergency vehicle areas or in cross walks shall be paid for by the employee unless otherwise approved by the Operations Manager or other COMPANY official or unless there are mitigating circumstances. Further, failure to turn in a parking ticket will result in the employee paying any late fees or fines that are incurred.

The EMPLOYER will provide adequate parking at the shop for employees' own cars. The EMPLOYER may advance anticipated toll and/or parking fee money, but normally the employees shall use their own money to pay for such expenses and subsequently submit to the EMPLOYER bona fide receipts for reimbursement. Provided the employee submits bona fide receipts, the EMPLOYER agrees to reimburse the employee for the same by no later than the regular pay day of the week following the week in which the receipts were submitted to the employee's foreman or supervisor. Notwithstanding the foregoing, an employee who has expended twenty dollars ($20) of his own money without being reimbursed for same will not be required to expend additional sums unless he is first reimbursed in full by the EMPLOYER. If the EMPLOYER fails to reimburse an employee as herein required, a late payment penalty of two dollars ($2) per day shall also apply.

SECTION 2: Any employee who is requested by the COMPANY to use his own vehicle for work-related business shall be reimbursed by the COMPANY for such use at the prevailing IRS rate.

## ARTICLE 23 - HOURS AND DAYS OF EMPLOYMENT

SECTION 1(A):      The normal work week shall be forty (40) hours (Monday through Friday) and the normal work day shall consist of eight (8) hours beginning at seven a.m. (7:00 a.m.) in the winter months and six a.m. (6:00 a.m.) in the summer months for Billposting.  Garage, non-rotary crew Construction Department Employees and Rotary

crews shall work six a.m. (6:00 a.m.) to two-thirty p.m. (2:30 p.m.) all year. However, the aforementioned shall be subject to the provisions as set forth in Article 28. Employees shall be given a fifteen (15) minute, paid work break in the morning. Lunch breaks will be taken from 12:15 p.m. until 1:00 p.m. in the winter and from 11:30 p.m. until 12:15 p.m. in the summer. In lieu of a fifteen (15) minute work break with pay in the afternoon, fifteen (15) minutes of lunch break shall be with pay. In establishing the aforementioned eight (8) hour work day, it is intended to specify the normal hours of productive effort, including reasonable travel time when necessary. Employees shall report, prepared for work, at the normal starting time.

SECTION 1(B):     For garage mechanics, there may be two (2) shifts. If a second shift is required by the EMPLOYER, the second shift will be from 8:00 a.m. until 4:30 p.m.

SECTION 1(C):     By mutual consent of the Employer and the bargaining unit employees, the start (and finish) of the normal work day may be altered by plus or minus one (1) hour.

SECTION 1(D):     If the EMPLOYER wishes to alter the normal starting time of the Construction and Billposting Departments by plus or minus two (2) hours, two-thirds (2/3) of the relevant department's members voting must agree (the preceding subparagraphs (b) and (c) contemplate a normal eight (8) hours shift of straight time beginning at 6:00 a.m. or 5:00 a.m.). Not withstanding the foregoing, individual members of either or both departments may agree with the COMPANY to begin work two (2) hours early or late and for so working shall receive eight and one-half (8 ½) hours pay for an eight (8) hour shift.

SECTION 2:   All work over forty (40) hours during Monday through Saturday, and except for straight time makeup as provided by Article 28 herein, all work performed on Saturday and all work performed before or after an employee's normal shift or adjusted shift as per Article 23, Sections 1(A) and 1(D) above, shall be "overtime" and shall be paid at time and one-half (1½). Work performed on Sunday or any of the holidays recognized in Article 37 herein shall be for at double time (2X).

SECTION 3:  The EMPLOYER shall establish a regular payday not after the Friday following the close of the work week. Each employee shall receive his/her full week's wages on said payday via direct deposit or negotiable check accompanied by a statement of gross earning and deductions, which statement shall conform to State and Federal Laws; and in addition, each employee shall be reimbursed on said payday the full amount of bona fide expenses incurred during the previous work week provided said employee submits receipts for same to the EMPLOYER by the preceding Friday.

Effective with the first pay period following January 1, 2002, employees shall be paid on a biweekly basis.

SECTION 4:   After completion of twelve (12) hours of continuous work an employee shall be entitled to an overtime relief break of one-half (½) hour with pay. Wash up time shall be limited to the last ten (10) minutes before lunch and the last ten (10) minutes before the end of an employee's shift.

SECTION 5:  All employees instructed to report to the shop or on the job, by the EMPLOYER or working foreman, and who are not placed to work, shall be entitled to a minimum of two (2) hours pay, at the regular rate of wage. Such employees will be

17

required to work such hours.

DH
CF

## ARTICLE 24 – CLASSIFICATIONS, RATES OF PAY, VACANT POSITION

SECTION 1:   All employees employed in the shop on a job of the EMPLOYER shall be classified as Shop Foreman, Crew chief, journeyman construction erector, journeyman rotary man, combination journeyman (construction), journeyman billposter, billposter preparation man, helper (construction or paint department), garage mechanic, or apprentice and shall be employed in the unit covered by this Agreement.

SECTION 2:   No supervisory personnel of the COMPANY will perform any work that is under the jurisdiction of the UNION other than in cases of emergency, or where the COMPANY has made reasonable efforts to have the work performed by a UNION employee and none is available to do the work.

SECTION 3:   The rates of pay for each classification are those detailed on Attachment "A", provided that no unit employee shall suffer a reduction in wages as a result of any provision of this Agreement.  Nor shall an employee be demoted to a lower paying and/or less responsible classification (i.e., crew chief or foreman to journeyman) without just cause.

There shall continue to be separate foreman in each of the following Stoneham shops: Billposting and Construction Foreman position vacancies shall be filled in accordance with the procedure detailed in Article 24, Section 4(A) herein.

SECTION 4(A):  In the event a Foreman's or Crew chief's position becomes vacant, the position will be posted and filled from among the employees of the particular department in which the vacancy has occurred. Subject to the arbitrable question of comparative ability to do the work required, the ability of the applicants shall determine which employee shall become the new Foreman or Crew chief.  The COMPANY shall have the right to assign supervisory personnel (i.e., crew chief/foreman).  However, the UNION shall have the right to grieve any such appointment.

SECTION 4(B):   Billposting and Construction department employees shall have the right to transfer to vacant, non-foreman position within their department(s) by seniority subject to the ability to do the work required.

## ARTICLE 25  APPRENTICESHIP

SECTION 1:   Apprentices shall be governed by the District Council #35 Joint Apprenticeship and Training Standards and any amendments, alterations and/or revisions adopted by authorized Trustees of the District Council #35 Joint Apprenticeship and Training Committee.  The EMPLOYER party to this Agreement agrees to continue to authorize and designate EMPLOYER representatives to serve as Trustees, in conjunction with UNION designees, of District Council #35 Joint Apprenticeship and Training Fund.

SECTION 2:   It is understood that the UNION will have jurisdiction with regard to the placement of Apprentices.  It is further understood that no Apprentice will be employed by any EMPLOYER unless such Apprentice is first registered with the UNION, the State Division of Apprenticeship and Training and the Local Apprenticeship and Training Committee.  The EMPLOYER, when seeking additional Apprentices, shall request the Joint Apprenticeship and Training Committee to refer same from its list of unemployed

18

Apprentices, and, if no Apprentices are unemployed, from its list of persons who desire to be employed in the sign industry as Apprentices. If the Joint Apprenticeship and Training Committee is unable to make such a referral within forty-eight (48) hours of receipt of such a request, then the EMPLOYER may hire from any outside source and indenture the new Apprentice in the Apprentice program.

SECTION 3:    During the term of this Agreement, the EMPLOYER agrees to contribute to the District Council #35 Joint Apprenticeship and Training Committee Fund the amount in Addendum "A" under the column entitled "J.T.P.T.", for each hour or part thereof each employee covered by this Agreement receives pay.  This contribution will be remitted c/o and by check payable to the District Council #35 Apprentice Training Fund, 25 Colgate Road, Roslindale, MA 02131, or any alternate collection entity designated by District Council #35 Joint Apprenticeship and Training Committee.

SECTION 4:    The entire Apprenticeship Standards and Trust Agreement, including any amendments adopted by the Trustees of same, shall be recognized as part of this Agreement as if the EMPLOYER had actually signed same.  The UNION and the COMPANY agree that the apprenticeship program shall be three (3) years for both billposters and construction employees.

SECTION 5:    Notwithstanding anything to the contrary that may be expressed or implied anywhere else in this Agreement or in the Apprenticeship Standards, it is mutually understood that upon satisfactory completion of the Apprenticeship and Training Program, such determination to be made by the Joint Apprenticeship and Training Committee, Apprentices shall be promoted to and classified as Journeymen receiving the wage scale then effective.

SECTION 6:    It is mutually agreed that a non-binding COMPANY recommendation will be requested by the Joint Apprenticeship and Training Committee when determining whether or not an Apprentice has satisfactorily completed the Apprenticeship and Training Program and should be upgraded to Journeymen and that, although non-binding, due consideration will be given to same.  It is further mutually agreed that an Apprentice's Employer will be consulted relative to method used by the Joint Apprenticeship and Training Committee, including the material on the Apprentice Final Exam, for journeyman upgrading.  The COMPANY shall have the right to examine whatever J.A.T.C. records are kept concerning the school attendance and performance of Apprentices in its employ.

SECTION 7:    Apprentice Billposters may be asked to work for as long as nine (9) months with a Journeyman Billposter.  Apprentice Billposters will be subject to two (2) probationary periods of ninety (90) days each.  The first probationary period shall begin at the commencement of an Apprentice's employment and expire ninety (90) calendar days thereafter.  The second (2nd) probationary period shall begin when an Apprentice has acquired sufficient skills to post billboards independently, and in no event later than nine (9) months after an Apprentice begins his employment.  Other Apprentices shall be probationary for their first (1st) one hundred eighty (180) calendar days of employment.

SECTION 8:

Apprentices shall be paid at the following percentages of the journeyman's rate of pay:

| | |
|---|---|
| 0 to 4 months | 50% |
| 4 to 8 months | 55 |
| 8 to 12 months | 60 |
| 12 to 16 months | 65 |
| 16 to 20 months | 70 |
| 20 to 24 months | 75 |
| 24 to 28 months | 80 |
| 28 to 32 months | 85 |
| 32 to 36 months | 90 |
| Journeyman | 100% |

## ARTICLE 26 – WORK PRESERVATION

SECTION 1:   No work covered by this Agreement will be subcontracted or assigned to non-bargaining unit personnel except under the following specific circumstances:

(a)      Motor vehicle repair work which is beyond the capabilities of the regular garage mechanic(s); necessary to instantly correct a safety hazard or work without which a vehicle would remain unusable during a time when the vehicle is needed in service.  This Article 26, Section 1(a) will not be construed to require AK MEDIA to acquire further equipment beyond replacement of items already present in the garage. The COMPANY may hire irregular, part-time help for the garage mechanic(s).

The COMPANY may continue to subcontract the excavation, crane work and cement work involved in the construction of one (1) and two (2) pole sign units, provided that a minimum of two (2) regular bargaining unit employees are assigned to work in composite with the subcontractor's crews and provided further that the COMPANY continues to make every effort to train its employees to perform the single and double pole work so that the work can be taken over completely by the EMPLOYER, without subcontractor involvement.

Unusually difficult tree removals the cutting and removal of which by AK MEDIA Billposting/Construction personnel would pose a safety risk to AK MEDIA employees or third parties or threaten the property of lessors or others.

Temporary, non-bargaining unit summer help may perform brush-cutting and other minor functions as mutually agreed upon by the UNION and the COMPANY, during the period from June first (1st) to Labor Day, provided the work performed by such temporary summer hires does not result in a diminution of work opportunities for regular bargaining unit employees and provided further that each brush cutting crew shall be under the direction and supervision of a regular bargaining unit employee.  Multiple brush cutting crews assigned to the same geographic location shall be considered a single crew under the direction of a single unit employee.

## ARTICLE 27-
### BILLPOSTING ROUTE ASSIGNMENTS
### AND PRODUCTION STANDARDS

SECTION 1:   As a general principle, the EMPLOYER will seek to continue the assignment of Routes to Billposters that were in effect on July 30, 2001 during the term of this Agreement unless a Billposter is removed from his route for good reason. However, the EMPLOYER may reorganize routes for efficiency reasons when it deems necessary.  The EMPLOYER will give the UNION advance notice of such changes and discuss them with the UNION upon request.

If any Routes become open and available during the term of this Agreement, the seniority status of Billposters covered by this Agreement, subject to the arbitrable questions of ability to do work required, shall be the exclusive determining factors in regard to choice and assignment of such open and available Route(s)

When necessary to operation of the plant, the COMPANY, in its sole discretion, may temporarily assign to a Billposter location(s) on another Billposter's route or on an open and available Route, as long as such temporary assignment is not used as a device to violate the regular route assignments in an arbitrary and capricious manner or to avoid the reassignment of an open and available Route(s).

SECTION 2:   It is mutually agreed that a Billposter may be assigned more than one (1) day's work.  However, the Billposter will still be required to call into the shop each morning with his previous day's work report, and that in the case of bad weather, will be governed by the weather conditions. (Article 29)

SECTION 3:   When any question arises concerning the ability to work due to weather conditions, the Billposter shall call the shop and consult the supervisor.  In the event unfavorable weather conditions result in the day being terminated, then the Billposter agrees to make up lost production (Article 28, Section 1).  In the event unfavorable weather conditions do not exist in another part of the plant then the Billposter shall continue to perform the scheduled regular day's work.

SECTION 4:   The COMPANY will not permanently remove a Billposter from his route without sufficient cause.  However, the COMPANY may suspend a Billposter from his route and require him to work out of the shop for a period up to one (1) month.  Such suspension shall not be arbitrable so long as no more than two (2) suspensions per man occur in any contract year.  Any suspensions in excess of two (2) per year in any contract year, may be subject to the grievance and arbitration procedure.

SECTION 5: Journeyman billposters shall continue to use their best efforts to complete ten (10) operations per eight (8) hour day.  If on any anniversary year of this Agreement the COMPANY believes it is not getting the production which is bargained for (i.e., ten stands per eight hour day), the COMPANY may request a meeting with the UNION to determine if a satisfactory resolution can be reached.  Should the UNION determine that the production standard which was implemented to be unattainable, then the UNION may request a meeting with the COMPANY to determine if a satisfactory resolution can be reached. If within ten (10) working days after any such meetings no agreement has been reached, then the COMPANY or the UNION may submit the issue to arbitration pursuant to Article 18 of this Agreement.

21

If the arbitrator finds that the COMPANY is not realizing ten (10) operations per eight (8) hour day within the limitations of the last paragraph of this Article 27, Section 5, then the arbitrator shall order a time study to be conducted by a mutually agreeable independent outside party. The arbitrator shall retain jurisdiction over the matter to ensure that the agreement upon an independent outside party is not unreasonably withheld by either party. The cost of the time study shall be borne by the COMPANY.

If the time study is undertaken in accordance with the above provisions and the conductor of the time study determines that (1) the COMPANY did not in fact receive the bargained for production within the limits of the contractual restraints and, (2) the production was obtainable, then the conductor of the time study shall make whatever recommendations are necessary so that the COMPANY will receive the bargained for production during the subsequent year(s) of this Agreement and the Employees will conform with the recommendations of the time study for the remainder of this Agreement.

Notwithstanding any of the provisions of this Section, the parties mutually agree that there are factors which may occasionally prevent an employee from performing his designated number of operations.

SECTION 6:   A two (2) person billposter crew shall use their best efforts to complete sixteen (16) operations per eight (8) hour day.

SECTION 7:   Any carding operations will be negotiated by the parties when such operations are contemplated by the COMPANY.

SECTION 8:   (a)      Bulletins shall be categorized as follows:

Straight 14 x 48 (no cut outs);
14 x 48 (with cut outs); and
20 x 60.

Type 1: 14" X 48' without cut outs      Type 3: 20'X 48" with or without cut outs
Type 2: 14' X 48' with cut outs            Type 4: Odd size (*i.e.*, Brighton 20 X 60')

"Pro-pay" for the above mentioned bulletins shall be paid in accordance with Addendum "D".

SECTION 8:   (b)      The minimum crew required to perform Types 1 and/or 2 and/or 3 shall be two (2) Journeyman Billposters.

The minimum crew required to perform Type 4 shall be three (3) Journeyman Billposters.

SECTIONS 8: (c)      Maximum production shall be as follows:

1.        In a two (2) Billposter crew, any combination of Types 1 and 2:  three (3) per eight (8) hour day.

2.        In a two (2) Billposter crew, two (2) Type 3 plus two (2) operations per eight (8) day.

3.    In a three (3) Billposter crew, one (1) Type 3 plus one Type 4 per eight (8) hour day.

SECTION 8:   (d)    No ladder shall exceed twenty (20) feet in length, and twenty (20) feet or higher panels shall be worked on from swing staging, the set up and operation of which shall come under the jurisdiction of the Billposters.

## ARTICLE 28– WEEKLY GUARANTEE

SECTION 1:   The COMPANY guarantees thirty-two (32) hours pay per week at the rates specified in Addendum "A" when weather conditions have reduced the number of hours actually worked during the work week, provided, however, when the work is reduced by observances of any of the holidays specified in Article 37, such guarantee for said work week shall be twenty-four (24) hours at the rates specified in Addendum "A". In any week in which two (2) holidays (specified in Article 37) occur, the guarantee for such week shall be sixteen (16) hours at the rate specified in Addendum "A."

SECTION 2:   The unit employees agree to make up production which was lost due to inclement weather. This "make-up" shall be confined to the work week during which the inclement weather occurred and shall not exceed eight (8) hours for any unit employee. Following the cancellation of a regular work day, in accordance with the procedure set forth in this Article 28, Section 3, each unit employee who has lost time agrees to work, as directed, up to two (2) additional hours (10 hour work days) each ensuing work day and/or on Saturday, if necessary, at straight time "make-up".

SECTION 3:   There shall, however, be no Saturday "make-up" if the Saturday, the preceding Friday or the following Sunday or Monday is a paid holiday in accordance with Article 37 herein. In order to make up lost time during a work week preceding such a long holiday weekend, the employees agree to work up to four (4) additional hours (12 hour work days), if necessary, on week days at straight time make up.

SECTION 4:   Billposting employees who are assigned to work on Saturday that owe make-up work will work only the number of hours owed (with a minimum of two hours), unless they are given the option by their supervisor to work additional hours at the overtime rate.

## ARTICLE 29– WEATHER CONDITIONS

SECTION 1:   When any questions arise concerning the ability to work due to weather conditions management and the UNION shop steward at each shop shall consult on the conditions and determine whether or not the employees shall perform their ordinary duties. If on any day, it is determined that weather conditions do not permit the performance of their ordinary duties, all employees reporting to and working out of the shop, are to be paid for two (2) hours or four (4) hours depending on how long they have been held. In the event the COMPANY designee and the UNION shop steward fail to agree on such a weather condition, the question may then be taken by either to the COMPANY'S general manager or designee who shall make the final determination. In the event a bad weather determination is on any weekday, after completion of four (4) hours of outside work, the employee will be paid not less than eight (8) hours for the day. After completion of two (2) hours of outside work on a Saturday, the employees will not be paid less than four (4) hours for the day; however, notwithstanding any other provision herein to the contrary, inside hours worked on a make up Saturday will not be compensated at overtime until they exceed forty (40) hours in the work week. In

23

computing the forty (40) hours per week, all hours for which an employee receives pay shall be counted. Employees will be required to work such additional inside hours as directed by the working foreman, the Operations Manager, or his management subordinate.

SECTION 2:   In the event of a weekday "bad" weather determination a minimum of one (1) billposter, and three (3) construction employees will be kept for the day and assigned inside duties. Exclusive of the shop stewards who will be kept in on each bad day, said employees will be kept in on a rotation basis so that each employee receives equal opportunities to be kept in.

SECTION 3:   Any employee who fails to report or carry out such inside, bargaining unit duties as are assigned to him thereby relieves the COMPANY from paying him the guarantee as provided in this Article 29 and Article 28 to the extent of the hours not worked for the period in which such failure occurs. For this purpose, the work "period" is to be construed on the basis of the work week.

## ARTICLE 30 – JOB GUARANTEE

SECTION 1:   During the term of this Agreement the COMPANY guarantees to actively employ at all times a minimum of forty (40) bargaining unit/DC #35 represented employees.

It is further provided, however, that if any employee retires between August 1, 2001 and July 31, 2002, the COMPANY shall be under no obligation to immediately replace such employee even if the number of unit employees falls below 40. On August 1, 2002, however, the COMPANY will recall any employees on layoff status to replace any employees who may have retired between August 1, 2001 and July 31, 2002.

Additionally, starting August 1, 2002, the COMPANY will recall employees on layoff status on a one for one basis to replace any employee who retires after August 1, 2002, provided further that, once the recall list is exhausted and all such employees on layoff status have been given an opportunity to return to work, the COMPANY shall be under no further obligation to replace employees who leave the COMPANY even if the number of unit employees falls below 40 as a result.

SECTION 2:   For the purpose of determining the actual number of faces, a "face" shall be defined as a standard billposting unit having a copy area of approximately twenty-two feet (22" X 12'). Each "rotary", "paint", or "panaflex" unit shall count as two (2) faces regardless of the size of the unit. "Junior Panel" units (i.e., Empire) shall not be included in the calculations.

SECTION 3: Active employment shall be defined as:  (1) actively at work, which shall include an employee absent, but on a paid vacation; or (2) out of work or on a leave of absence granted by both parties to this Agreement; or (3) absent from work due to illness or injury, worker's compensation or otherwise, but for a period not to exceed one (1) year.

# ARTICLE 31– SENIORITY

SECTION 1:   There shall be three (3) separate COMPANY departments for seniority purposes under this Agreement, specifically Billposting Construction, and Garage.  The number of seniority lists relied upon for effecting changes in the size of the bargaining unit shall be three (3) separate distinctive seniority lists identified as follows:

The garage department shall have its own separate and distinct seniority list;

The billposting department shall be defined in a single list; and

The construction department shall have its own separate and distinct seniority list.

In all cases, seniority shall be by department and an employee's department "start date" shall determine the employee's seniority status.

The seniority status of all employees who on the effective date of this Agreement, have employment rights at AK MEDIA are attached hereto as Addendum "D" and by this reference made a part of this collective bargaining agreement.

SECTION 2:   An employee hired after 8/1/98 shall not acquire seniority rights and shall not have job guarantee rights pursuant to Article 30 herein until after the completion of their probationary period at which time the employee's seniority date shall date to his/her start date.

SECTION 3:   The probationary period for a newly hired employee shall be the first six (6) months of employment.  A probationary employee is not protected by the just cause discipline or discharge provisions of this Agreement, and the COMPANY may discipline or discharge a probationary employee solely as it deems necessary, and such is not grievable or arbitrable under this Agreement.

SECTION 4:   An employee's seniority status shall be considered broken for any of the following:

Absence from work without cause, without notification to the EMPLOYER for two (2) or more successive days.

Discharge for cause.

Failure to report for work within forty-eight (48) hours after being notified by registered mail or telegraph to the last address on file of the availability or work, unless said employee can give just cause for such failure.  An employee on layoff status shall be responsible for advising AK MEDIA as to his/her whereabouts so that a recall notice may be delivered.

Failure to return for reemployment within seven (7) calendar days of cessation of Workmen's Compensation benefits and certification by a competent medical doctor of the employee's ability to return to work unless the employee can give just cause for such a failure.

Absence from work for one (1) year or more for any reason other than a Worker's Compensation related injury or illness, unless the employee notifies in writing both the UNION and the COMPANY of his/her desire to remain on the "holding list" pursuant to Article 33, herein.

SECTION 5:   The EMPLOYER agrees that scheduled overtime jobs for Saturday, Sunday, holidays and night work shall be governed by seniority and assigned in rotation so that each capable employee receives equal overtime opportunities, subject to the ability to do the work required.  However, this Article 31, Section 5, will not operate to require the EMPLOYER to rotate crews on any jobs that are in progress or require an emergency assignment by seniority.  An employee who refuses a scheduled overtime assignment will be returned to the bottom of the overtime list.

SECTION 6:   The COMPANY will, after consultation with and agreement from the UNION, grant an employee an unpaid leave of absence, for the period requested, up to twelve months, provided the granting of same will not prevent the COMPANY from meeting necessary production schedules.  However, a leave of absence requested in order to accept a full-time position with the UNION, DC #35 will under no circumstances be denied.

At the termination of the leave of absence, the employee will upon application, be returned to his former position.  In the event the former position has been since abolished, then the employee shall be returned to an equivalent position if one so exists.  In each case the employee will receive the prevailing rate for the position to which he has been assigned.

Seniority shall accumulate during all leaves of absence.

## ARTICLE 32 - LOSS OF JOB

SECTION 1:   In the event of a loss of a billboard, positions may be eliminated pursuant to the Guaranteed Job provision, Article 32 herein, and in the following manner:

As positions are eliminated employees will be laid off in the department(s) with the least amount of work by first seeking voluntary and permanent retirements, then by seeking voluntary layoffs and finally by inverse order of seniority, subject to the ability to do the work required.  However, shop stewards, shop foreman and in the construction department, the assistant foreman shall be the last to be laid off.  The COMPANY agrees to use its best efforts to schedule work in such a manner so as to allow for the retention of the senior most employees.

A minimum of five (5) working days notice shall be given to an employee to be laid off.  The COMPANY may, at its option, compensate the employee five (5) days pay in lieu of the five (5) day notice.

SECTION 2:   The procedure for seeking voluntary and permanent retirements shall operate as follows:  Any employee fifty-five (55) years of age or older shall be given the option of permanently retiring.  If an employee accepts the retirement offer, the COMPANY agrees to continue to pay the employee's Health and Welfare benefits for a period of eighteen (18) months or until the employee dies or attains the age of sixty-five (65) whichever is sooner. .  The contribution rate(s) shall be in accordance with the applicable rate(s) in the collective bargaining agreement.  The COMPANY shall remit at

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
APPENDIX C  LOCAL COVER SHEET

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)  Clear Channel Outdoor, Inc.
   v. International Union of Painters and Allied Trades D.C. #35

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

DISTRICT OF MASS.

05    10380 WGY

___    I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_X_    II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

___    III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

___    IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

___    V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?                                                     YES ☐      NO ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)                      YES ☐      NO ☒
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?   YES ☐      NO ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?                                              YES ☐      NO ☒

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).                 YES ☒      NO ☐

   A.  IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?
       EASTERN DIVISION ☒      CENTRAL DIVISION ☐      WESTERN DIVISION ☐

   B.  IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
       GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?
       EASTERN DIVISION ☒      CENTRAL DIVISION ☐      WESTERN DIVISION ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  George A. Berman
ADDRESS  30 Rowes Wharf, Boston, MA 02110
TELEPHONE NO.  617-951-2100

(AppendixC.wpd - 11/27/00)

%JS 44   (Rev. 3/99)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Clear Chnnel Outdoor, Inc.

**DEFENDANTS** International Union of Painters and Allied Trades, AFL-CIO, CLC, D.C. #35

APPENDIX B  CIVIL COVER SHEET

(b) County of Residence of First Listed Plaintiff **Middlesex**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed   Suffolk
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)
Peabody & Arnold
30 Rowes Wharf
Boston, MA 02110
(617) 951-2100

Attorneys (If Known)
Feinberg, Campbell & Zack, P.C.
177 Milk Street, Suite 300
Boston, MA 02109
(617) 338-7070

05 10380 WGY

**II. BASIS OF JURISDICTION**    (Place an "X" in One Box Only)

| | |
|---|---|
| G 1  U.S. Government Plaintiff | G X  Federal Question (U.S. Government Not a Party) |
| G 2  U.S. Government Defendant | G 4  Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | G 1 | G 1 | Incorporated or Principal Place of Business In This State | G 4 | G 4 |
| Citizen of Another State | G 2 | G 2 | Incorporated and Principal Place of Business In Another State | G 5 | G 5 |
| Citizen or Subject of a Foreign Country | G 3 | G 3 | Foreign Nation | G 6 | G 6 |

**IV. NATURE OF SUIT**   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| G 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | G 610 Agriculture | G 422 Appeal 28 USC 158 | G 400 State Reapportionment |
| G 120 Marine | G 310 Airplane | G 362 Personal Injury— Med. Malpractice | G 620 Other Food & Drug | | G 410 Antitrust |
| G 130 Miller Act | G 315 Airplane Product Liability | G 365 Personal Injury— Product Liability | G 625 Drug Related Seizure of Property 21 USC | G 423 Withdrawal 28 USC 157 | G 430 Banks and Banking |
| G 140 Negotiable Instrument | G 320 Assault, Libel & Slander | G 368 Asbestos Personal Injury Product Liability | G 630 Liquor Laws | | G 450 Commerce/ICC Rates/etc. |
| G 150 Recovery of Overpayment & Enforcement of Judgement | G 330 Federal Employers' Liability | | G 640 R.R. & Truck | **PROPERTY RIGHTS** | G 460 Deportation |
| G 151 Medicare Act | G 340 Marine | **PERSONAL PROPERTY** | G 650 Airline Regs | G 820 Copyrights | G 470 Racketeer Influenced and Corrupt Organizations |
| G 152 Recovery of Defaulted Student Loans (Excl. Veterans) | G 345 Marine Product Liability | G 370 Other Fraud | G 660 Occupational Safety/Health | G 830 Patent | G 810 Selective Service |
| G 153 Recovery of Overpayment of Veteran's Benefits | G 350 Motor Vehicle | G 371 Truth in Lending | G 690 Other | G 840 Trademark | G 850 Securities/Commodities/ Exchange |
| G 160 Stockholders' Suits | G 355 Motor Vehicle Product Liability | G 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | G 875 Customer Challenge 12 USC 3410 |
| G 190 Other Contract | G 360 Other Personal Injury | G 385 Property Damage Product Liability | G 710 Fair Labor Standards Act | G 861 HIA (1395ff) | G 891 Agricultural Acts |
| G 195 Contract Product Liability | | | G X 720 Labor/Mgmt. Relations | G 862 Black Lung (923) | G 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | G 730 Labor/Mgmt.Reporting & Disclosure Act | G 863 DIWC/DIWW (405(g)) | G 893 Environmental Matters |
| G 210 Land Condemnation | G 441 Voting | G 510 Motions to Vacate Sentence | G 740 Railway Labor Act | G 864 SSID Title XVI | G 894 Energy Allocation Act |
| G 220 Foreclosure | G 442 Employment | Habeas Corpus: | | G 865 RSI (405(g)) | G 895 Freedom of Information Act |
| G 230 Rent Lease & Ejectment | G 443 Housing/ Accommodations | G 530 General | G 790 Other Labor Litigation | **FEDERAL TAX SUITS** | G 900 Appeal of Fee Determination Under Equal Access to Justice |
| G 240 Torts to Land | G 444 Welfare | G 535 Death Penalty | G 791 Empl. Ret. Inc. Security Act | G 870 Taxes (U.S. Plaintiff or Defendant) | G 950 Constitutionality of State Statutes |
| G 245 Tort Product Liability | G 440 Other Civil Rights | G 540 Mandamus & Other | | G 871 IRS—Third Party 26 USC 7609 | G 890 Other Statutory Actions |
| G 290 All Other Real Property | | G 550 Civil Rights | | | |
| | | G 555 Prison Condition | | | |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | |
|---|---|---|---|---|---|---|
| G X Original Proceeding | G 2 Removed from State Court | G 3 Remanded from Appellate Court | G 4 Reinstated or Reopened | G 5 Transferred from another district (specify) | G 6 Multidistrict Litigation | G 7 Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

29 USCA  §185 - Petition to Vacate Arbitration Award

**VII. REQUESTED IN COMPLAINT:**   G CHECK IF THIS IS A CLASS ACTION  UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    G Yes    G No X

**VIII. RELATED CASE(S) IF ANY**    (See instructions):

JUDGE                                         DOCKET NUMBER

DATE                              SIGNATURE OF ATTORNEY OF RECORD
                                  2/28/05

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

AK MEDIA/MA
(D/B/A CLEAR CHANNEL OUTDOOR)

COLLECTIVE BARGAINING AGREEMENT

WITH

DISTRICT COUNCIL #35,
INTERNATIONAL UNION
OF PAINTERS AND ALLIED TRADES,
AFL-CIO, CLC

AUGUST 1, 2001
THROUGH
JULY 31, 2005

~~EMPLOYER~~ JOINT

EXHIBIT NO. 1

TABLE OF CONTENTS

| ARTICLE | TITLE PAGE | PAGE |
|---|---|---|
| | PREAMBLE | 5 |
| 1. | RECOGNITION | 5 |
| 2. | SUCCESSORSHIP | 5 |
| 3. | UNION SECURITY | 6 |
| 4. | CHECK OFF | 6 |
| 5. | UNION LABEL | 7 |
| 6. | MANAGEMENT RIGHTS | 7 |
| 7. | PICKET LINES, STRUCK WORK SUPPORT OF PRIMARY ACTIVITY | 7 |
| 8. | WORKER'S COMPENSATION, ILLNESS | 8 |
| 9. | UNION AGENTS AND STEWARD | 9 |
| 10. | SUPREMACY | 9 |
| 11. | SAFETY | 10 |
| 12. | JURY DUTY | 11 |
| 13. | CREDIT UNION | 11 |
| 14. | FUNERAL BENEFITS | 11 |
| 15. | MILITARY SERVICE | 11 |
| 16. | NO DISCRIMINATION | 12 |
| 17. | WORK RULES, DISCIPLINE, DISCHARGE | 12 |
| 18. | GRIEVANCE AND ARBITRATION | 13 |
| 19. | LOCKOUT AND STRIKE | 14 |
| 20. | ALCOHOLISM, DRUG ABUSE | 14 |
| 21. | UNIFORMS, TOOLS, EQUIPMENT, LICENSES | 15 |
| 22. | TRAVEL | 16 |
| 23. | HOURS AND DAYS OF EMPLOYMENT | 16 |

24.        CLASSIFICATION, RATES OF PAY
           VACANT POSITIONS
                                              18

25.        APPRENTICESHIP
                                              18

26.        WORK PRESERVATION
                                              20

27.        BILLPOSTING ROUTE ASSIGNMENTS AND
           PRODUCTION STANDARDS
                                              21

28.        WEEKLY GUARANTEE
                                              23

29.        WEATHER CONDITIONS
                                              23

30.        JOB GUARANTEE
                                              24

31.        SENIORITY
                                              25

32.        LOSS OF JOB
                                              26

33.        RECALL
                                              27

34.        DUTIES
                                              27

35.        INTERCHANGEABILITY
                                              28

36.        NIGHT SHIFT
                                              28

37.        HOLIDAYS
                                              29

38.        VACATIONS AND SICK DAYS
                                              30

39.        HEALTH AND WELFARE
                                              33

40.        PENSION
                                              34

41.        L.M.C.F.
                                              35

42.        ADDENDA
                                              36

43.        SEVERABILITY
                                              36

44.        TERM REOPENING
                                              36

45.        COMPLETE AGREEMENT AND WAIVER
                                              37

3

ADDENDUM A    WAGES-CLASSIFICATIONS-FRINGES                    38

ADDENDUM B    CONSTRUCTION JOURNEYMAN EVALUATION      42

ADDENDUM C    RESPONSIBILITIES OF WORKING SHOP
              FOREMAN                                          45

ADDENDUM D    SENIORITY LISTS                                  46

ADDENDUM E    TRAINING REQUIREMENTS                            49

              EMPLOYER WORK RULES AND DISCIPLINE               51

## AK MEDIA/MA COLLECTIVE BARGAINING AGREEMENT

Entered into effective August 1, 2001 by and between the following two (2) "parties": AK MEDIA/MA (a division of the ACKERLEY Group) hereinafter referred to as the "EMPLOYER and/or "AK MEDIA", and/or the "COMPANY" and Sign and Pictorial Workers Union, District Council #35 affiliated with the International Union of Painters and Allied Trades, AFL-CIO, hereinafter referred to as the "UNION" and/or "District Council #35".

With respect to the wages, hours and other conditions of employment of the EMPLOYER'S Billposting, Construction, and Garage department employees, the parties hereby agree to as follows:

### ARTICLE 1 – RECOGNITION

SECTION 1:   AK Media recognizes DC #35 as the exclusive collective bargaining representative of all of its Construction, Garage and Billposting employees ("bargaining unit"). The COMPANY agrees that any person hired during the term of this Agreement to perform bargaining unit work within the jurisdiction of DC #35 shall also be employed in the Local 391 bargaining unit and covered by this Agreement. The COMPANY also agrees that as to such bargaining unit work any new positions created as a result of technological changes and/or the introduction of new posting, painting and/or construction methods shall be within the DC #35 bargaining unit. Excluded from the bargaining unit are managers (such as., Operations Manager) and Program Directors (e.g., Safety), supervisors, confidential employees, and all other employees not performing painting, posting, garage and/or construction work (e.g., office-clerical staff).

SECTION 2:   DC #35 shall have the exclusive right to determine by which forum any "jurisdictional disputes" involving its members shall be settled. The No Strike, No Lockout provision of this Agreement shall apply during the interim of resolution.

The EMPLOYER recognizes the jurisdictional area of Local 391 of DC #35 as New England.

### ARTICLE 2 – SUCCESSORSHIP

SECTION 1:   This Agreement shall be binding upon and inure to the benefit of present and future employees of the COMPANY, the UNION and its successors.

SECTION 2:   In the event the COMPANY'S business is, in whole or in part, sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceeding, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

## ARTICLE 3 – UNION SECURITY

SECTION 1:   The EMPLOYER agrees to operate a "Union Shop" in conformity with the National Labor Relations Act.   Therefore, all present employees who are members of the UNION on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the UNION in good standing as a condition of employment.  All present employees who are not members of the UNION and all employees who are hired hereafter shall become and remain members in good standing of the UNION as a condition of employment on and after the thirty-first (31st) day following the beginning of their employment or the thirty-first (31st) day following the effective date of this Agreement, whichever is the later.

## ARTICLE 4 – CHECKOFF

SECTION 1:   UNION DUES – The COMPANY agrees to deduct the sum of money from the wages of each bargaining unit employee as directed by the Secretary Treasurer of the UNION, for UNION dues, provided no such sums shall be deducted by the COMPANY from any employee's wage unless and until the employee has voluntarily signed an authorization form authorizing the deduction and delivered said form to the COMPANY.  Such authorization and assignment shall not be irrevocable for a period longer than one (1) year or the termination of this Agreement, whichever occurs first, at which time it may be revoked by written notice which is to be given by the employee to the COMPANY and the UNION at any time during a period of ten (10) days prior to the one (1) year anniversary of the authorization or ten (10) days prior to the expiration of this Agreement, whichever occurs first.  If no such notice is given, the authorization shall automatically be renewed for successive period of one (1) year thereafter with the same privilege of revocation at the end of such period.

The COMPANY will keep appropriate records of the dues deductions, including an accounting or data process statement of same.  The UNION shall undertake to indemnify and hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.  A copy of the deduction statement will be sent to the Financial Secretary of the UNION by the fifteenth (15th) of each month, along with a check for the amount of dues withheld during the previous month.

SECTION 2:   POLITICAL ACTION – the EMPLOYER agrees to check off from the weekly wages of covered employees twenty-five cents (\$.25) per week for Political Action Fund employee voluntary contribution.  The twenty-five cents (\$.25) per week "PAT" check off shall be only for employees who have authorized the EMPLOYER to do . so by a legal voluntary authorization form supplied by the UNION.  The UNION shall undertake to hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.

The EMPLOYER further agrees to remit by the fifteenth (15th) of each month to the address designated by the UNION party hereto the "PAT" contribution deducted in the previous month together with an accounting of same by data process report or by hand a form supplied by the UNION.

6

SECTION 3:  INDUSTRY BETTERMENT – The EMPLOYER may also deduct seventy-five cents ($.75) per week from each employee's wages who has executed a voluntary authorization form to that effect. Such deductions will be contributed to a political action fund to promote the billboard industry within the Commonwealth of Massachusetts. Such deductions and contributions will be made only in accordance with applicable State and Federal laws. . The UNION shall undertake to indemnify and hold the COMPANY harmless from all claims, demands, suits or other forms of liability in any and all forums that may arise against the COMPANY for or on account of any deduction made from the wages of such employee.

## ARTICLE 5 – UNION LABEL

SECTION 1:  AK MEDIA may instruct its DC #35 represented employees to paint and affix the "Sign/Display" Union label of Local 391 to billboards, signs, and the like, provided the COMPANY first executes the UNION's standard Union Label Agreement. The UNION has reserved shop identification number (#6) for AK MEDIA.

## ARTICLE 6 – MANAGEMENT RIGHTS

SECTION 1:  Except as specifically limited by the express provisions of this Agreement, the COMPANY retains exclusively to itself all rights to manage and operate the business, and to direct, plan and control the operation of the facilities; the right to change, alter, abolish, improve, or introduce new materials, equipment, facilities, accounting practices, and procedures in general; the right to utilize suppliers, contractors and subcontractors; the right to determine what products shall be manufactured, serviced and distributed, and to determine their design, marketing, advertising, and pricing; the right to determine the number of hours per day or number of hours per week operations shall be carried on; the right to hire, select, and determine the number of employees required; the right to assign work to such employees as determined by management; the right to reasonably establish, change, and abolish work schedules and assignments (including overtime work); the right to transfer or promote the employees; the right to demote, suspend, discharge, or otherwise discipline employees for just cause (or, in the case of probationary employees, without cause); the right to promulgate and enforce all reasonable rules relating to safety, operations, and other matters not inconsistent with the terms of this Agreement, the right to layoff employees because of loss of billboards, and otherwise to take such measures as management may determine to be necessary for the orderly, safe, and efficient conduct of the business. The COMPANY agrees that the above prerogatives will not be exercised in a discriminatory manner.

## ARTICLE 7 – PICKET LINES, STRUCK WORK, SUPPORT OF PRIMARY ACTIVITY

SECTION 1:  Notwithstanding the no strike provisions detailed in ARTICLE 19 herein, it shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action, in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful primary picket line, including the lawful primary picket line of the UNION party to this Agreement, and including any lawful primary picket lines at the EMPLOYER'S own places of business or job sites and:

it shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action, if any employee refuses to perform any services which AK MEDIA undertakes to perform for any employer or person whose employees are on strike, and which service(s), but for the strike, would be performed by the employees of the employer or person on strike; and

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the UNION party to this Agreement has a right to request its member-covered employees to withdraw whenever their EMPLOYER party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

SECTION 2:    Notwithstanding Article 7, Section 1 above, the UNION and employees covered by this Agreement shall not honor any picket line established at or around the EMPLOYER'S Stoneham, Massachusetts facility if the picket line does not involve a labor dispute with AK MEDIA.

## ARTICLE 8 – WORKER'S COMPENSATION, ILLNESS

SECTION 1:    The EMPLOYER agrees to insure all employees with Worker's Compensation Insurance. A copy of the actual worker's compensation certificate shall be furnished to the UNION. The UNION shall be advised of any change of worker's compensation carriers.

SECTION 2:    Any employee who receives minor work connected injuries and is unable to return to work as a result of such injury shall receive not less than eight (8) hours wages for the work performed on the day of such injury, provided the employee's resulting absence from work does not exceed four (4) calendar days. An employee will make his best efforts to schedule a follow-up visit with his physician during non-working hours. Should he be unable to do so, the EMPLOYER will agree to give him the necessary time off for a single follow-up visit. Abuse of this policy Section can subject an employee discipline.

SECTION 3:    Any employee suffering personal injury arising out of or in the course of his employment, shall notify the immediate supervisor as soon as possible thereafter, which barring any extraordinary circumstances, shall be before the close of the work day on which the injury occurs. Failure to do so without reasonable excuse therefore shall be cause for disciplinary action. Each employee who has a work related injury and seeks medical attention must show his/her worker's compensation medical card to the medical provider. During a recuperation period for a work related injury, the COMPANY agrees to make reasonable efforts to assign temporarily, for a period of up to four (4) weeks, any employee to inside duties, and in accordance to state law.

SECTION 4:    An employee shall notify the immediate supervisor of sickness as soon as practicable before the employee's starting time, but no later than or furnish reasonable excuse for failure to do so. It is intended that in most cases this can be accomplished within one-half (½) hour before the employee's starting time.

## ARTICLE 9 – UNION AGENTS AND STEWARDS

SECTION 1:   The Union Business Manager or designee shall be privileged to enter upon the premises of the EMPLOYER during working hours and to confer with EMPLOYER representatives and/or the employees on matters affecting the employees or conditions of this Agreement, provided such discussions with employees do not significantly or deliberately interfere with employee production, reasonable notice of intended visit to be given.

SECTION 2:   The UNION shall have the right to appoint shop stewards, each of whom shall have top seniority in his/her respective department, in accordance with the following schedule:

    20-29 employees:   one (1) steward
    30-39 employees:   two (2) stewards
    40-49 employees:   three (3) stewards
    50 or more employees: four (4) stewards.

SECTION 3:   Whenever possible, stewards shall be notified of overtime worked or to be worked by employees in their respective departments.

SECTION 4:   Shop Stewards shall at all times, have a copy of this Agreement and shall represent the UNION in the absence of the Business Representative.  Shop Stewards shall have full protection of the UNION, shall not be discriminated against for services rendered in behalf of the UNION, and shall not suffer lost wages for time spent during working hours policing the terms of this Agreement, including  time spent with the EMPLOYER or a representative of the EMPLOYER during any "Step One" grievance proceeding as outlined in this Agreement, but excluding any time spent at any formal Arbitration Hearing.

SECTION 5:   The UNION has the right to post in each shop UNION notices, newsletters and related material

SECTION 6:   The COMPANY agrees to consider a request for unpaid time off from any duly accredited Union Official who is a full time employee for the COMPANY and requires time off from regularly scheduled work in order to perform necessary work for the UNION. Management will consider such request and grant same providing the reason is valid and necessary and such time off will not significantly interfere with the operations of the plant.

SECTION 7:   In the event a shop steward resigns or is removed from the position of steward he/she will automatically resume his/her rightful place on the seniority list.

## ARTICLE 10 – SUPREMACY

SECTION 1:   The EMPLOYER agrees not to enter into any agreement or contract with employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

# ARTICLE 11 – SAFETY

SECTION 1: In the interest of promoting safety, the EMPLOYER and the UNION agree to form a "Safety Committee" composed of one (1) bargaining unit employee designated by the UNION from each major department (Construction, and Billposting), together with the EMPLOYER's Safety Director (or management designee). The Safety Committee will meet on company time at times mutually convenient, but in no event less often than once every month. The COMPANY will supply dates and notice of meetings January 1st of each year of the Agreement. The garage mechanic shall attend monthly meetings only when requested by the Safety Committee.

The Committee shall endeavor to develop plausible solutions for whatever safety problems are brought to the attention of same either by employees input or from any other source. The Safety Committee shall have full access to all EMPLOYER records concerning safety and accidents. The Business Manager or designee of the UNION shall be permitted to attend meetings of the Safety Committee.

Adequate Safety Committee meeting minutes shall be taken and maintained on EMPLOYER files.

SECTION 2: Notwithstanding Section 1 above, in accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the responsibility of the EMPLOYER as opposed to the UNION to insure the safety of its employees and compliance by them with any safety rules contained herein or established by the EMPLOYER. Nothing in this Agreement will make the UNION liable to any employee or to any other persons in the event that work related disease, sickness, death, injury, or accident occurs.

The EMPLOYER will not allege the participation of UNION Safety Committee designees as grounds for any litigation against the UNION on a subrogation theory, contribution theory or otherwise, so as to obtain a money judgment from it in connection with any work related disease, sickness, death, injury or accident.

SECTION 3: The EMPLOYER shall at all times, provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of the crew chief, the crew's tools, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the crew's employees shall not be required to work with such tools, materials and equipment under such conditions unless or until they are made safe. Irrespective, no employee shall be dismissed or otherwise disciplined for a reasonable refusal to work with unsafe tools, materials or equipment or under unsafe working conditions

If a question arises concerning the safety of any EMPLOYER owned or controlled vehicle, the garage mechanic shall make the final determination. The employees agree to cooperate insofar as making minor equipment and/or location repairs necessary to insure safe working conditions.

SECTION 4: It shall be the duties of the employees to report unsafe conditions to their supervisor who shall advise the Safety Director, who will then report to the Committee of the same and post such report in a noticeable location in the shop. Upon being made aware of an "unsafe report", the EMPLOYER may independently institute corrective measures as needed.

Pending corrective action by the EMPLOYER (as above) and/or determination by the Safety Committee, no employees shall be assigned or required to work on a panel reported as "unsafe". It shall be the responsibility of each employee to check his daily assignment(s) against the posted list of unsafe panel to insure that he has not inadvertently been assigned a reported "unsafe" panel, and to notify the Supervisor in the event of such an erroneous assignment.

## ARTICLE 12 – JURY DUTY

SECTION 1:   In the event it becomes necessary for any employee covered by this Agreement to serve as a juror or appear in court in any case for the COMPANY, the COMPANY agrees to pay all "fringes" provided in this Agreement on behalf of said employee at a rate of eight (8) hours per day and the COMPANY also agrees to pay the difference between straight time wages and any juror's or witness' compensation.

## ARTICLE 13 – CREDIT UNION

SECTION 1: The EMPLOYER agrees that during the term of this Agreement it will make a credit union available to its employees on a payroll deduction basis.

## ARTICLE 14 – FUNERAL BENEFITS

SECTION 1:   Up to three (3) working days off with pay at the applicable rate shall be paid to an employee for attending the funeral of a member of his immediate family: mother, father, current wife or husband, son, daughter, brother, sister, current mother-in-law or father-in-law.  One (1) day off with pay will be paid to an employee for attending the funeral of a grandparent or grandchild.  No employee will be denied the use of a vacation or sick day or an unpaid day off, if the employee is ineligible for a paid day off, to attend the funeral of any other relative.

## ARTICLE 15 – MILITARY SERVICE

SECTION 1:   AK MEDIA shall, upon presentation of official orders, grant time off to any employee who is a member of the National Guard or of any reserve component of the armed forces of the United States and who is called to perform short-term duty of thirty-one (31) calendar days or less.

SECTION 2:   Employees who are ordered to military duty associated with a state of emergency, annual training or extended active duty shall be granted a military leave of absence for the necessary period allowed by law.

SECTION 3:   During any calendar year, an employee on an approved military leave shall be paid the difference between the employee's regular pay and the pay received by the employee for such service, but to a maximum of fifteen (15) calendar days per year.  In order to receive payment for military leave of absence, an employee, upon returning to work must submit to the COMPANY a copy of military orders and a statement of military pay for the period for which pay is claimed.

SECTION 4:   While on military leave of absence, an employee shall be entitled to all rights and benefits as though the employee were at work.  Any employer contributions to fringe benefits shall be processed according to normal practices, meaning and intending

11

thereby that contributions to all fringe benefit funds shall be remitted on behalf of the employee on military leave on the basis of eight (8) hours per day for the maximum fifteen (15) calendar days per year.

SECTION 5: Employees shall not receive pay for time off associated with weekend military training duty.

SECTION 6: Employees who become members of any branch of the armed forces of the United States and become obligated to extended active duty shall be guaranteed re-employment rights, providing they apply for re-employment within thirty-one (31) days after their release from duty.

# ARTICLE 16 - NO DISCRIMINATION

SECTION 1: Neither the UNION, nor the EMPLOYER, shall discriminate against any employee or applicant for employment because of the employee's race, color, religion, national origin, sex, age, handicap, sexual orientation, or status as a special disabled veteran or veteran of the Vietnam Era. The use of such words as "he", "his", "himself", "man", "workman" or "steward" in this Agreement shall include a person of the female gender as well as a person of the male gender unless the Agreement clearly required a different construction.

# ARTICLE 17 - WORK RULES, DISCIPLINE, DISCHARGE

SECTION 1: The EMPLOYER shall have the right to post reasonable rules and regulations provided they are not in conflict with the terms of this Agreement.

SECTION 2: No employee shall be discharged, suspended, or disciplined without just cause.

SECTION 3: The COMPANY agrees that any employee who receives a disciplinary action will have it expunged after 18 months, provided he/she has not committed any further disciplinary offenses.

SECTION 4: During the term of this Agreement, copies of any statement(s) of oral warning(s), written reprimand(s), suspension(s), or discharge(s) issued to an employee covered by this Agreement shall be given simultaneously to the employee, with duplicate copy to the employee's shop steward. A copy shall also be sent to the Local Union office. Such statement(s) shall be signed by the Operations Manager and shall set forth the nature of same.

SECTION 5: Employees shall not be held responsible for damage caused by paint carried by wind or any other unavoidable accident while in the employ of the EMPLOYER. However, this Article 17, Section 5 will not operate as an endorsement of callous work habits which may be the subject of disciplinary action.

SECTION 6: In the event it becomes necessary to prohibit an employee from operating a COMPANY vehicle per a demand of same by EMPLOYER'S liability insurance carrier or, an employee loses his drivers license, the EMPLOYER agrees to use every reasonable effort to assign such an employee to a non-driving assignment. In the event no such assignment is available, then the EMPLOYER shall have the right to suspend such an employee for the period of prohibition and/or such loss of license

12

and until there

is an open and available position for the employee to return to. The UNION will not challenge the EMPLOYER'S right to invoke such a work-availability suspension provided the EMPLOYER was in fact unable to reassign the employee to a non-driving position after reasonable efforts to do so as above.

In the event that an employee loses his/her license or had his/her license suspended, he/she must report it immediately to his/her supervisor. Failure to do so will result in disciplinary action in accordance with the Work Rules and Discipline section of this Agreement.

## ARTICLE 18 – GRIEVANCE AND ARBITRATION

SECTION 1:  Any and all grievances and disputes shall be adjusted by the parties in the following manner:

STEP ONE:   Within five (5) working days of known occurrence of the incident giving rise to the grievance or dispute, the Union Shop Steward, Business Representative and/or Business Manager shall meet with the EMPLOYER or the EMPLOYER'S authorized representative to adjust same.  During such five (5) day period, the UNION or the COMPANY may, or may not, reduce said grievance or dispute to writing and serve notice to the opposite party.

STEP TWO:   If the grievance is not satisfactorily adjusted in Step One, then the UNION or the COMPANY shall reduce said grievance to writing within an additional ten (10) working days, fifteen (15) days from known occurrence of the incident, and forward or deliver a copy of said written grievance to the opposite party.  The Business Representative or Business Manager of the UNION and the EMPLOYER, or like representative, shall meet within the aforementioned additional ten (10) working day period to resolve the matter.

STEP THREE:   If the grievance is not satisfactorily adjusted in Step Two, then the COMPANY or the UNION may submit the matter to mediation with the Federal Mediation and Conciliation Service within an additional ten (10) working days, twenty-five (25) days from the known occurrence of the incident giving rise to the grievance.

STEP FOUR:  If the grievance is not satisfactorily adjusted in Step Three, either the COMPANY or the UNION may submit the matter to expedited arbitration within an additional ten (10) working days, thirty five (35) day from the known occurrence of the incident giving rise to the grievance. The parties agree that should the grievance be submitted to arbitration, the arbitration shall be in accordance with the rules of the American Arbitration Association.

SECTION 2:   The arbitration shall be expedited and both parties will reserve the right to present briefs to the arbitrator unless it is otherwise mutually agreed.  The arbitration will be otherwise conducted in accordance with the American Arbitration Association. The arbitrator shall not have power or authority to add to, subtract from or modify the terms of this Agreement.  The decision of the arbitrator shall be final and binding on both parties, subject only to the applicable standards for judicial review of arbitration decisions.  The cost of the Arbitration, except that incurred by either party in presenting its side of the case, shall be shared equally by both parties.  Both the EMPLOYER and

the UNION agree to waive the right to appeal the arbitrator's decision, except as otherwise provided by law.

SECTION 3: Either party may waive Step One and proceed directly to Step Two of the grievance procedure. Should the grievance not be satisfactorily adjusted either party may then proceed directly to mediation and/or directly to arbitration, as outlined in Steps Three and Four.

SECTION 4: If either party fails to abide by the terms of the arbitrator's award within twenty (20) days after receiving notice of the award, the arbitrator may reconvene the arbitration for the purpose of assessing legal penalties on either party. If the arbitrator's award must be enforced by a lawsuit, attorney's fees may be assessed.

## ARTICLE 19 - LOCKOUT AND STRIKE

SECTION 1. The grievance and arbitration procedure set forth above is the exclusive means of resolving grievances, and the procedures before appropriate governmental administrative agencies and courts are the exclusive means of resolving a dispute of any other kind between the employee (or the UNION) and the EMPLOYER. Accordingly, during the term of this Agreement there shall not be nor shall the UNION encourage or sanction, any strike (including a sympathy strike), picketing, sit-down, stay-in, slow-down, curtailment of work, restriction of production, intentional interference with operations, or boycott.

SECTION 2: During the term of this Agreement, the EMPLOYER will not institute a lockout over a dispute with the UNION as long as there is good faith compliance by the UNION with this Section; unless the EMPLOYER cannot efficiently operate due to a breach of this Section.

SECTION 3: A breach of this Section by the UNION (or employees) or by the EMPLOYER shall not be subject to the grievance and arbitration procedure of this Agreement, other than as specifically provided in this Section.

## ARTICLE 20 – ALCOHOLISM, DRUG ABUSE

SECTION 1: Alcoholism and, drug abuse and emotional illness are to be recognized by the EMPLOYER as health problems and are to be treated by the parties as any other disease, provided the employee accepts assistance. However, the EMPLOYER shall have the right to terminate an employee so afflicted who refuses to acknowledge such a health problem and accept assistance, or who has received assistance for two treatments after the effective date of this Agreement and yet continues to demonstrate signs of active alcoholism or substance abuse. Provided such a health problem significantly impairs such an employee's work performance and the UNION is satisfied that the employee was made aware of his condition and refused assistance, the UNION shall not challenge the EMPLOYER'S termination of such an employee. Any employee shall have the right to refuse to work with another employee who is under the influence of alcohol or drugs.

SECTION 2: AK MEDIA endorses the UNION'S "Brotherhood Assistance Program" and agrees to cooperate and work with the staff of "Modern Assistance Programs"; and/or any successor alcoholism/substance abuse benefit management entity contracted with by the District Council #35 Health and Welfare Fund.

14

## ARTICLE 21– UNIFORMS, TOOLS, EQUIPMENT, LICENSES

DH
CF

SECTION 1:  TOOLS – With respect to billposting and paint department employees, AK MEDIA shall continue to furnish all necessary tools and equipment for such employees to perform their respective jobs.  Garage mechanics shall receive a tool allowance of $300.00 per year for the first two (2) years, and $400.00 for the third (3rd) of this Agreement.  AK MEDIA shall furnish all construction department employees with an initial set of required hand tools on a one time basis, which tools must be replaced by and at the employee's expense if lost or broken as a result of the employee's personal negligence.  In all cases, employees will take reasonable care of all tools and equipment entrusted to them.

SECTION 2:  Employees required to perform welding and/or burning will be required to wear protective clothing supplied by the EMPLOYER.  The EMPLOYER agrees to supply all safety equipment and clothes, including gloves, as necessary and to supply rain gear and boots for yard work and/or brush cutting on inclement days.

SECTION 3:  For each employee covered by this Agreement, the EMPLOYER will during the month of September give each employee the choice of either one (1) jacket, one (1) pair of boots or one pair of coveralls, which will not exceed a maximum cost of seventy-five dollars ($75.00) per employee; on each November first (1st) of this Agreement, employees will receive their aforementioned selection and four (4) pairs of denim type jeans, two (2) company sweatshirts and five (5) company jersey type tee shirts.  On November 1 of the first year of this Agreement, the COMPANY will supply five (5) jersey type tee shirts and two (2) mock turtle necks.  The COMPANY at its discretion will determine the supplier as well as the selection of the aforementioned clothing allotments and will make every reasonable effort to insure good quality as well as American made goods.  Employees are required to wear complete AK Media uniforms and only such uniforms at all times while on the job. Any employee who fails to report to work dressed in his/her AK Media uniform will be subject to discipline in accordance with the work rules of Category A.

SECTION 4:  The EMPLOYER will pay the cost of any license renewal or certificate renewal required by the State, Federal or Local law or this Collective Bargaining Agreement. Employees will be permitted to use employer vehicles and/or equipment on COMPANY time for license examination(s).  The EMPLOYER will pay the employee the difference between his Class II license and the cost of a Class III Massachusetts Driver's License. The COMPANY will pay for the Builders License application fee, training cost and license renewal.

SECTION 5(A):     The following licenses are mandatory for all new journeyman and for all apprentices to be upgraded to journeyman:

Construction Employees – A crane operator's license coded for "Sign Hanger" from the Massachusetts Division of Public Safety; a class II Massachusetts drivers license and Welding certificate satisfactory to the COMPANY and District Council #35 Joint Apprenticeship and Training Committee.

Mechanics -- A class II Massachusetts driver's license.

SECTION 5(B):     Current employees without the licenses and/or certification required above will make continuing efforts to obtain same.

If a current construction employee fails to obtain a Class B driver's license and a crane operators' license within three (3) years from August 1, 2001 or, for new employees, within three (3) years of hire, then he/she will no longer be eligible for Journeyman status and shall have his/her pay reduced to 90% of the Journeyman's rate until said license is obtained.

SECTION 6:   No employee shall work alone on a swing stage.

SECTION 7:   Apprentices and Helpers shall be supervised by Journeymen except when performing simple tasks not requiring such supervision.

## ARTICLE 22 - TRAVEL

Section 1: Employees shall normally report to and work out of the EMPLOYER's Stoneham, Massachusetts shop.

The EMPLOYER will regulate and pay for all necessary parking fee(s) and tolls incurred by the employee during the work day with the COMPANY vehicles or from a "report to the job site" directive. The Employee shall make every effort when parking a COMPANY vehicle to do so legally. The employee shall pay for parking meters but shall be reimbursed for such expenditures. If an employee receives a parking violation, he/she shall timely submit the ticket to his/her supervisor. The COMPANY shall pay for parking tickets, provided, however, that a ticket for parking in a handicapped space, parking near a fire hydrant or other emergency vehicle areas or in cross walks shall be paid for by the employee unless otherwise approved by the Operations Manager or other COMPANY official or unless there are mitigating circumstances. Further, failure to turn in a parking ticket will result in the employee paying any late fees or fines that are incurred.

The EMPLOYER will provide adequate parking at the shop for employees' own cars. The EMPLOYER may advance anticipated toll and/or parking fee money, but normally the employees shall use their own money to pay for such expenses and subsequently submit to the EMPLOYER bona fide receipts for reimbursement. Provided the employee submits bona fide receipts, the EMPLOYER agrees to reimburse the employee for the same by no later than the regular pay day of the week following the week in which the receipts were submitted to the employee's foreman or supervisor. Notwithstanding the foregoing, an employee who has expended twenty dollars ($20) of his own money without being reimbursed for same will not be required to expend additional sums unless he is first reimbursed in full by the EMPLOYER. If the EMPLOYER fails to reimburse an employee as herein required, a late payment penalty of two dollars ($2) per day shall also apply.

SECTION 2: Any employee who is requested by the COMPANY to use his own vehicle for work-related business shall be reimbursed by the COMPANY for such use at the prevailing IRS rate.

## ARTICLE 23 - HOURS AND DAYS OF EMPLOYMENT

SECTION 1(A):        The normal work week shall be forty (40) hours (Monday through Friday) and the normal work day shall consist of eight (8) hours beginning at seven a.m. (7:00 a.m.) in the winter months and six a.m. (6:00 a.m.) in the summer months for Billposting. Garage, non-rotary crew Construction Department Employees and Rotary

crews shall work six a.m. (6:00 a.m.) to two-thirty p.m. (2:30 p.m.) all year. However, the aforementioned shall be subject to the provisions as set forth in Article 28. Employees shall be given a fifteen (15) minute, paid work break in the morning. Lunch breaks will be taken from 12:15 p.m. until 1:00 p.m. in the winter and from 11:30 p.m. until 12:15 p.m. in the summer. In lieu of a fifteen (15) minute work break with pay in the afternoon, fifteen (15) minutes of lunch break shall be with pay. In establishing the aforementioned eight (8) hour work day, it is intended to specify the normal hours of productive effort, including reasonable travel time when necessary. Employees shall report, prepared for work, at the normal starting time.

SECTION 1(B):    For garage mechanics, there may be two (2) shifts. If a second shift is required by the EMPLOYER, the second shift will be from 8:00 a.m. until 4:30 p.m.

SECTION 1(C):    By mutual consent of the Employer and the bargaining unit employees, the start (and finish) of the normal work day may be altered by plus or minus one (1) hour.

SECTION 1(D):    If the EMPLOYER wishes to alter the normal starting time of the Construction and Billposting Departments by plus or minus two (2) hours, two-thirds (2/3) of the relevant department's members voting must agree (the preceding subparagraphs (b) and (c) contemplate a normal eight (8) hours shift of straight time beginning at 6:00 a.m. or 5:00 a.m.). Not withstanding the foregoing, individual members of either or both departments may agree with the COMPANY to begin work two (2) hours early or late and for so working shall receive eight and one-half (8 ½) hours pay for an eight (8) hour shift.

SECTION 2:    All work over forty (40) hours during Monday through Saturday, and except for straight time makeup as provided by Article 28 herein, all work performed on Saturday and all work performed before or after an employee's normal shift or adjusted shift as per Article 23, Sections 1(A) and 1(D) above, shall be "overtime" and shall be paid at time and one-half (1½). Work performed on Sunday or any of the holidays recognized in Article 37 herein shall be for at double time (2X).

SECTION 3:    The EMPLOYER shall establish a regular payday not after the Friday following the close of the work week. Each employee shall receive his/her full week's wages on said payday via direct deposit or negotiable check accompanied by a statement of gross earning and deductions, which statement shall conform to State and Federal Laws; and in addition, each employee shall be reimbursed on said payday the full amount of bona fide expenses incurred during the previous work week provided said employee submits receipts for same to the EMPLOYER by the preceding Friday.

Effective with the first pay period following January 1, 2002, employees shall be paid on a biweekly basis.

SECTION 4:    After completion of twelve (12) hours of continuous work an employee shall be entitled to an overtime relief break of one-half (½) hour with pay. Wash up time shall be limited to the last ten (10) minutes before lunch and the last ten (10) minutes before the end of an employee's shift.

SECTION 5:    All employees instructed to report to the shop or on the job, by the EMPLOYER or working foreman, and who are not placed to work, shall be entitled to a minimum of two (2) hours pay, at the regular rate of wage. Such employees will be

required to work such hours.

# ARTICLE 24 – CLASSIFICATIONS, RATES OF PAY, VACANT POSITION

SECTION 1:   All employees employed in the shop on a job of the EMPLOYER shall be classified as Shop Foreman, Crew chief, journeyman construction erector, journeyman rotary man, combination journeyman (construction), journeyman billposter, billposter preparation man, helper (construction or paint department), garage mechanic, or apprentice and shall be employed in the unit covered by this Agreement.

SECTION 2:   No supervisory personnel of the COMPANY will perform any work that is under the jurisdiction of the UNION other than in cases of emergency, or where the COMPANY has made reasonable efforts to have the work performed by a UNION employee and none is available to do the work.

SECTION 3:   The rates of pay for each classification are those detailed on Attachment "A", provided that no unit employee shall suffer a reduction in wages as a result of any provision of this Agreement.  Nor shall an employee be demoted to a lower paying and/or less responsible classification (i.e., crew chief or foreman to journeyman) without just cause.

There shall continue to be separate foreman in each of the following Stoneham shops: Billposting and Construction Foreman position vacancies shall be filled in accordance with the procedure detailed in Article 24, Section 4(A) herein.

SECTION 4(A):   In the event a Foreman's or Crew chief's position becomes vacant, the position will be posted and filled from among the employees of the particular department in which the vacancy has occurred. Subject to the arbitrable question of comparative ability to do the work required, the ability of the applicants shall determine which employee shall become the new Foreman or Crew chief.  The COMPANY shall have the right to assign supervisory personnel (i.e., crew chief/foreman). However, the UNION shall have the right to grieve any such appointment.

SECTION 4(B):   Billposting and Construction department employees shall have the right to transfer to vacant, non-foreman position within their department(s) by seniority subject to the ability to do the work required.

# ARTICLE 25  APPRENTICESHIP

SECTION 1:   Apprentices shall be governed by the District Council #35 Joint Apprenticeship and Training Standards and any amendments, alterations and/or revisions adopted by authorized Trustees of the District Council #35 Joint Apprenticeship and Training Committee.  The EMPLOYER party to this Agreement agrees to continue to authorize and designate EMPLOYER representatives to serve as Trustees, in conjunction with UNION designees, of District Council #35 Joint Apprenticeship and Training Fund.

SECTION 2:   It is understood that the UNION will have jurisdiction with regard to the placement of Apprentices. It is further understood that no Apprentice will be employed by any EMPLOYER unless such Apprentice is first registered with the UNION, the State Division of Apprenticeship and Training and the Local Apprenticeship and Training Committee.  The EMPLOYER, when seeking additional Apprentices, shall request the Joint Apprenticeship and Training Committee to refer same from its list of unemployed

18

Apprentices, and, if no Apprentices are unemployed, from its list of persons who desire to be employed in the sign industry as Apprentices. If the Joint Apprenticeship and Training Committee is unable to make such a referral within forty-eight (48) hours of receipt of such a request, then the EMPLOYER may hire from any outside source and indenture the new Apprentice in the Apprentice program.

SECTION 3:    During the term of this Agreement, the EMPLOYER agrees to contribute to the District Council #35 Joint Apprenticeship and Training Committee Fund the amount in Addendum "A" under the column entitled "J.T.P.T.", for each hour or part thereof each employee covered by this Agreement receives pay.  This contribution will be remitted c/o and by check payable to the District Council #35 Apprentice Training Fund, 25 Colgate Road, Roslindale, MA 02131, or any alternate collection entity designated by District Council #35 Joint Apprenticeship and Training Committee.

SECTION 4:    The entire Apprenticeship Standards and Trust Agreement, including any amendments adopted by the Trustees of same, shall be recognized as part of this Agreement as if the EMPLOYER had actually signed same. The UNION and the COMPANY agree that the apprenticeship program shall be three (3) years for both billposters and construction employees.

SECTION 5:    Notwithstanding anything to the contrary that may be expressed or implied anywhere else in this Agreement or in the Apprenticeship Standards, it is mutually understood that upon satisfactory completion of the Apprenticeship and Training Program, such determination to be made by the Joint Apprenticeship and Training Committee, Apprentices shall be promoted to and classified as Journeymen receiving the wage scale then effective.

SECTION 6:    It is mutually agreed that a non-binding COMPANY recommendation will be requested by the Joint Apprenticeship and Training Committee when determining whether or not an Apprentice has satisfactorily completed the Apprenticeship and Training Program and should be upgraded to Journeymen and that, although non-binding, due consideration will be given to same.  It is further mutually agreed that an Apprentice's Employer will be consulted relative to method used by the Joint Apprenticeship and Training Committee, including the material on the Apprentice Final Exam, for journeyman upgrading. The COMPANY shall have the right to examine whatever J.A.T.C. records are kept concerning the school attendance and performance of Apprentices in its employ.

SECTION 7:    Apprentice Billposters may be asked to work for as long as nine (9) months with a Journeyman Billposter.  Apprentice Billposters will be subject to two (2) probationary periods of ninety (90) days each.  The first probationary period shall begin at the commencement of an Apprentice's employment and expire ninety (90) calendar days thereafter. The second (2nd) probationary period shall begin when an Apprentice has acquired sufficient skills to post billboards independently, and in no event later than nine (9) months after an Apprentice begins his employment.  Other Apprentices shall be probationary for their first (1st) one hundred eighty (180) calendar days of employment.

SECTION 9:

Apprentices shall be paid at the following percentages of the journeyman's rate of pay:

| | |
|---|---|
| 0 to 4 months | 50% |
| 4 to 8 months | 55 |
| 8 to 12 months | 60 |
| 12 to 16 months | 65 |
| 16 to 20 months | 70 |
| 20 to 24 months | 75 |
| 24 to 28 months | 80 |
| 28 to 32 months | 85 |
| 32 to 36 months | 90 |
| Journeyman | 100% |

## ARTICLE 26– WORK PRESERVATION

SECTION 1:   No work covered by this Agreement will be subcontracted or assigned to non-bargaining unit personnel except under the following specific circumstances:

(a)      Motor vehicle repair work which is beyond the capabilities of the regular garage mechanic(s); necessary to instantly correct a safety hazard or work without which a vehicle would remain unusable during a time when the vehicle is needed in service.  This Article 26, Section 1(a) will not be construed to require AK MEDIA to acquire further equipment beyond replacement of items already present in the garage. The COMPANY may hire irregular, part-time help for the garage mechanic(s).

The COMPANY may continue to subcontract the excavation, crane work and cement work involved in the construction of one (1) and two (2) pole sign units, provided that a minimum of two (2) regular bargaining unit employees are assigned to work in composite with the subcontractor's crews and provided further that the COMPANY continues to make every effort to train its employees to perform the single and double pole work so that the work can be taken over completely by the EMPLOYER, without subcontractor involvement.

Unusually difficult tree removals the cutting and removal of which by AK MEDIA Billposting/Construction personnel would pose a safety risk to AK MEDIA employees or third parties or threaten the property of lessors or others.

Temporary, non-bargaining unit summer help may perform brush-cutting and other minor functions as mutually agreed upon by the UNION and the COMPANY, during the period from June first (1st) to Labor Day, provided the work performed by such temporary summer hires does not result in a diminution of work opportunities for regular bargaining unit employees and provided further that each brush cutting crew shall be under the direction and supervision of a regular bargaining unit employee.  Multiple brush cutting crews assigned to the same geographic location shall be considered a single crew under the direction of a single unit employee.

20

## ARTICLE 27-
## BILLPOSTING ROUTE ASSIGNMENTS
## AND PRODUCTION STANDARDS

SECTION 1:   As a general principle, the EMPLOYER will seek to continue the assignment of Routes to Billposters that were in effect on July 30, 2001 during the term of this Agreement unless a Billposter is removed from his route for good reason. However, the EMPLOYER may reorganize routes for efficiency reasons when it deems necessary.  The EMPLOYER will give the UNION advance notice of such changes and discuss them with the UNION upon request.

If any Routes become open and available during the term of this Agreement, the seniority status of Billposters covered by this Agreement, subject to the arbitrable questions of ability to do work required, shall be the exclusive determining factors in regard to choice and assignment of such open and available Route(s)

When necessary to operation of the plant, the COMPANY, in its sole discretion, may temporarily assign to a Billposter location(s) on another Billposter's route or on an open and available Route, as long as such temporary assignment is not used as a device to violate the regular route assignments in an arbitrary and capricious manner or to avoid the reassignment of an open and available Route(s).

SECTION 2:   It is mutually agreed that a Billposter may be assigned more than one (1) day's work.  However, the Billposter will still be required to call into the shop each morning with his previous day's work report, and that in the case of bad weather, will be governed by the weather conditions.  (Article 29)

SECTION 3:   When any question arises concerning the ability to work due to weather conditions, the Billposter shall call the shop and consult the supervisor.  In the event unfavorable weather conditions result in the day being terminated, then the Billposter agrees to make up lost production (Article 28, Section 1).  In the event unfavorable weather conditions do not exist in another part of the plant then the Billposter shall continue to perform the scheduled regular day's work.

SECTION 4:   The COMPANY will not permanently remove a Billposter from his route without sufficient cause.  However, the COMPANY may suspend a Billposter from his route and require him to work out of the shop for a period up to one (1) month.  Such suspension shall not be arbitrable so long as no more than two (2) suspensions per man occur in any contract year.  Any suspensions in excess of two (2) per year in any contract year, may be subject to the grievance and arbitration procedure.

SECTION 5: Journeyman billposters shall continue to use their best efforts to complete ten (10) operations per eight (8) hour day.  If on any anniversary year of this Agreement the COMPANY believes it is not getting the production which is bargained for (i.e., ten stands per eight hour day), the COMPANY may request a meeting with the UNION to determine if a satisfactory resolution can be reached.  Should the UNION determine that the production standard which was implemented to be unattainable, then the UNION may request a meeting with the COMPANY to determine if a satisfactory resolution can be reached. If within ten (10) working days after any such meetings no agreement has been reached, then the COMPANY or the UNION may submit the issue to arbitration pursuant to Article 18 of this Agreement.

21

If the arbitrator finds that the COMPANY is not realizing ten (10) operations per eight (8) hour day within the limitations of the last paragraph of this Article 27, Section 5, then the arbitrator shall order a time study to be conducted by a mutually agreeable independent outside party. The arbitrator shall retain jurisdiction over the matter to ensure that the agreement upon an independent outside party is not unreasonably withheld by either party. The cost of the time study shall be borne by the COMPANY.

If the time study is undertaken in accordance with the above provisions and the conductor of the time study determines that (1) the COMPANY did not in fact receive the bargained for production within the limits of the contractual restraints and, (2) the production was obtainable, then the conductor of the time study shall make whatever recommendations are necessary so that the COMPANY will receive the bargained for production during the subsequent year(s) of this Agreement and the Employees will conform with the recommendations of the time study for the remainder of this Agreement.

Notwithstanding any of the provisions of this Section, the parties mutually agree that there are factors which may occasionally prevent an employee from performing his designated number of operations.

SECTION 6:   A two (2) person billposter crew shall use their best efforts to complete sixteen (16) operations per eight (8) hour day.

SECTION 7:   Any carding operations will be negotiated by the parties when such operations are contemplated by the COMPANY.

SECTION 8:   (a)      Bulletins shall be categorized as follows:

Straight 14 x 48 (no cut outs);
14 x 48 (with cut outs); and
20 x 60.

Type 1: 14" X 48' without cut outs      Type 3: 20'X 48" with or without cut outs
Type 2: 14' X 48' with cut outs            Type 4: Odd size (i.e., Brighton 20 X 60')

"Pro-pay" for the above mentioned bulletins shall be paid in accordance with Addendum "D".

SECTION 8:   (b)      The minimum crew required to perform Types 1 and/or 2 and/or 3 shall be two (2) Journeyman Billposters.

The minimum crew required to perform Type 4 shall be three (3) Journeyman Billposters.

SECTIONS 8: (c)      Maximum production shall be as follows:

1.        In a two (2) Billposter crew, any combination of Types 1 and 2:  three (3) per eight (8) hour day.

2.        In a two (2) Billposter crew, two (2) Type 3 plus two (2) operations per eight (8) day.

3.        In a three (3) Billposter crew, one (1) Type 3 plus one Type 4 per eight (8) hour day.

SECTION 8:   (d)     No ladder shall exceed twenty (20) feet in length, and twenty (20) feet or higher panels shall be worked on from swing staging, the set up and operation of which shall come under the jurisdiction of the Billposters.

# ARTICLE 28– WEEKLY GUARANTEE

SECTION 1:   The COMPANY guarantees thirty-two (32) hours pay per week at the rates specified in Addendum "A" when weather conditions have reduced the number of hours actually worked during the work week, provided, however, when the work is reduced by observances of any of the holidays specified in Article 37, such guarantee for said work week shall be twenty-four (24) hours at the rates specified in Addendum "A". In any week in which two (2) holidays (specified in Article 37) occur, the guarantee for such week shall be sixteen (16) hours at the rate specified in Addendum "A."

SECTION 2:   The unit employees agree to make up production which was lost due to inclement weather. This "make-up" shall be confined to the work week during which the inclement weather occurred and shall not exceed eight (8) hours for any unit employee. Following the cancellation of a regular work day, in accordance with the procedure set forth in this Article 28, Section 3, each unit employee who has lost time agrees to work, as directed, up to two (2) additional hours (10 hour work days) each ensuing work day and/or on Saturday, if necessary, at straight time "make-up".

SECTION 3:   There shall, however, be no Saturday "make-up" if the Saturday, the preceding Friday or the following Sunday or Monday is a paid holiday in accordance with Article 37 herein. In order to make up lost time during a work week preceding such a long holiday weekend, the employees agree to work up to four (4) additional hours (12 hour work days), if necessary, on week days at straight time make up.

SECTION 4:   Billposting employees who are assigned to work on Saturday that owe make-up work will work only the number of hours owed (with a minimum of two hours), unless they are given the option by their supervisor to work additional hours at the overtime rate.

# ARTICLE 29– WEATHER CONDITIONS

SECTION 1:   When any questions arise concerning the ability to work due to weather conditions management and the UNION shop steward at each shop shall consult on the conditions and determine whether or not the employees shall perform their ordinary duties. If on any day, it is determined that weather conditions do not permit the performance of their ordinary duties, all employees reporting to and working out of the shop, are to be paid for two (2) hours or four (4) hours depending on how long they have been held. In the event the COMPANY designee and the UNION shop steward fail to agree on such a weather condition, the question may then be taken by either to the COMPANY'S general manager or designee who shall make the final determination. In the event a bad weather determination is on any weekday, after completion of four (4) hours of outside work, the employee will be paid not less than eight (8) hours for the day. After completion of two (2) hours of outside work on a Saturday, the employees will not be paid less than four (4) hours for the day; however, notwithstanding any other provision herein to the contrary, inside hours worked on a make up Saturday will not be compensated at overtime until they exceed forty (40) hours in the work week. In

computing the forty (40) hours per week, all hours for which an employee receives pay shall be counted. Employees will be required to work such additional inside hours as directed by the working foreman, the Operations Manager, or his management subordinate.

SECTION 2:   In the event of a weekday "bad" weather determination a minimum of one (1) billposter, and three (3) construction employees will be kept for the day and assigned inside duties. Exclusive of the shop stewards who will be kept in on each bad day, said employees will be kept in on a rotation basis so that each employee receives equal opportunities to be kept in.

SECTION 3:   Any employee who fails to report or carry out such inside, bargaining unit duties as are assigned to him thereby relieves the COMPANY from paying him the guarantee as provided in this Article 29 and Article 28 to the extent of the hours not worked for the period in which such failure occurs. For this purpose, the work "period" is to be construed on the basis of the work week.

## ARTICLE 30– JOB GUARANTEE

SECTION 1:   During the term of this Agreement the COMPANY guarantees to actively employ at all times a minimum of forty (40) bargaining unit/DC #35 represented employees.

It is further provided, however, that if any employee retires between August 1, 2001 and July 31, 2002, the COMPANY shall be under no obligation to immediately replace such employee even if the number of unit employees falls below 40. On August 1, 2002, however, the COMPANY will recall any employees on layoff status to replace any employees who may have retired between August 1, 2001 and July 31, 2002.

Additionally, starting August 1, 2002, the COMPANY will recall employees on layoff status on a one for one basis to replace any employee who retires after August 1, 2002, provided further that, once the recall list is exhausted and all such employees on layoff status have been given an opportunity to return to work, the COMPANY shall be under no further obligation to replace employees who leave the COMPANY even if the number of unit employees falls below 40 as a result.

SECTION 2:   For the purpose of determining the actual number of faces, a "face" shall be defined as a standard billposting unit having a copy area of approximately twenty-two feet (22" X 12'). Each "rotary", "paint", or "panaflex" unit shall count as two (2) faces regardless of the size of the unit. "Junior Panel" units (i.e., Empire) shall not be included in the calculations.

SECTION 3: Active employment shall be defined as:  (1) actively at work, which shall include an employee absent, but on a paid vacation; or (2) out of work or on a leave of absence granted by both parties to this Agreement; or (3) absent from work due to illness or injury, worker's compensation or otherwise, but for a period not to exceed one (1) year.

## ARTICLE 31– SENIORITY

SECTION 1:   There shall be three (3) separate COMPANY departments for seniority purposes under this Agreement, specifically Billposting Construction, and Garage.  The number of seniority lists relied upon for effecting changes in the size of the bargaining unit shall be three (3) separate distinctive seniority lists identified as follows:

The garage department shall have its own separate and distinct seniority list;

The billposting department shall be defined in a single list; and

The construction department shall have its own separate and distinct seniority list.

In all cases, seniority shall be by department and an employee's department "start date" shall determine the employee's seniority status.

The seniority status of all employees who on the effective date of this Agreement, have employment rights at AK MEDIA are attached hereto as Addendum "D" and by this reference made a part of this collective bargaining agreement.

SECTION 2:   An employee hired after 8/1/98 shall not acquire seniority rights and shall not have job guarantee rights pursuant to Article 30 herein until after the completion of their probationary period at which time the employee's seniority date shall date to his/her start date.

SECTION 3:   The probationary period for a newly hired employee shall be the first six (6) months of employment.  A probationary employee is not protected by the just cause discipline or discharge provisions of this Agreement, and the COMPANY may discipline or discharge a probationary employee solely as it deems necessary, and such is not grievable or arbitrable under this Agreement.

SECTION 4:   An employee's seniority status shall be considered broken for any of the following:

Absence from work without cause, without notification to the EMPLOYER for two (2) or more successive days.

Discharge for cause.

Failure to report for work within forty-eight (48) hours after being notified by registered mail or telegraph to the last address on file of the availability or work, unless said employee can give just cause for such failure.  An employee on layoff status shall be responsible for advising AK MEDIA as to his/her whereabouts so that a recall notice may be delivered.

Failure to return for reemployment within seven (7) calendar days of cessation of Workmen's Compensation benefits and certification by a competent medical doctor of the employee's ability to return to work unless the employee can give just cause for such a failure.

Absence from work for one (1) year or more for any reason other than a Worker's Compensation related injury or illness, unless the employee notifies in writing both the UNION and the COMPANY of his/her desire to remain on the "holding list" pursuant to Article 33, herein.

SECTION 5:   The EMPLOYER agrees that scheduled overtime jobs for Saturday, Sunday, holidays and night work shall be governed by seniority and assigned in rotation so that each capable employee receives equal overtime opportunities, subject to the ability to do the work required.  However, this Article 31, Section 5, will not operate to require the EMPLOYER to rotate crews on any jobs that are in progress or require an emergency assignment by seniority.  An employee who refuses a scheduled overtime assignment will be returned to the bottom of the overtime list.

SECTION 6:   The COMPANY will, after consultation with and agreement from the UNION, grant an employee an unpaid leave of absence, for the period requested, up to twelve months, provided the granting of same will not prevent the COMPANY from meeting necessary production schedules.  However, a leave of absence requested in order to accept a full-time position with the UNION, DC #35 will under no circumstances be denied.

At the termination of the leave of absence, the employee will upon application, be returned to his former position.  In the event the former position has been since abolished, then the employee shall be returned to an equivalent position if one so exists.  In each case the employee will receive the prevailing rate for the position to which he has been assigned.

Seniority shall accumulate during all leaves of absence.

## ARTICLE 32 - LOSS OF JOB

SECTION 1:   In the event of a loss of a billboard, positions may be eliminated pursuant to the Guaranteed Job provision, Article 32 herein, and in the following manner:

As positions are eliminated employees will be laid off in the department(s) with the least amount of work by first seeking voluntary and permanent retirements, then by seeking voluntary layoffs and finally by inverse order of seniority, subject to the ability to do the work required.  However, shop stewards, shop foreman and in the construction department, the assistant foreman shall be the last to be laid off.  The COMPANY agrees to use its best efforts to schedule work in such a manner so as to allow for the retention of the senior most employees.

A minimum of five (5) working days notice shall be given to an employee to be laid off.  The COMPANY may, at its option, compensate the employee five (5) days pay in lieu of the five (5) day notice.

SECTION 2:   The procedure for seeking voluntary and permanent retirements shall operate as follows:  Any employee fifty-five (55) years of age or older shall be given the option of permanently retiring.  If an employee accepts the retirement offer, the COMPANY agrees to continue to pay the employee's Health and Welfare benefits for a period of eighteen (18) months or until the employee dies or attains the age of sixty-five (65) whichever is sooner. .  The contribution rate(s) shall be in accordance with the applicable rate(s) in the collective bargaining agreement.  The COMPANY shall remit at

26

one hundred fifty (150) hours for each of the eighteen (18) or less months. The month in which the employee takes his/her retirement and ceases to work for the COMPANY will not count as one of the eighteen (18) months, or less, months; and the COMPANY shall remit for that month at the actual number of hours for which the employee received pay.

Effective for employees retiring on or after September 1, 2003, the COMPANY agrees to continue to pay the employee's Health and Welfare benefits for a period of twelve (12) months or until the employee dies or attains the age of sixty-five (65) whichever is sooner.

## ARTICLE 33 – RECALL

SECTION 1: Employees whose positions are eliminated and who are as a result laid off shall be kept on a "holding list". When hiring, the COMPANY must first recall from the holding list. In the event of a recall; employees will be recalled by inverse order of layoff subject to basic ability to do the work required. An employee on layoff status or otherwise absent from work not as a result of worker's compensation related injury or illness shall, after an absence from work of one (1) year, be dropped from the "holding list", unless the employee at that time notifies, in writing, both the COMPANY and the UNION of his/her desire to continue to be retained on the "holding list". In no event, however, shall a laid off employee be kept on the holding list for more than thirty (30) months.

SECTION 2: If the "holding list" is exhausted and the COMPANY requires additional employees, AK MEDIA agrees to give preference for employment to members of Sign Display Local Union 391. The COMPANY when seeking additional employees, shall request the UNION to refer such qualified additional employees. The UNION shall refer such workers from its list of unemployed workers. The UNION shall add to such list the names of workers who desire to be employed in the industry without regard to membership in the UNION. If the UNION cannot make such a referral within two (2) working days after a request, then the COMPANY may seek employees from an outside source.

## ARTICLE 34 - DUTIES

SECTION 1: The normal and usual duties of the different departments in the UNION covered by this Agreement are as follows:

## BILLPOSTING DEPARTMENT

It shall be the duty of the Billposters to inspect poster panels; report unsafe conditions; post and scrape all poster panels and all work in connection thereto; cards and printed bulletins and sections thereof, on location and inside, to install cards on poster panels and printed bulletins, clear grounds and roofs of all scraped papers, wash moldings, cut brush and trees, clean grounds general, care for equipment, install unit and permit numbers, clean imprints and police roofs and grounds, and perform whatever minor utility jobs in and around the plant as have hitherto been performed. The COMPANY agrees to recognize the fastening of any type of adhesive backed poster and poster snipes as part of the Billposter trade.

It shall be the duty of a Billposter preparation man to prepare poster, collate papers, roll blanks and perform minor utility jobs as directed by the shop foreman or

27

management.

## CONSTRUCTION DEPARTMENT

It shall be the duty of Construction department employees to remove and install all billboard sections on location and in the shop; fabricate all cut outs and like devices; and to build, remove, repair and service all billboards, signs and like advertising devices whether owned by AK MEDIA or maintained by AK MEDIA under a service arrangement; and all work incidental thereto including the operation of all cranes, trucks, and equipment, welding, burning, blue print interpretation; and the forming, setting and pouring of all footings and foundations.

## GARAGE DEPARTMENT

The repair of all COMPANY vehicles and all work incidental thereto.

SECTION 2: It shall be the responsibility of all employees in all departments to report any unsafe working conditions immediately to the supervisor.

## ARTICLE 35 – INTERCHANGEABILITY

SECTION 1:   While employees shall normally be assigned duties within their respective departments, the COMPANY may assign any bargaining unit employees to perform any work at the COMPANY within the jurisdiction of Local 35. However, any work performed through interchangeability by the employees will not cause a layoff of any department personnel.

SECTION 2:   Garage department personnel will not normally perform work outside their respective departments except in emergency situations and/or in the case of a *de minimus* assignment.

## ARTICLE 36 - NIGHT SHIFT

SECTION 1:   The COMPANY may establish a night shift composed of up to three (3) employees to perform in shop work at the Stoneham, Massachusetts facility.  To avoid being laid off, any day shift billposter, mechanic, or construction employee may "bump" into night shift by seniority, subject to the basic ability to do the work required and the employee's willingness to do the night work.

SECTION 2:   The seniority status of night shift employees shall be the employee's "start date" in any AK MEDIA/LOCAL 391 department (*i.e.*, "plant-wide" seniority). Similarly, if the night shift is discontinued, to avoid being laid off the night shift employees may "bump" into the day shift by seniority, subject to the basic ability to do the work required.

SECTION 3:   Night shift employees hired by AK MEDIA after the date of execution of this Agreement shall be paid at a wage rate of fifty percent (50%) of the day shift construction helper's rate. Any day shift employee who "bumps" into the night shift shall continue to be paid in accordance with the day shift rates except that the hourly rate accorded such an employee shall not exceed the day shift construction helper's rate.

SECTION 4:   One (1) night shift employee shall be designated as "night foremen" and that position shall be compensated at an additional fifty cents ($.50) per hour.  Unlike

28

day shift foreman and shop stewards, night shift foreman and stewards shall not be granted "super seniority" rights.

SECTION 5:   At present this is a proposed position only and will come to be when the COMPANY decides it has a need for this position.

## ARTICLE 37 - HOLIDAYS

SECTION 1:   The following holidays, or days designated by the Commonwealth of Massachusetts are to be observed as legal holidays.

New Years' Day
Martin Luther King Day
Washington's Birthday
Patriot's Day
Memorial Day
Independence Day

Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Day after Thanksgiving
Christmas Day

SECTION 2:   Should any of the above dates fall on a Sunday, the holiday is to be observed on the following Monday. All work performed on the above-listed holidays will be paid at the rate of double time.

SECTION 3:   No work shall be performed on Labor Day, except in case of emergency involving public safety.

SECTION 4:   Each employee coming within the terms of this Agreement, shall be paid for eight (8) hours at the regular, straight time hourly rate for each of the above described holidays, which pay shall be in addition to pay received for work done on such holidays, as hereinbefore provided. Should any of the foregoing holidays occur, or be observed during the vacation period of any employee, the employee shall receive the work day immediately following his vacation period off with pay or with mutual agreement of the COMPANY and the employee, he shall be paid for eight (8) hours at the regular straight time hourly rate of pay for such holiday in addition to any vacation pay. If said holiday should occur on a Saturday the COMPANY may, at its option:

(1) observe the holiday on the preceding Friday, or the next Monday, or (2) it may pay eight (8) hours additional wages at the straight time hourly rate for such holiday, but in no event, shall such wages be considered as hours worked, for the purposes of computing overtime pay.

SECTION 5:   To be eligible for a paid holiday, an employee must work his full time schedule for the work day preceding the holiday and the work day following the holiday; or be excused from such work by the COMPANY for good and sufficient cause.



## ARTICLE 38 – VACATIONS AND SICK DAYS

SECTION 1:  Employees shall be eligible for paid, annual vacations after one year of employment. Vacation time will be accrued per biweekly payperiod according to the following schedule:

| Years Employed | Hours Accrued Per Year | Accrual Rate Per Biweekly Payperiod |
|---|---|---|
| 1 - 2 | 40 | 1.54 hrs |
| 2 –3 | 80 | 3.08 hrs |
| 3-10 | 120 | 4.62 hrs |
| 10th anniversary+ | 160 | 6.16 hrs |

SECTION 1-A:  Notwithstanding anything contained in this Article, an employee shall only be allowed to carry over forty (40) vacation hours in addition to the maximum number hours that the employee could have accrued in that year from one year to the next.  This limitation on carrying forward vacation hours shall not apply to vacation time earned through December 31, 2002.  However, any employee who has obtained the maximum number of vacation hours that the employee could have accrued in a year, plus an additional forty (40) hours, shall not accrue any vacation hours until such employee's available number of vacation hours falls below such amount.  Additionally, an employee shall lose all vacation hours in excess of the maximum number of hours an employee could have accrued that calendar year, plus an additional forty (40) hours, if the employees have not used their vacation hours by December 31, 2003.

SECTION 1-B:  Vacations shall be requested and scheduled pursuant to Section 7 of this Article.  The maximum number of weeks of paid, annual vacation each employee is entitled to shall be based on the plant-wide seniority and in accordance with the following schedule:

After one (1) year, but less than (2) years seniority:

One (1) week, forty (40) hours, at the employee's then current hourly rate;

After two (2) years, but less than three (3) years seniority:

Two (2) weeks, eighty (80) hours, at the employee's then current hourly rate;

After three (3) years, but less than ten (10) years seniority:

Three (3) weeks, one hundred twenty (120) hours, at the employee's then current hourly rate;

After (10) years seniority:

Four (4) weeks, one hundred sixty (160) hours, at the employee's then current hourly rate.

SECTION 2:   An employee's actual vacation entitlement shall also be based on accruement, as determined by the number of months worked by said employee. The following schedule shall apply:

If the employee has worked one (1) month, 1/12 of his yearly vacation.

If the employee has worked two (2) months, 2/12 of his yearly vacation.

If the employee has worked three (3) months, 3/12 of his yearly vacation.

If the employee has worked four (4) months, 4/12 of his yearly vacation.

If the employee has worked five (5) months, 5/12 of his yearly vacation.

If the employee has worked six (6) months, 6/12 of his yearly vacation.

If the employee has worked seven (7) months, 7/12 of his yearly vacation.

If the employee has worked eight (8) months, 8/12 of his yearly vacation.

If the employee has worked nine (9) months, 9/12 of his yearly vacation.

If the employee has worked ten (10) months, 10/12 of his yearly vacation.

If the employee has worked eleven (11) months, 11/12 of his yearly vacation.

If the employee has worked twelve (12) months, all of his yearly vacation.

For the purpose of vacation entitlement, an employee shall be deemed to have worked one (1) month if he has worked seventeen (17) or more days in that month. To the degree that the employee falls short in any given month, he may use extra days

accumulated in the other months. For purposes of this provision, a day worked shall be defined as any day in which an employee received pay, including a day in which an employee only received report wages.

SECTION 3:   Any employee who, during his previous accruement year, lost time from work due to a Worker's Compensation covered injury or illness, shall receive an accruement credit of up to three (3) months as a result of such injury or illness. Such credit(s) shall be applied to the accruement schedule in Article 38, Section 2 herein as if said employee had actually worked such days.

SECTION 4:   Any employee whose employment is terminated or leaves voluntarily or is disabled shall be entitled to receive compensation for all unused vacation time, which vacation time the employee would otherwise have taken during his then current anniversary year of employment, plus any time he shall have accrued during the year of termination, since his last anniversary date of employment based on the accruement schedule in Article 38, Section 2 herein, and which time, but for the termination, the employee would have used as paid vacation during his next anniversary year of employment. Every quitting employee must give the COMPANY one (1) week's written notice by delivery in hand to the COMPANY'S Operation Manager and the UNION Business Agent, or by certified mail posted ten (10) days prior to his last day of work. Provided such notice is given, a quitting employee shall receive his vacation pay entitlement pursuant to Article 38 herein on his last day of work. An employee discharged for cause shall receive his full, unused accrued vacation entitlement by no later than the regular pay day immediately following this date of discharge.

SECTION 5:   An employee entitled to three (3) or more weeks vacation shall be permitted to use any vacation days from the third (3rd) or fourth (4th) week of vacation as paid sick days, provided the EMPLOYER is notified in advance of intention to use same. Any employee entitled to vacation who is on an Family Medical Leave Act (FMLA) leave or who is unable to work for two (2) or more consecutive weeks due to bona fide illness or injury, shall be permitted to take his vacation time during such period of illness or injury.

Effective August 1, 2002, an employee shall be entitled to one (1) paid sick day per year. Effective August 1, 2003, an employee shall be entitled to two (2) paid sick days per year.

SECTION 6: All vacation requests shall be submitted to the Operations Manager, who shall review them for possible approval and scheduling subject to the COMPANY'S determination of workload needs. Vacations shall be scheduled during the normal vacation period, June first (1st) to Labor Day. Unless otherwise mutually agreed with the Operations Manager, employees shall submit vacation requests at least 30 days in advance, except that any employee who wishes to take a single vacation day shall make the request at least 48 hours in advance. Selection of such vacation time shall be based on seniority. Vacation assigned at any other time of the year shall be by mutual consent. A third (3rd) week of vacation and a fourth (4th) week shall be assigned outside the normal vacation period. Notwithstanding the other sections of this Article, and regardless of the use of each employee's anniversary date of employment for the calculation of vacation entitlement, no employee shall be permitted to take more than two (2) weeks of vacation between June first (1st) and Labor Day. Employees entitled to two or more weeks vacation shall have the option of taking individual days or up to (2)

weeks consecutive weeks vacation outside of the summer vacation period. All vacation requests are subject to the COMPANY'S review and approval based on its determination of workload needs.

If an employee gives the required thirty (30) day notice, he will receive vacation pay in advance. Pay for individual vacation days will be addressed within the pay period in which the vacation day falls.

SECTION 7:   Employees may carry over one (1) week of vacation time from year to year.

SECTION 8:   No employee will incur a net loss or gain of paid vacation time as a result of the parties 8/1/01 agreement to change the formula from an August first (1st) method or an employee anniversary date method of accruement to a per biweekly payperiod.

SECTION 9:   Employees shall be entitled to two (2) company paid sick days beginning on January 11, 2002 and on each January thereafter. Annual sick days will not be carried over to the next year.

## ARTICLE 39 – HEALTH AND WELFARE

SECTION 1:   During the term of this Agreement, the EMPLOYER agrees to contribute to the Painters District Council #35 Health and Welfare Fund the amount specified under Addendum "A" herein, for each hour employee receives pay and to make payments for parts on an hour as agreed. Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to:  Apprentices, Billposters, Preparation Men, Helpers, Trainees, Probationary employees, Journeymen, Foremen, Assistant Foremen, Crew Chiefs and Mechanics.

SECTION 2:   The EMPLOYER agrees pursuant to the rules and regulations of the said Fund to prepare and send monthly employment reports on forms supplied by the Fund, with payment in full of the amount due to the agent or collection entity designated by the Trustees of the said Fund by the fifteenth (15th) calendar day following the month of employment of an employee or employees covered by this Agreement. Unless notified to the contrary by the Trustees, checks should be made payable to the Painters District Council No. 35 Health and Welfare Fund and remitted to same at 25 Colgate Road, Roslindale, Ma 02131.

SECTION 3:   The EMPLOYER agrees to be bound by the Agreement and declaration of Trust, as amended, establishing the Painters District Council No. 35 Health and Welfare Fund and to be bound by the rules and regulations adopted by the Board of Trustees.

SECTION 4:   Recommendations by the Trustees to the UNION for removal of its members from said employer jobs or job sites can be initiated immediately and shall not be used as, nor constitute a ground or basis for any suit, claim, bill in equity, or other proceeding in law or in equity against the Trustees.

SECTION 5:   The EMPLOYER agrees that upon receipt of notice from the Trustees, or their agent by registered mail or failure to receive a report of payment, the EMPLOYER will, within ten (10) calendar days, deliver such report and payment to the Trustees or their agents, and that upon failure to do so, it may be deemed in violation of this

Agreement and the UNION shall have full right to remove its members who are in the employ of the EMPLOYER. The EMPLOYER's liability for payment under this Article shall not be subject to or covered by, and grievance or arbitration procedure of any "no strike" clause which may be set forth elsewhere in the Agreement. The EMPLOYER agrees that the withdrawal of employees by the UNION for said violation shall not be used as, nor constitute a ground or basis for any suit, claim, bill in equity, or other proceeding in law or in equity against the UNION, any of its members, agents, or employees.

SECTION 6:   Interest charged at the rate of one and one-half percent (1 ½) per month will be assessed for any delinquent contributions which are not paid in violation of this Collective Bargaining Agreement.

SECTION 7:   The UNION may, in its discretion, require that a bond be posted by delinquent employers guaranteeing future payments. The UNION agrees that upon notice to it by the Trustees, no member of the UNION will be allowed to work for any employer in default until the notice of removal of default has been received.

SECTION 8:   Notwithstanding, the per hour Health and Welfare, EMPLOYER contributions specified herein, the EMPLOYER agrees that should the Trustees determine, at any time during the term of this Agreement, that the aforementioned contribution rate is insufficient to maintain the said Fund, with agreement of the UNION the wage rates specified in Schedule A herein, shall be adjusted down and the rate of Health and Welfare contribution shall be adjusted up proportionally.  If, on the other hand, the cost of maintaining the Health and Welfare Fund is abated, the UNION shall have the authority to determine if the Health and Welfare contribution rate should be reduced and, if so, whether the savings shall be applied to wages or another benefit.

SECTION 9:   It is agreed that all EMPLOYER payroll records be made available to an auditor, appointed by the Trustees, when disputes of EMPLOYER payments or reports to any of the Funds are involved. Failure to produce adequate payroll records to an auditor within ten (10) days after notification, shall be deemed a violation of this Agreement.

SECTION 10: COLLECTION AGENCIES:   Collection and enforcement of delinquency procedures will be designated to the Fund Office on behalf of the Trustees. Payments to all funds will be made to designated authorized collecting agencies.

## ARTICLE-40- PENSION

SECTION 1:   Relative to pension, the only agreement between the parties shall be as contained in this Article 40. All Pension Fund and Annuity Plan contribution(s) shall be paid on behalf of the employee(s) to the International Brotherhood of Painters and Allied Trades Union and Industry National Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1967. The COMPANY hereby agrees to be bound by the said Agreement and Declaration of Trust, as though it had actually signed same.

SECTION 2:   The COMPANY irrevocably designates as its representatives on the Board of Trustees, such Trustees as are now serving or will in future serve as EMPLOYER Trustees, together with their successors. The COMPANY further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

SECTION 3:   All contributions shall be made at such time and in such manner as the Trustees require and the Trustees may, at any time, conduct an audit in accordance with Article V, Section 6 of the said Agreement and Declaration of Trust.

SECTION 4:   If the COMPANY fails to make contributions to the Pension Fund, within twenty (20) days after the date required by the Trustees, the UNION shall have the right to take whatever steps are necessary to secure compliance with this Agreement, and other provision hereof to the contrary notwithstanding; and the COMPANY shall be liable for all costs for collecting the payments due, together with attorney's fees and such penalties as may be assessed by the Trustees. The COMPANY'S liability for payment under this Article 40 shall not be covered by any grievance or arbitration procedure, or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

SECTION 5:  The Pension Plan and Annuity Plan adopted by the Trustees of said Pension Fund shall at all times conform with the requirements of the Internal Revenue Code so as to enable the COMPANY at all time to treat contributions to the Pension Fund as a deduction for income tax purpose.

SECTION 6:   Contributions to the aforementioned Pension Fund will be made by the COMPANY in the combined amount(s) prescribed in Addendum "A" Section 1 entitled "Pension" and "Annuity." Said combined contribution shall be allocated as entitled in Addendum A Section 1. Payment by the COMPANY as prescribed shall be made for each hour or portion thereof, for which a covered employee receives pay.  For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable. Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, Apprentices, Billposters, Preparation Men, Helpers. Trainees, Probationary Employees, Journeymen, foremen, Assistant Foremen, Pictorial Artists, Crew Chiefs and Mechanics.

## ARTICLE 41– LABOR MANAGEMENT COOPERATION FUND

SECTION 1:   (a)        Commencing with the first (1st) day of July. 1995, and for the duration of the Agreement, and any renewals or extension thereof, the EMPLOYER agrees to make payments to the Painters and Allied Trade Labor Management Cooperation Fund ("Fund") for each covered by this agreement as follows:

For each hour or portion thereof, for which an employee receives pay, the EMPLOYER shall make a contribution of two cents ($.02) to the Fund.

For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours of which contributions are payable.

Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this agreement. This includes, but is not limited to, apprentices, trainees, and probationary employees.

The EMPLOYER and UNION signatory to this Agreement agree to be bound by

DA
CF

and to the agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

SECTION 2:    The EMPLOYER hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now service, or who will in the future serve as EMPLOYER Trustees, together with their successors.

SECTION 3:    All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

SECTION 4.    If an EMPLOYER fails to make contributions to the Fund within twenty (20) days after the date required by the Trustees, the UNION shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the EMPLOYER shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees. The EMPLOYER's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE 42 – ADDENDA

Amended to this Agreement are the following Addenda:

WAGES/CLASSIFICATION/FRINGES

CONSTRUCTION JOURNEYMANS EVALUATION

SENIORITY

TRAINING REQUIREMENTS

It is understood and agreed that each addendum is part of this collective bargaining agreement.

## ARTICLE 43 – SEVERABILITY

The provisions of this Agreement shall be severable, and the illegality or invalidity of any such provision shall not affect the validity of the remainder of the Agreement, except that the "Guarantee", "Loss of Job", and "Interchangeability" 0provision, Article 30, 32 and 35 respectfully, shall be considered joined for the purpose of the "invalidity/severability" and, therefore, should any one of those specific three (3) provisions be deemed illegal the remaining two (2) provisions shall likewise be deemed invalid.8

## ARTICLE 44 – TERM/REOPENING

SECTION 1:    This Agreement shall take effect on August 1, 2001 and shall continue in full force and effect from such date to July 31, 2005, inclusive. Between the ninetieth (90th) and the sixtieth (60th) day prior to the expiration date of this Agreement, either party may give notice to the other party of desired changes, amendments or termination of this Agreement. Provided such notice is given, both parties to this Agreement agree

to meet on the expiration date, that last working day of this Agreement, and every seven (7) days thereafter, to negotiate even though a strike may exist. In the event no such notice is given, as provided herein, this Agreement shall continue in full force and effect from year to year thereafter unless and until notice as provided herein shall be given by one party to the other prior to July 31st of any subsequent year.

## ARTICLE 45 – COMPLETE AGREEMENT AND WAIVER

This Agreement superseded and cancels all prior practices and agreements, whether written or oral, unless expressly stated to the contrary herein, and together with any letters of understanding executed in writing concurrently (or after) with this Agreement constitutes the complete and entire agreement between the parties, and concluded collective bargaining (except as provided for in the grievance procedure) for its term.

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with the respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Therefore, the COMPANY and the UNION, for the life of this Agreement, voluntarily and unqualifiedly waive the right, and agree that the other shall not be obligated, to bargain collectively with the respect to any subject matter referred to or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

Executed this 21 day of ___June___, 2002

Sign and Pictorial Workers Union
District Council #35, International
Union of Painters and Allied
Trades, AFL-CIO

AK MEDIA/MA d/b/a
Clear Channel Outdoor

Signed for the UNION

Charles Fogell
Business Representative

Signed for the EMPLOYER

Drew Hoffman
Vice President/General Manager

ADDENDUM "A"

AK MEDIA
COLLECTIVE BARGAINING AGREEMENT
DISTRICT COUNCIL NO. 35
BARGAINING UNIT WAGE AND BENEFIT SCHEDULE
(NEW WAGE MULTI-YEAR SCHEDULE TO BE DRAFTED)
effective August 1, 2001 through July 31, 2002

SECTION 1:

| Classification | Wage | H & W | Pension | Annuity | L.M.C.F. | J.T.P.T |
|---|---|---|---|---|---|---|
| Billposting: | | | | | | |
| Shop Foreman | $25.99 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Journeyman | $23.84 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Prepman | $23.84 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Art Director | $27.93 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Construction: | | | | | | |
| Shop Foreman | $26.59 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Combination J-Man | $25.09 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Journeyman | $23.84 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Helper | $22.80 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Garage: | | | | | | |
| Shop Foreman | $25.99 | $3.42 | $2.75 | $.70 | $.02 | $.15 |
| Mechanic | $23.84 | $3.42 | $2.75 | $.70 | $.02 | $.15 |

APPRENTICE PER APP%
CREW CHIEF (CONST.) $1.50 PER HOUR ABOVE SCALE

D#
C#

Effective August 1, 2002 through July 31, 2003

| Classification | Wage | H & W | Pension | Annuity | L.M.C.F. | J.T.P.T. |
|---|---|---|---|---|---|---|
| Billposting: | | | | | | |
| Shop Foreman | $26.74 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Journeyman | $24.59 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Prepman | $24.59 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Art Director | $28.68 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Construction: | | | | | | |
| Shop Foreman | $27.34 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Combination J-Man | $25.84 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Journeyman | $24.59 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Helper | $23.55 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Garage: | | | | | | |
| Shop Foreman | $26.74 | $3.47 | $3.00 | $.80 | $.02 | $.15 |
| Mechanic | $24.59 | $3.47 | $3.00 | $.80 | $.02 | $.15 |

Effective August 1, 2003 through July 31, 2004

| Classification | Wage | H & W | Pension | Annuity | L.M.C.F. | J.T.P.T. |
|---|---|---|---|---|---|---|
| Billposting: | | | | | | |
| Shop Foreman | $27.64 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Journeyman | $25.49 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Prepman | $25.49 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Art Director | $29.58 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Construction: | | | | | | |
| Shop Foreman | $28.64 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Combination J-Man | $26.74 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Journeyman | $25.49 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Helper | $24.45 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Garage: | | | | | | |
| Shop Foreman | $27.64 | $3.52 | $3.25 | $.90 | $.02 | $.15 |
| Mechanic | $25.49 | $3.52 | $3.25 | $.90 | $.02 | $.15 |

Effective August 1, 2004 through July 31, 2005

| Classification | Wage | H & W | Pension | Annuity | L.M.C.F. | J.T.P.T. |
|---|---|---|---|---|---|---|
| Billposting: | | | | | | |
| Shop Foreman | $28.59 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Journeyman | $26.44 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Prepman | $26.44 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Art Director | $30.53 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Construction: | | | | | | |
| Shop Foreman | $29.19 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Combination J-Man | $27.69 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Journeyman | $26.44 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Helper | $25.40 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Garage: | | | | | | |
| Shop Foreman | $28.59 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |
| Mechanic | $26.44 | $3.57 | $3.50 | $1.00 | $.02 | $.15 |

SECTION 2: The COMPANY will not, during the term of this Agreement grant its
I.B.E.W. represented employees greater increases, wages and fringes combined than
those granted to Local 391 represented employees pursuant to Addendum "A", Section
1 above.

SECTION 3: Billposters, Construction or Garage employees hired on or after the
effective date of this Agreement will commence employment as Journeyman Billposters
(subject to Addendum "A", Section 4 herein ( or as Apprentice Billposters, Construction
or Garage employees (subject to Article 25 herein).

Furthermore, with the agreement of the UNION, the COMPANY may pay an
employee at a rate higher than called for in the above schedule.

*DH*
*CF*

## ADDENDUM B

### Construction Journeyman Evaluation

#### Section I

It is agreed that Journeyman competency shall be determined within classification, specifically as a Billboard Erector or Billboard Rotaryman and in accordance with the criteria details in this addendum section.

#### Section II

To be classified as a Construction Journeyman, each applicant must be willing and able to assume and complete the following responsibilities as well as demonstrate proficiency in the following areas.

Must be in possession of, and demonstrate safe and knowledgeable operating skills with the following licenses:

1. Class B Drivers License
2. Crane Operator License
3. Forklift Certification

Must have completed welding course offered at DC 35 and have certificate of completion.

Must have skills in all areas pertaining to layouts, in fields or in shop, whether from plot plan for blueprints. Also be able to layout all material that are relevant to the outdoor industry, which would include bulletins, tri-vision units, wall units, 30 sheet, 8 sheet, belt signs and mono-poles and also taking field measurements as they relate to said structure.

Must possess the woodworking skills pertinent to the fabrication of cutouts, bases, belt signs, etc.

Must be willing to accomplish all work assigned to you in a competent and professional manner which would include when necessary, the proper supervision of men, and when applicable, the training of men assigned to you.

Must be willing to complete daily work reports (including material usage data sheet) in accordance with joint union/management policy, and convey such reports to the Construction Foreman at the end of the day. Also must report any problems with the fly-away system to the construction foreman or supervisor by the end of the work day.

In order to promote growth within the construction department in the following areas, the company will establish a pay differential. When a construction department employee attains his/her state certification in welding, he/she will be paid at a rate of $.50 above the existing rate of a Journeyman's wage. In order to be certified by the State, the employee will need to complete a course at Wentworth Institute or comparable institution.

42



## Section III

To be classified as a rotaryperson in the construction department, an employee must: possess a Class B motor vehicle license, a forklift certification and a Crane Operator's license, and properly operate the Company's cranes; be able to read a computerized route printout for the purpose of matching the type and the right location of a sign with its ride number to install proper copy; possess the ability to secure flex copy and cut outs to existing sections; insure that the sections of the sign are properly aligned; insure that all clips are properly fastened, and in proper condition; insure that all signs have a clear and undamaged ride number and company imprint; insure that all signs are clean after being hung;

Routinely check oil, transmission fluid, radiator and windshield wipers on truck; report to immediate supervisor any maintenance or electrical problems with signs (e.g., paper flagging, imprint damaged or missing, lights damaged or not operating, letter bars of improper length, etc.); report to immediate supervisor any mechanical problems with forklift or trucks or their need for maintenance; and to insure that the trucks are left at the end of the working day and stocked with hardware, tools and all supplies necessary for the next day of work.

To be Classified as a Construction Combinationman, you must possess the following:

1. The ability to lead and take control of all men assigned to you each and everyday.

2. Must be able not only to do tasks themselves, but train men under their supervisor.

3. Must possess the following license:

> Class B Drivers License
> Crane Operators License
> Forklift Certification
> Builders License

4. Must be state certified in the following areas:

> Horizontal Welding
> Vertical Welding
> Overhead Welding
> Must be able to set gauges to burn with oxygen and acetylene torch

5. Must be able to take charge of all layouts in the field or in the shop, whether from plot plan blueprints, also lay out of all materials for the entire facet of the sign industry, including bulletins, tri-visions, 30 sheets posters, 8 sheets posters, belt signs, single poles. Also when taking measurements in the field, be capable of making simple drawings said structures.

6. Must possess the skills required in the carpenter shop such as cutouts, bases, belt signs, etc.

DH
CF

## ADDENDUM C

### RESPONSIBILITIES OF WORKING SHOP FOREMAN

To receive orders from supervisor and designate them accordingly daily.

To collect daily work sheets and materials requisitions. Making sure the Crew Chief has filled it out properly. Turning them in at the end of the day.

To assure that Crew Chief keeps their men busy until 2:20 P.M. and no one punches out prior to 2:30 P.M. without permission.

He will observe trucks returning daily to see to it that the Crew Chief instructs his men to keep trucks clean inside and out and everything in its place secured properly.

He will have a knowledge of all inventory and let the supervisor know if we are low on any material.

ADDENDUM D

SENIORITY LISTS – EFFECTIVE AUGUST 1, 2001

***BILLPOSTING DEPARTMENT***

| EMPLOYEE | DEPT. | CLASS | DATE OF HIRE |
|---|---|---|---|
| J. Inferrera | Post | Jnyman | 06-30-69 |
| H. Kimball | Post-Wor | Jnyman | 12-11-69 |
| W. Londergan | Post-Wor | Jnyman | 03-17-71 |
| G. Rodgers** | Post | Shop Foreman | 03-14-72 |
| P. Hadzipanajotis | Post | Jnyman | 02-12-73 |
| W. Towbridge | Post | Jnyman | 05-29-73 |
| E. Howard | Post | Jnyman | 05-01-76 |
| G. Cortina | Post | Jnyman | 07-07-79 |
| D. Hejinian | Post | Art Director | 03-10-80 |
| J. Hanlon | Post | Jnyman | 03-02-81 |
| J. Bohmback | Post | Jnyman | 07-06-87 |
| D. Crowley | Post | Jnyman | 05-15-89 |
| B. Lee | Post-Wor | Jnyman | 07-31-89 |
| E. Cronin | Post | Jnyman | 04-08-97 |
| P. Sheehan | Post | Jnyman | 10-13-98 |
| Dupras | Post | Jnyman | 2-24-99 |
| Moniz | Post | Jnyman | 2-24-99 |
| Vega | Post | Jnyman | 1-24-00 |
| Phin | Post | Jnyman | 4-28-00 |

*Shop Steward
**
Shop Foreman

***CONSTRUCTION DEPARTMENT***

| EMPLOYEE | DEPT. | CLASS | DATE OF HIRE |
|---|---|---|---|
| J. Defrancisco** | Const.. | Foreman | 01-19-70 |
| J. Warren  * | Const. | Jnyman | 02-18-70 |
| J. Reynolds | Const. | Jnyman | 07-18-71 |
| J. Breault | Const. | Jnyman | 05-21-79 |
| R. Fitzgerald | Const. | Jnyman | 10-09-79 |
| J. Duhaime | Const. | Comb-man | 06-02-80 |
| J. Keiedjian | Const. | Jnyman | 01-27-83 |
| R. Gay  * | Const. | Jnyman | 07-23-84 |
| A. Ventola | Const. | Jnyman | 08-08-84 |
| S. Cawlina | Const. | Jnyman | 09-04-84 |
| B. Gay | Const. | Comb-man | 09-10-84 |
| S. MacKay | Const. | Jnyman | 05-16-88 |
| J. Petrine | Const. | Jnyman | 01-09-89 |
| Fortes | Const. | Apprentice | 05-15-89 |
| Petry | Const. | Jnyman | 07-17-89 |
| R. Jones | Const. | Jnyman | 05-07-90 |
| White | Const. | Jnyman | 05-14-90 |
| Fitzgerald | Const | Helper | 01-24-94 |
| M. Gagne | Const. | Jnyman | 06-20-94 |
| M. Presutti | Const. | Jnyman. | 09-15-95 |
| Ferro | Const. | Helper | 02-24-99 |
| Sousa | Const. | Helper. | 02-24-99 |
| Thornton | Const. | Apprentice | 09-13-99 |
| Harsh | Const. | Apprentice | 11-22-99 |
| McCann | Const. | Apprentice | 07-17-00 |
| Pomerane | Constr | Apprentice | 11-27-00 |
| Williams | Const. | Helper | 01-02-01 |

DH
CP

****GARAGE DEPARTMENT**

| EMPLOYEE | DEPT. | CLASS | DATE OF HIRE |
|----------|-------|-------|--------------|
| R. Ladue | Garage | Jnyman | 03-30-98 |

## ADDENDUM E

### 1. REQUIRED COURSES

The COMPANY and the Joint Apprenticeship and Training Committee agree that the following courses will be a requirement for all UNION employees commencing August 1, 2001. The employee agrees to complete the required courses with 18 months of the signing of this Agreement. Courses shall be taken on non-work time. All new employee hired after August 1, 2001 will have 18 months from their date of hire to complete the required courses.

-- OSHA CONSTRUCTION OUTREACH COURSES (Length 10 hours)

-- SCAFFOLD USER COURSE        (length 4 hours)

Failure to complete courses within the required time will result in a hearing in front of the J.A. T.C. at which time the Committee will make a recommendation on disciplinary action.

Employees shall also take a required course in Adult CPR (Length 4 hours -- valid for one year) and recertification as required which will be held on COMPANY premises on work time.

### 2. APPRENTICESHIP PROGRAM

Both the UNION and the COMPANY agree to provide the necessary training for all new apprentices hired by AK Media. All new hires that are hired as apprentices will be required to attend school in compliance with the standards of apprenticeship. If the UNION is unable to provide the necessary training for the skills required to reach Journeyman Sign Erector status, AK Media agrees to provide its facilities and equipment for the apprenticeship program . Approval and funding will be provided by the Apprenticeship Program. It is mutually understood that upon satisfactory completion of the Apprenticeship and Training Program, such determination to be made by the Joint Apprenticeship and Training Committee, apprentices shall be promoted to and classified as Journeymen receiving the wage scale then effective.

To be classified as a Journeyman Sign Erector, each Apprentice upon completion of the required training program must demonstrate proficiency in the following areas:

Must be in possession of the following licenses:

· 1. Class B Driver's License

2. Crane Operator License

3.Forklift Certification

Must complete a welding course provided by DC 35

49

Must have skills in the following areas:

— Reading and understanding blue prints for the purpose sign layout and erection in the shop or in the field including ground, roof or wall mounted sings

— Must be able to repair or remove roof anchors

— Must be able to make minor roof repairs

— Must demonstrate woodworking skills pertinent to the fabrication of sign extensions, bases, belt signs, etc.

— Must be able to determine the amount of concrete needed to be used for footings or foundations for Beam and MonoPole construction

— Must properly fill out daily report and turn them in to the Construction Foreman or immediate supervisor

DIT
CF

## AK MEDIA - EMPLOYEE WORK RULES & DISCIPLINE

The following work rules have been promulgated to provide for a safe, orderly and efficient work atmosphere. Because rules cannot be issues to cover every conceivable work situation, the following concern only those issues that the parties have identified for mutual understanding and application. The EMPLOYER may establish other work rules as it deems necessary, provided, however, that the Union will be given prior notice of at least one week prior to the implementation of any new work rule and may discuss and negotiate the new work rule with the EMPLOYER prior to implementation. Unsatisfactory performance of work will be treated on a case by case basis.

Category A **Infractions & Rules.** Absent mitigating or aggravating circumstances which could result in no discipline or greater discipline (including review of an employee's complete disciplinary record), a violation of any of the following work rules will normally be enforced as follows:

1st offense - oral warning reduced to writing
2nd offense - written warning
3rd offense - up to a five (5) day suspension
4th offense - 30 day suspension
5th offense - discharge

1. Habitual absenteeism

2. Habitual tardiness

3. Failure to advise one's supervisor at least one-half (½) hour before the employee's starting time that he/she will be absent.

4. Use of the company telephone for a non-emergency without the permission of the shop foreman or supervisor.

5. Leaving either the Company property or the employee's job route during working hours without the permission of his/her supervisor. In this regard, each employee must call in and notify his/her supervisor if there is a problem which necessitates the employee asking for permission to go home. Employees shall not leave their route and return to the shop without discussing the matter with their supervisor first.

6. Failure to report to work wearing AK Media uniform or failure to wear only such uniform during working hours.

7. Defacing or damaging AK Media uniforms

8. Failure to use workers compensation medical card when seeing medical providers

No active employee may perform any of the work described in Article 1, Section 1 of the Collective Bargaining Agreement for another employer as an employee or independent contractor if such work is in competition with AK Media's business.

Category B  Infractions & Rules.  Absent mitigating or aggravating circumstances which could result in lesser discipline or greater discipline, violation of any of the following work rules will normally be enforced as follows:

1st offense - written warning
2nd offense - 5 day suspension
3rd offense - 30 day suspension .
4th offense - discharge

Falsification of time or work records.

Failure to report damage to company property or the property of a lessor or customer.

No employee shall intentionally damage company property, the personal property of another employee, or the property of a lessor or customer.

Employees shall not remove tools, stock, equipment, or company vehicles from the shop without permission of the supervisor unless they have a valid job-related reason.

Fighting on company property or while on the job will not be permitted.

No employee shall intentionally falsify any motor vehicle or industrial accident report.

Stealing a poster that he/she is scheduled to do or stealing a scrape.

Insubordination

Back posting

Violations of the Company's Sexual Harassment Policy subject to the terms and conditions of the collective bargaining agreement

Personal Use of Company Vehicle. When the Company in its discretion allows an employee to take a Company vehicle home, the vehicle shall only be used to go directly home and to come directly to work the next work day, unless some other use has been specifically authorized by the Operations Manager. Any other use of the vehicle shall be considered a violation of this section.

If an employee is taking prescribed drugs or other legal drugs which may impair the ability to work or otherwise create a safety issue, such employee must notify his/her supervisor upon reporting to work and the supervisor may reassign the employee to jobs consistent with employee safety.

In situations where an employee has violations in both Category A and Category B, there shall be a total four disciplinary steps prior to discharge.

Category C  Infractions & Rules. Violation of any of the following work rules will normally be enforced by  immediate discharge:

1.   Gross insubordination to striking or pushing a supervisor.

2.    The use, consumption, or possession of alcohol or illegal drugs on company premises, in company vehicles, on the job or during working hours

3.    Reporting to work under the influence of alcohol or drugs

4.    Bringing firearms onto Company premises or while on the job

5.    Failure to notify the supervisor of having a driver's license suspended or loss of license

6.    Misuse of Company vehicle. This shall include the use of Company vehicle for outside work or other misuse

### SAFETY RULES & DISCIPLINE:
### HARD HATS & SAFETY HARNESSES –

Hard Hat Violations and Safety Harness Violations (also includes being hooked up)

1st Offense    Written Warning
2nd Offense    Three (3) Day Suspension
3rd Offense    Five (5) Day Suspension
4TH Offense    Thirty (30) Day Suspension
5th Offense    Discharge

## LETTER OF AGREEMENT

If there are any emergency paint need (i.e. line changes, etc.), AK Media will utilize the former paint department employees and pay them for such work at a differential rate of 9.3% when they are engaged in such paint work, and the men shall be paid not less than 8 hours pay.

# *Clear Channel Outdoor*

# *Drug and Alcohol Control Program*

~~EMPLOYER~~  *Jo.NT*

EXHIBIT NO. *2*

# *Program Manual*

Effective April 15, 1997
Revised October, 2000
Revised February, 2002
Revised April, 2003

Developed By: ZEE Consulting & Associates

# *Clear Channel Outdoor*

## *DRUG AND ALCOHOL CONTROL PROGRAM*
### *(Also referred to as the Clear Channel Outdoor*
### *Corporate Substance Abuse Program)*

## I.    PURPOSE

The purpose of this document is to clearly state the policy of Clear Channel Outdoor regarding the use and/or abuse of drugs and alcohol by employees and contractors.

Clear Channel Outdoor recognizes that its continued success is dependent upon the physical and mental health of its employees, and the moral obligation to protect the health of their employees. These obligations include maintaining a safe, healthful and efficient working environment for all employees, contractors, and the public.    Clear Channel Outdoor recognizes its right to protect company property, equipment, and operations by preventing and, when necessary, dealing with problems commonly associated with substance abuse.

To ensure that Clear Channel Outdoor accomplishes these goals, the following policy and procedures concerning the use of and testing for alcohol and drugs will apply to Clear Channel Outdoor employees and contractors. All employees and contractors must be aware that Clear Channel Outdoor policies apply to them and they are subject to all of its provisions.

Clear Channel Outdoor maintains an Employee Assistance Program, which provides referral information to employees who wish to seek help with alcohol or drug abuse. Employees are financially responsible for their own care and treatment.

With these objectives in mind, Clear Channel Outdoor (hereafter referred to as "Company") has established the following policies and procedures.

## II.    SCOPE

**This substance abuse program is presented as a statement of the Company's current policy and may be changed or updated by the Company at any time. Nothing in these guidelines binds the company to any specific policies, procedures, actions, rules, or terms and conditions of employment.**

**These guidelines are not intended to create a contract between the Company and any employee.  Nothing contained in this policy or related procedures shall create an employment relationship, contractual right or guarantee of employment, for a fixed period of time or modify the existing at-will relationship between the Company and each of its employees.  Any employee has the right to voluntarily terminate their**

employment with the Company at any time.

This substance abuse program does not change or supersede any collective bargaining agreement between the Company and any labor union. If there is a difference between this substance abuse program and a collective bargaining agreement, the collective bargaining agreement will govern.

The Company reserves its right to terminate from employment any employee at any time with or without cause.

This policy applies to **all** final candidates with offers for employment, temporary employees, part-time employees and regular full-time employees. Each final candidate for employment agrees to comply with this policy if employed by the Company. Each employee agrees to comply with this policy by their continued employment with the Company.

In addition, this policy shall apply, as deemed appropriate by the Company, to any employee, representative or agent of vendors, suppliers, or contractors performing work or supplying products or services to the Company on Company property. Any such person determined to be engaged in a prohibited activity set forth within this policy while on Company property shall be required to leave the property and shall not be allowed to return without written permission of the Company.

This policy was implemented on **April 15, 1997, and reviewed for efficacy October, 2000, February, 2002, and April, 2003**. This policy replaces and supersedes any prior written policy pertaining to alcohol and drugs. This policy does not change the right of the Company to take action it considers appropriate in the areas addressed herein.

The Company reserves the right to modify, interpret, implement, and administer this policy at its sole discretion. The Company specifying certain grounds for disciplinary action hereunder shall not prevent the Company from imposing other appropriate discipline, as solely determined by the Company, for other reasons or in other circumstances.

**Job offers are made before pre-employment drug/alcohol testing is performed**. Any final candidate who is given an offer for a position with the Company will undergo mandatory pre-placement drug/alcohol testing. This applies to any and all positions. All job offers are conditional, based on successful completion of the mandatory drug/alcohol test. Successful completion means that initial testing or confirmation testing does not show evidence of a prohibited substance, or sample adulterant in the final candidate's system.

Applicants will be informed prior to the completion of the application process that any job offer is contingent upon full cooperation with pre-employment testing procedures and passing the pre-employment test. Those applicants not wishing to undergo drug/alcohol testing may choose to withdraw their application from consideration. Final candidates who have been extended conditional job offers who refuse to complete testing procedures will have their conditional job offers withdrawn. Final candidates with conditional job offers who fail the drug/alcohol test will have their offers withdrawn. "Fail the drug test" means that a confirmation test showed the presence of a prohibited drug (including a metabolite of the drug being tested for) or adulterant in the final candidate's system.

Prior to any drug/alcohol test, final candidates and/or current employees, **will** be required to execute appropriate documents including an authorization for the use and disclosure of the test results, a consent form, and a notice concerning nature of drug testing. Neither final candidates, nor employees, will be forced to produce urine samples in any way that is demeaning. Final candidates and employees who question a positive test result may make a written demand for a retest of the preserved portion of original sample by a laboratory of their choice, as long as the laboratory selected is certified by the Department of Health and Human Services, also known as SAMSHA. Certification, **at their own expense and said laboratory follows current Company Cut-Off levels for positive results.** Such written demand must be made within thirty (30) days. If prescription drug use or a physical disability is determined to be a problem, the applicant may submit a second medical opinion for consideration.

Any final candidate who has refused to submit to pre-employment drug/alcohol testing or one who is disqualified for employment due to a confirmed positive test will not be employed. There will be no exceptions even for otherwise well-qualified applicants or hard-to-fill positions. Disqualified applicants **MAY NOT** reapply.

## III.   DEFINITIONS

1.     **"Controlled Substances" and Drugs."** When this policy refers to "controlled substances" and/or "drugs," it means and includes all substances and/or medications that can affect one or more mental and/or physical functions (e.g., coordination, reflexes, vision, mental capacity or judgment, etc.). The words "controlled substances" and/or "drugs" includes all chemical substances or drugs listed in any controlled substances acts or regulations applicable under any federal, state or local laws. They also include prescription drugs and/or over-the-counter drugs as such drugs also may affect the employee's performance of his/her job. The term drugs and alcohol may be used interchangeably at times in this program.

2.     **"On The Job," "On Duty" and "Work/Working."** For the purpose of this policy, an employee is considered "on the job" or "on Company's premises" or "on duty" or "at work" or "working" whenever the employee is:

   • On Company property, including parking lots, at any time;

   • On Company time, even if off Company premises (including lunch, and rest periods);

   • On the property and/or at the facilities of customers, clients and/or vendors of the Company;

   • Driving or riding as a passenger in a Company vehicle or a private conveyance for which the Company reimburses expenses;

   • At a job site.

3. **"Possession."** For the purpose of this policy, "possession" includes substances, paraphernalia, or items of contraband being physically held by or found in/on a person and/or stored or deposited in areas the employee controls (e.g., inside purses, lunch boxes, personal automobiles, lockers and limited access work areas).

4. **"Safety/Environmentally/Security-Sensitive Position"** (SESSP) A position that requires an employee to perform, or is responsible for performing, duties which are directly related to the safe operation/security of a facility or piece of equipment, including a company vehicle driven in/on safety or environmentally sensitive operations and/or property, and which, if not performed properly, could result in a serious safety risk or environmental hazard to the employee, employees of the company, a facility, company property, or the general public. An employee who has the responsibility of supervising, employees that perform such duties shall be considered as occupying a "safety-sensitive position."

**Examples of Safety/Environmentally/Security Sensitive Position are those employees assigned to the use of:**

- **a company heavy motor vehicle or heavy vehicle requiring a commercial driver's license on public roads or elsewhere,**

- **machinery, power tools or other equipment**

- **who handles, uses, directs, or supervises, the use or handling or cranes, heavy equipment, forklifts, power tools, movable stages, stationary stages, scissor-lifts, jack hammers, nail-guns, pneumatic tools, caustic or toxic chemicals, and/or who works above ground**

- **mechanic / repair man for listed equipment/tools, or other substances or devices, in field work or on any job site, that possess the potential of causing injury, death, or property damage.**

5. **"Under the Influence"** shall include, but not be limited to, an employee reporting to work or working with alcohol, intoxicating beverages, illegal drugs, narcotics, or controlled substances in their system with said substance appreciably affecting the nervous system, brain, muscles or other parts of a person's body, or creating in them any perceptible abnormal mental or physical condition.

6. **"Impairment"** For the purpose of this policy, the term "impairment" shall be defined as, but not limited to, any intoxicating beverage, illegal drug, narcotic, controlled substance, or legal product that has the ability to appreciably affect the central nervous system, brain, muscles, or other parts of the body, creating a perceptible abnormal mental or physical condition.

7. **"Reasonable Suspicion"** Any facts, circumstances, physical evidence, physical signs/symptoms, or a pattern of performance/behavior that would cause a prudent person to reasonably conclude that an employee may be "under the influence" of a prohibited substance or has used a prohibited substance which appears to be affecting

their job performance.

8.    **"Fitness for Duty"** (Prohibited Materials) An individual's ability to perform an assigned job/task, free from the impairment caused by prohibited material(s). Employee's may be requested to cooperate in "fitness for duty/under the influence" exams and drug/alcohol testing under the conditions and situations described in this policy.

9.    **"Proof of Wellness"** Statement by a company approved substance abuse professional that the employee is free from conditions that would adversely affect work performance.

10.   **"Contraband Inspections"** The company may conduct unannounced inspections for illegal drugs, alcohol, firearms, weapons, or any other item classified as "contraband" by the Company, in Company facilities, property, or areas of work.

      Inspections of employees and their personal property, including personal vehicles, lockers, lunch packs/pails, etc., may be conducted when there is reasonable suspicion to believe that the employee or employees are in violation of this policy.

      Inspection of employees and their personal property may be otherwise conducted when circumstances or workplace conditions justify them.

      An employee's consent to inspection is required as a condition of employment and the employee's refusal to consent may result in disciplinary action up to and possibly including termination, even for first time refusal.

      Inspections of Company property, facilities, or work areas can be conducted at any time and do not have to be based on reasonable suspicion.

11.   **"Failed Test"** Defined as failure of both the panel screen and the confirmation test for the presence of a prohibited drug (including metabolite), alcohol, or other substance the Company deems to be unacceptable to be in the employee's system, or any other test that scientifically renders a result that indicates the presence of the items described.

12.   **"Refusal of Testing"** Defined as refusal to submit to testing or refusal to cooperate in the testing process. Refusal to cooperate in the testing process will be treated as a "failed test" resulting in retraction of offers of employment, or termination of employment.

13.   **"Reporting for Collection/Testing"** Employees are required to report for testing immediately after notification, without unnecessary delay. Once informed of the testing requirements, employees are to report to the company authorized collection facility immediately. The collection must be completed on the day of notification. The Company program administrator must approve any delay or postponement. The delay/postponement will be documented and may require the employee to produce evidence to verify the reason for being unable to report for collection/testing.

14.   **"Adulterating/Tampering with Samples"** Defined as adulterating, tampering, substituting, contaminating, destroying, or any other circumstance created with the intent to defeat, delay, or prevent the collection/testing process. It also includes tampering with the collection form, consent form, or any other written instrument used in the collection/testing process. The company reserves the right to discharge immediately any employee who is found to have tampered with or falsified a sample.

15.   **"Non-Compliance with Rehabilitation Programs"** Failure to comply with or complete a rehabilitation program as required by the "last chance agreement" when entered into between an employee and the Company.

16.   **"Voluntary Surrender"** Voluntarily is defined as: done or brought about by one's own free will, done by intention and not by accident, or not to conceal exposure/consequence. As stated in the policy "voluntary surrender" or "voluntarily coming forward" means prior to employee knowledge of a drug/alcohol test requirement. An attempt to "voluntarily surrender" after notification of a test requirement, after a specimen collection, after testing is performed, at a time when disciplinary action involving termination is being administered, etc., will be considered too late.

# IV.   PROHIBITED ACTIVITIES

1.   Narcotic, Illegal Drugs, Controlled Substances or Items of Contraband

The unlawful use, possession, manufacture, distribution, dispensation, or sale of narcotics, illegal drugs, controlled substances, synthetic or "Designer" drugs, (hereinafter referred to as "drugs"), drug paraphernalia or items of contraband, by any employee while on duty, on Company premises, in any Company vehicle, or on any job site is prohibited. The only exception shall be for properly used prescription drugs prescribed by a licensed physician as medication for use by the person possessing such substances.

2.   Misuse of Legal Drugs

The misuse of any legal drug (whether prescribed or over the counter) is prohibited. Misuse includes, but is not limited to, use or possession of any drug for which a prescription is required but for which an employee does not have a valid prescription, or use or possession of a prescribed drug in quantities greater than the amount prescribed.

An employee who either operates or is subject to operating (1) a Company motor vehicle, heavy-vehicle requiring a commercial drivers license on public roads or elsewhere, or (2) machinery, power tools or other equipment or (3) who handles, uses, directs or supervises; the use or handling of cranes, heavy equipment, forklifts, power tools, moveable stages, stationary stages, scissor-lifts, jack-hammer, nail-guns, pneumatic tools, and/or who works above ground, mechanic/repairman for above

equipment/tools; in field work or on any job site, must report to their supervisor prior to performing such work, if they are taking any prescribed drugs or over the counter medication that would or could affect the safe performance of such work.

The use of any legally obtained drug by any employee while performing Company business or while in a Company facility is prohibited to the extent that such use may affect the safety of the employee, co-workers, the general public, or the safety of the Company facility, equipment, or property. Employees are required to disclose to their supervisor anytime they report to work while taking any medication that may cause impairment (i.e. cause drowsiness, inability to safely operate machinery, etc.). An employee can continue to work while taking legal drugs/prescription medication, if Management has determined, after consulting with a healthcare professional, that the employee using the medication does not pose a threat to their own safety, the safety of fellow employees, or significantly impact the employee's job performance. Otherwise, the employee may be required to take a leave of absence or comply with other appropriate action as determined by Management. It is required that the employee's supervisor make a copy of, or electronically scan, the employee's prescription as a means of documentation.

If requested by a supervisor the employee shall be required to provide written, signed documentation from their doctor verifying that the medication is not and will not impair their ability to safely perform their job.

Any employee called to work on scheduled time off (i.e. off hours, weekends, holidays, scheduled days off, etc.), will notify the calling party and/or the on duty supervisor if a prescription drug, over-the-counter drug, alcohol, or other potentially impairing substance has been taken that would or could affect the safe performance of their job.

3.  **Alcohol or Intoxicating Beverages**

    **Unless otherwise specifically authorized**, the Company prohibits the use, possession, purchase, sale, transfer or transportation of alcoholic beverages at work, while on duty, while on the Companies' premises and/or while on Company business off the premises. To the extent not rendered illegal by any law, regulation, or ordinance, the prohibitions on alcoholic beverages may from time to time be waived by management at its sole discretion (e.g., for Company sponsored functions). However, any such waiver shall not relieve employees of their obligation to perform their allotted duties in a safe and efficient manner.

4.  **Reporting to Work or Working While Under the Influence of Alcohol, Intoxicating Beverages, Illegal Drugs, Narcotics or Controlled Substances**

    Reporting to work or working while under the influence of alcohol, intoxicating beverages, illegal drugs, narcotics or controlled substances is prohibited.

    For the purpose of this policy, the term *"under the influence"* shall include, but not be limited to, an employee reporting to work or working with alcohol, intoxicating

beverages, illegal drugs, narcotics, or controlled substances in their system with said substance appreciably affecting the nervous system, brain, muscles or other parts of a person's body, or creating in them any perceptible abnormal mental or physical condition.

Any presence of a substance that has the ability to impair an employee's abilities will be considered by the Company to be sufficient evidence of impairment and grounds for disciplinary action.

5.    **Criminal Convictions**

When required to comply with federal and/or state laws, including the requirements of the Federal Drug-Free Workplace Act of 1988 (including all D.O.T./D.O.E. Programs), all employees convicted of a criminal drug offense, occurring in the workplace, must notify the Company within five (5) days of such conviction. The Company must report the conviction within ten (10) days to the contracting or granting agency. Within 30 days, the Company must impose employee sanctions from discharge to requiring satisfactory participation in a drug abuse treatment program.

6.    **Failure to Cooperate During Searches and Investigations**

In order to accomplish the purpose of this policy, the Company reserves the right to carry out reasonable searches of individual employees and their personal effects when employees are on Company premises, in any Company vehicle, while employees are on duty, or while employees are at a job site. Personal effects of employees include, but not limited to, personal vehicles, baggage, lockers, tool boxes, and lunch pails. Searches may be initiated without prior notice and conducted at times and locations deemed appropriate by the Company. The Company also reserves the right to utilize scent trained canines and handlers who, are certified in the detection of prohibited substances, paraphernalia, packaging, and other items of contraband.

Employees may be requested to cooperate in "fitness for duty/under the influence" exams and drug/alcohol testing using bodily fluid specimens such as urine, blood, saliva and hair, under the conditions and situations outlined in this policy. Employees have the right to refuse to be searched, have personal effects searched, or to refuse to cooperate in the requested tests; however, **refusal to permit such searches or to cooperate in such lawfully permitted tests by any employee will result in termination of employment**.

# V.    DRUG AND ALCOHOL TESTING

The Company reserves the right to request bodily fluid specimens for the purpose of drug/alcohol testing. Normally a **urine specimen** is requested, but blood, saliva, or hair are other possible options at the Company's discretion in circumstances deemed appropriate. These circumstances include, but are not limited to, the following:

1. *Final Candidate Testing:* Final candidates with conditional offers of employment will be asked to submit to drug/alcohol testing, and to authorize the release of the test results to the Company. Final candidates whose test results are positive (prohibited substances present) will have conditional job offers withdrawn. Applicants who withdraw but are not disqualified from consideration may reapply three (3) months from date of withdrawal.

2. *Required Programs and Testing (Government, client, contract or other):* Whenever required by governmental laws, rules or regulations, including the U.S. Department of Transportation, Department of Defense, Department of Energy and or by contract agreement, any of which may include post accident/injury, pre-assignment, unscheduled and random drug and alcohol testing.

3. *Post-Accident Vehicle Testing:* All employees, when **operating** a Company vehicle, a Company sponsored/reimbursed vehicle, aircraft, or other Company owned or leased equipment involved in an accident, **will** be asked to submit to drug/alcohol testing. Where reasonable suspicion exists that the passenger caused, or was involved in the accident, then the passenger **will** be asked to submit to drug/alcohol testing also.

4. *Post-Accident Injury Testing:* All employees involved in an on-the-job accident (caused by "human error") where there is an injury to an employee requiring medical care by a physician **will** be asked to submit to drug/alcohol testing.

5. *Post-Accident Property Damage Testing:* All employees involved in an on-the-job accident (caused by "human") resulting in property damage or loss, **valued at $1,000.00 or more, will** be asked to submit to drug/alcohol testing.

6. *Probationary Status Testing:* Probationary employees may be asked to submit to unannounced drug/alcohol testing as terms of employment. These unannounced tests will conclude at the end of the probationary period.

7. *Random Testing:* The Company has determined that random drug screens are in the best interests of the employees, the public, and the continued well being of the Company. Random Drug Testing will be conducted on all personnel deemed safety sensitive as defined by this policy (see definitions).

   Each branch will identify safety sensitive positions and employees that fill these positions. A roster of these employees will be maintained at all times and periodically reviewed to ensure it remains current.

   Random Drug Screening will be conducted according to the following guidelines;

   The minimum number of tests (annually) will equal 50% of the covered employees. **Selection of individuals to be tested will be truly random (strictly on the basis of chance) with all affected employees having an equal probability of being selected each time.** The selection process will be done by a disinterested third party to ensure objectivity and thereby

preclude the need to defend charges of biased selection.

Random drug/alcohol testing is required of all safety sensitive employees, and in some states may allow testing of other employee groups. The Company reserves the right to test to the fullest extent allowed in each state. Refusal to cooperate with random testing is a violation of Company policy and will result in the employee's termination from employment and will be considered a positive test.

Employees are to be notified of their selection for a random test within two weeks of notification to the company by the third party provider that provides the selection service. Should this period of time exceed two weeks, the employee's name shall be returned to the third party provider and a new name will be provided.

The only acceptable reasons an employee's name is to be returned to the third party provider are:

- Medical Leave
- Vacation
- Extended Jury Duty
- Any other reasonable situation causing the employee to be absent from work for an extended period of time

Employees being tested under the random testing requirements will not be excluded from performing their normal duties pending the outcome of the test results. If the test results are negative, no further action will be taken.

Random testing of employees will be conducted at a frequency determined by the Company. The Company reserves the right to increase or decrease the frequency of testing at any time, without notice.

8.  *Unannounced Group or Area Testing*: The Company **may randomly** and/or **periodically**, select a work group, classification, or area for testing. **Everyone** in the selected work group, classification or area will be tested. The Program Administrator and Management will determine selection of the work group, classification or area.

9.  *Unannounced/Unscheduled Testing:* Unannounced/unscheduled drug/alcohol testing may be conducted on any safety sensitive employee, and in some states any employee. The Company reserves the right to test to the fullest extent allowed in each state. Refusal to cooperate with random testing is a violation of Company policy and will result in the employee's termination from employment and will be considered a positive test.

10. *Reasonable Suspicion Testing:* The Company will further require employees to submit to drug/alcohol testing when it determines, in its sole discretion that reasonable suspicion, other than the above conditions, exists that an employee or employees are engaged in activities prohibited by this policy.

*REASONABLE SUSPICION* shall mean: Facts, circumstances, physical evidence, physical signs/symptoms, or a pattern of performance and/or behavior that would

cause a prudent person to reasonably conclude that an employee may be "under the influence" of a prohibited substance or has used a prohibited substance which is, or appears to be, affecting their job performance.

Each and every situation will be considered individually to determine if REASONABLE SUSPICION, for the purpose of drug testing, does in fact exist. Reasonable Suspicion includes, but not limited to:

a)    Reports of an employee creating unsafe working conditions as a result of possible drug or alcohol use on Company premises or prior to reporting to work.

b)    Observable, objective signs of an employee having used a prohibited substance, which may include but are not limited to, the following; unsteady gait, slurred speech, odor of alcohol, abnormal eye findings (reddish eyes, watery eyes, dilated or constricted pupils, heavy or overly alert eyes, swollen eyelids), skin lesions, unreal self-perception, paranoia, confusion, time distortion, rapid speech and/or movement, mood and/or energy swings.

c)    High individual accident experience, excessive absenteeism, observed erratic behavior or impairment, and/or deteriorating job performance as determined by the Company.

d)    An on-the-job accident or "near miss" which is unexplained and having suspicious circumstances, or where there was significant property damage, or the potential for significant property damage or serious personal injury, as determined by the Company.

e)    A determination during the course of a "fitness for duty/under the influence" exam that there is reasonable suspicion to believe that an employee is affected by the use of alcohol/drugs. A "fitness for duty" test shall consist of observation and/or measurement of physiological responses and motor skills of an employee by trained personnel.

11.  *Post-Treatment Testing:*  Any individual with an alcohol or drug abuse problem who *voluntarily* comes forward *before* a disciplinary problem occurs, or notification of a testing situation, and who thereafter cooperates with the Company for treatment and rehabilitation will NOT be subject to disciplinary action for doing so. However, creating a threat to safety by failure to satisfactorily complete/successfully participate in treatment, or withdrawal from treatment before completion, will result in disciplinary action up to and including termination.

a)    Once an individual has successfully completed a treatment program, they will participate in a drug/alcohol-testing program monitored by the Company. These and other conditions will be provided to the employee in written form, (see attached LETTER OF AGREEMENT) and the employee will be required to sign this agreement as NEW TERMS OF CONTINUED EMPLOYMENT.

b)    Prior to the employee returning to full duty, they will provide (at the lab/facility of the Company's choice) at least one drug/alcohol test that reveals no detectable amount of a substance prohibited by this policy.

12.    *Return to Duty Testing:* Any employee returning to work after an extended absence may be required to submit to a fitness for duty evaluation and drug/alcohol testing before being allowed to begin working.

# VI.    EMPLOYEE ASSISTANCE PROGRAM (EAP)

COMPONENTS:

1.    Any employee who comes forward on a voluntary basis, prior to notification of testing and/or before disciplinary action is to be taken, will receive reasonable accommodation including but not limited to unpaid leave, for treatment of a drug/alcohol related problem. The Company does not pay for cost of treatment other than that which is available through the Company's health insurance plan.

2.    The Company will make available to all employees contact information regarding drug/alcohol education and information for self-referral for assistance and/or treatment.

3.    The Company will provide programs and information to all employees regarding drug and alcohol abuse, use, health risks and safety risks attached to such activity. Programs will be directed at the workplace, community, and the home.

4.    The Company will maintain a "Post Treatment" testing program to protect the recovering employee, their fellow employees, the public, and customers. These types of follow-up treatment programs have proven successful for increasing recovery for many patients.

5.    The Company also reserves the right to modify the EAP program as it deems necessary.

6.    **Financial responsibility for participation in treatment programs is the employee's.**

# VII.    DRUG AND ALCOHOL TESTING GUIDELINES

1.    Samples for testing shall be collected under sanitary conditions and in a manner reasonably calculated to prevent substitutions or interference with the collection or testing of reliable samples.

2.    The individual being tested will be given the opportunity to provide information that they consider relevant to the test. For example: identification of prescription or nonprescription drugs, which the individual may be currently using or has recently

taken, or other relevant medical information.

3.    The Company shall pay all costs of tests requested by the Company.

4.    All specimens collected will be properly sealed to prevent tampering and, an appropriate chain of custody will be maintained from point of collection to the testing laboratory and within the testing laboratory.

5.    An appropriately certified laboratory utilizing established laboratory procedures required by state and federal laws will perform all tests.

6.    The testing laboratory using an alternate, more sensitive method of testing, will confirm all "positive" laboratory results obtained on initial screen.

7.    After a sample is shown to be positive for a specific substance (or its metabolite) and the presence of the substance (or its metabolite) has been confirmed by an alternate method, the remaining sample, if any, will be stored by the laboratory for a period of not less than one (1) year.

8.    Information pertaining to test results will be treated as confidential, and only released by the laboratory to designated representatives of the Company. The Company will also treat test results as confidential, and results will be released within the Company on a strict "need to know" basis and **WILL NOT** be included in the employee's personnel file.

9.    All specimens will be properly sealed to prevent tampering and an appropriate chain of custody will be maintained from point of collection to the testing facility, and remain intact while being processed during the testing process. The donor should not allow their specimen to be out of their presence until it has been sealed, labeled, initialed, and all paperwork completed.

10.   Individuals testing positive will be given the opportunity to explain the positive test result and provide information that might be relevant to the test result. Local Management will then have the responsibility to confer with the testing facility to determine the possibility of the positive test resulting from the information provided by the employee. Final decisions will be the result of conference with the Program Administrator.

11.   Specimen testing conducted in accordance with this policy will be performed to the following test parameters.

## Test Parameters

| Substance | Pre-Screen | Confirmation |
|---|---|---|
| **Amphetamine** | 300 ng/ml | 260 ng/ml |
| Amphetamine | | |
| Methamphetamine | | |
| MDMA/MDA (ecstasy) | 500 ng/ml | 300 ng/ml |
| **Barbituate** | 300 ng/ml | 300 ng/ml |
| Amobarbital | | |
| Butalbarbital | | |
| Bualbital | | |
| Pentobarbital | | |
| Phenobarbital | | |
| Secobarbital | | |
| **Benzodiazepines** | 300 ng/ml | 300 ng/ml |
| **Cannabinoids** | 25 ng/ml | 10 ng/ml |
| **Cocaine** | 300 ng/ml | 150 ng/ml |
| Benzoylecgonine | | |
| **Opiates** | 300 ng/ml | 260 ng/ml |
| Codeine/Morphine | | |
| Heroin as Morphine | | |
| Hydrocodone/Hydromorphone | | 300 ng/ml |
| **Methadone** | 300 ng/ml | 300 ng/ml |
| **Methaqualone** | 300 ng/ml | 300 ng/ml |
| **Phencyclidine** | 25 ng/ml | 25 ng/ml |
| **Propoxyphene** | 300 ng/ml | 300 ng/ml |
| Norpropoxyphene | | |
| **Ethanol** | 0.05 % | |

# VIII. COMMUNICATION AND TRAINING

1.  Every employee will be given a copy of this policy and of any changes or revisions that occur in the future.

2.  Clear Channel Outdoor will provide instruction concerning the dangers associated with drug and alcohol use/abuse.

3.  Supervisory personnel will be given training and education concerning drug and alcohol use/abuse, recognizing its symptoms, and handling situations involving use and abuse appropriately.

4.  Additional training and information will be provided whenever deemed desirable or necessary by Clear Channel Outdoor.

5.  **This substance abuse program is presented as a statement of the Company's current policy and may be changed or updated by the Company at any time. Nothing in these guidelines binds the company to any specific policies, procedures, actions, rules, or terms and conditions of employment.**

    **These guidelines are not intended to create a contract between the Company and any employee. Nothing contained in this policy or related procedures shall create an employment relationship, contractual right, or guarantee of employment, for a fixed period of time or modify the existing at-will relationship between the Company and each of its employees. Any employee has the right to voluntarily terminate their employment with the Company at any time.**

    **This substance abuse program does not change or supersede any collective bargaining agreement between the company and any labor union. If there is a difference between this substance abuse program and a collective bargaining agreement, the collective bargaining agreement will govern.**

    **The Company reserves its right to terminate from employment any employee at any time with or without cause.**

## IX.  DISCIPLINARY ACTION

1.  Any employee determined by Clear Channel Outdoor to have engaged in any of the prohibited activities set forth in this policy, without an explanation satisfactory to the Company, will be subject to disciplinary action up to and including termination from employment.

2.  Should a prohibited substance (including a metabolite for one of the drugs tested for) be detected, this policy will be deemed to have been violated and the company reserves the right to discipline the employee, up to and including immediate termination, irrespective of when or where the prohibited substance entered the employee's system.

I have read and understand Clear Channel Outdoor's, Drug, Alcohol, and Control Program and I agree to be bound by its requirements:

Employee (printed) Name:_____

Employee Signature:_____    Date:_____

Company (name printed) Representative:_____

Company Representative Title:_____

Company Representative Signature:_____    Date:_____

(Note: Once signed, a copy of this page is to be provided to the signing employee with the original filed)

# Clear Channel Outdoor

# Motor Vehicle Point Systems

EMPLOYER *Joint*

EXHIBIT NO. 3

## Purpose:

Insurance carriers require that prospective employees and employed individuals that operate motor vehicles in the course and scope of their job requirements be excluded from coverage if they do not meet underwriting standards for safe operation of vehicles. The Insurance Carriers have made these decisions due to past unfavorable judgments involving "negligent entrustment" on the part of the employer.

## Scope:

To determine if an employee is eligible to operate a motor vehicle in the course and scope of their job requirement, each Clear Channel Outdoor branch will be required to run Motor Vehicle Reports on all current and potential drivers.

Motor Vehicle Reports do not list all criminal behavior involving the operation of a vehicle. Homicide with a motor vehicle, transporting illegal substances, or other felonies or high crimes should be investigated through the use of a criminal background check along with credit history. The corporate office can supply additional information on securing this type of reporting.

Since some states report motor vehicle violations for the previous ten (10) years, this policy will only take into account the past four years of driving history. Criminal records will be reviewed for the entire history the report can furnish.

## Procedure:

To be able to determine whether or not someone will be able to operate a motor vehicle for work purposes, the branch will need to adopt one of the following point rating systems outlined on MV 2.1, and MV 2.2, and report the point number system selection to the corporate office.

After selecting the point system to be used, the branch will compile a roster of the names, and required information of all drivers and supply it to the company providing the Motor Vehicle Report. The branch may use the local state motor vehicle office, an on line service such as http://www.iix.com, or a full service company such as BTi http://www.btiscreening.com (the company has negotiated rates and services with BTi and iix.com. These are preferred providers.).

The roster of employees that are approved to operate vehicles and that have acceptable quarterly Motor Vehicle Reports will be kept on file at the branch and used for submission for Quarterly Motor Vehicle Reports. Only people that are on this roster will be allowed to operate company owned vehicles, company sponsored vehicles, or personal vehicles in the course and scope of their job requirements.

Once the Motor Vehicle Report is completed and returned, the branch will total the points according to the selected point rating system and determine if the employee will be

allowed to operate, or continue to operate, a motor vehicle in the course and scope of their job requirements.

If the employee has neared a point where driving privileges might be suspended but has not gone over the point allotment, a caution letter will be issued (example: MV 2.4). If the employee has exceeded the allotted points, driving privileges will be suspended and a letter of suspension will be sent (example: MV 2.4). If an employee is required to drive as part of their work requirement, their employment may be terminated if alternate methods of satisfying the requirement cannot be found (i.e. chauffer, public transportation, etc.). Alternate methods of transportation are at the employee's personal expense.

Prior to collection of any personal information, the employee must sign a release allowing the company to receive this type of information (example: 2.5). If a warning letter or a letter terminating driving privileges is sent to the employee, it must contain the Fair Credit Reporting Act statement that allows the employee or perspective employee to contact the reporting agency and correct any erroneous information.

**Quarterly Reports**
All current employees who drive company owned vehicles, company sponsored vehicles, or personal vehicles in the course and scope of their job requirement must have quarterly Motor Vehicles Reports run on their driving record.

**Pre-Employment**
Prior to employment, Motor Vehicle Reports are to be run for all employees who drive in the course and scope of company business. This reporting is to include personnel that operate company owned vehicles as well as employees who drive personal vehicles in the course and scope of their employment. If a person is denied employment based on driving record, the branch must inform them in writing and include the Fair Credit Reporting Act statement along with the information on the company providing the Motor Vehicle Report (example: 2.3).

As an employer, an effort must be made to determine that a prospective or current employee does not have a record that would cause a "reasonable and prudent" person not to employ an individual who has caused bodily injury/death or has operated a vehicle in a manner that presents the high possibility of causing bodily injury/death. This is a legal "duty" for employers in most jurisdictions. In the event there is an area that requires a judgment call to be made, the corporate office will be contacted and their decision will prevail. Evaluation of driving records must include actual point count, habitual violations, acting irresponsibly through repeated non-moving violations, etc.

## Insurance Requirements for Personal Vehicles

In addition to having acceptable Motor Vehicle Reports, personnel that drive personal vehicles in the course and scope of their job requirements will be required to maintain certain insurance requirements.

The employee will name Clear Channel Outdoor as additionally insured on their motor vehicle insurance policy. The employees that drive personal vehicles in the course and scope of their job requirements will also be required to carry the following coverage as a minimum:

Limits of Liability: $250/$500/$100,000 Limit – Bodily Injury

The insuring company must have an A.M. Best rating of B+X or better. Clear Channel Outdoor requires a thirty-day notice of cancellation of the policy.

Any deviation from this coverage due to state coverage requirements, umbrella policies, etc. must be approved by corporate. Failure to carry the outlined coverage will disqualify drivers from operating company owned/sponsored vehicles, or personal vehicles in the course and scope of their job requirements.

In some states where coverage is controlled by state administrators and these levels are not available, an alternate method of additional insurance may be accepted, with the approval of the corporate office. Any deviation from the written program requires approval from the program administrator.

# Point System 2

1.   Violations                                                          Points
     a)   Non moving violations                                      1
     b)   Minor moving violations not resulting in
          an accident  or listed in program                          3
     c)   Unlawful speed – less than 15 mph over
          posted speed limit                                         3
     e)   Reckless Driving; Unlawful speed – more
          than 15 mph over posted speed limit                        4
     f)   Passing stopped school bus                                 4
     g)   All other moving violations resulting in an accident       4
     h)   Leaving the scene of an accident                           6
     i)   Reckless Driving – willful and wanton                      6
     j)   Unlawful speed resulting in an accident                    6
     k)   Driving under the influence of alcohol or drugs            8


2.   Point Accumulation:

     6 Points within 1 year        Written warning; eligible for hire with
                                    written warning.

     8 Points within 1 year        Ineligible for hire or driving

     10 Points within 2 years      Written warming; eligible for hire with
                                    written warning

     12 Points within 2 years      Ineligible for hire or driving

     12+ Points within 3 years     Ineligible for hire or driving


Evaluation of driving records must include actual point count, habitual violations, acting
irresponsible through repeated non-moving violations, etc.  If in doubt, contact the
corporate program administrator for determination of eligibility to drive.

# SAMPLES

On LETTERHEAD #1

(Sample letter – potential new hire who fails MVR.  Send via Certified Mail)

Certified Mail - #_____

Name
Address
City, State, Zip

Dear            :

It is my duty to inform you that your offer for employment with Clear Channel Outdoor
has been withdrawn.  Upon examination of your Motor Vehicle Report, your driving
record indicates that you would not be able to operate motor vehicles under the
perimeters set forth by Clear Channel Outdoor's Insurance carrier.

Pursuant to the Fair Credit Reporting Act, we are required to provide to you the name and
address of the agency that obtained and reported your Motor Vehicle information to us.
You have the right under this Act to dispute the information provided by this agency.
Please find listed below the agency that obtained this information for us:

      (list name, and address of vendor you used to obtain Motor Vehicle Report)

Thank you for your interest in employment with Clear Channel Outdoor.

Sincerely,




Operations Manager (or other title)
Clear Channel Outdoor
_____ Branch

cc:   President, HR (branch), (MVR vendor)

Clear Channel Outdoor                                                                              MV 2.3
Rev 04/03

WARNING (or reword for suspension of driving privileges)   MEMO FORMAT #2


To:      Employee

From:  Operations Manager

Cc:      President, Employee file, Jim Poage

Date:

Subject:        Company Policy on Motor Vehicle Violations

As you are aware, Clear Channel Outdoor requires quarterly review of Motor Vehicle
Reports (MVR) on all employees who drive in the course and scope of their job
requirements.- Your recent MVR indicates that you have the following violation (s):

                      (List violations and the number of points according
                      to the evaluation program your branch uses)


This is to advise you that you are dangerously close to losing your driving status with the
company.

If you feel this MVR report is in error, pursuant to the Fair Credit Reporting Act, we are
required to provide to you the name and address of the agency that obtained and reported
your MVR information to us.  You have the right under this Act to dispute the
information provided by this agency.  Please find listed below the agency that obtained
this information for us:

                      (list name, address of vendor you used to obtain MVR)



(you will need to word warning paragraph according to the specific situation such as
suspension of driving privileges, warning, etc.)

# CLEARCHANNEL
### WORLDWIDE

# BACKGROUND
# INVESTIGATION CONSENT

I _____, hereby authorize Clear Channel and/or its agents to make an independent investigation of my background, references, character, past employment, education, credit, driving history, criminal or police records, including those maintained by both public and private organizations and all public records for the purpose of confirming the information contained on my application and/or obtaining other information which may be material to my qualifications for employment with Clear Channel.

I release Clear Channel, or any one of its affiliates and/or its agents and any person or entity, which provides information pursuant to this authorization, from any and all liabilities, claims or law suits in regards to the information obtained from any and all of the above reference sources used.

The following is my true and complete legal name and all information is true and correct to the best of my knowledge. I understand that providing false or misleading information may result in a refusal to hire or if discovered after commencement of employment will result in discipline or discharge.

**FULL NAME PRINTED**

**OTHER NAMES USED**

**Present Address**          **City/State/Zip**          **How Long?**

**Former Address**          **City/State/Zip**          **How Long?**

**Date Of Birth\***   **Social Security**   **Driver's License**   **State**   **Position**

**Signature**          **Date**

*\*Note:* Clear Channel, and its affiliates are an Equal Opportunity Employer, and comply with all state and federal laws prohibiting discrimination in employment based on race, age, color, religion, national origin or other protected classifications.

| Please complete the following information before sending it to the HR Department. | | | |
|---|---|---|---|
| Requestor: | Company: | Division: | Phone number: |



November 18, 2002

Mr. Chuck Fogel
Business Representative
Painters and Allied Trades, D.C. #35
25 Colgate Road
Roslindale, MA 02131

Dear Chuck:

Please find enclosed a copy of the Drug and Alcohol Control Program and the Motor Vehicle
Point Systems Policies for Clear Channel Outdoor.

I will also be distributing a copy of each policy to all DC 35 Union members for their review.
The random drug testing that is required under the DOT will continue as scheduled. All other
random testing will begin effective January 1, 2003.

After your review of the enclosed policies, please contact me if you should have any questions.

Sincerely,

*Gary S. Shay*

Gary Shay
Operations Manager

GS/ns

Enclosures

Union Ex. 2

781 | 438 - 8880 Tel
    | 279 - 1493 Fax

12/02/02  15:05 FAX 781 279 1493  CLEAR CHANNEL OFFICE    Case 1:05-cv-10380-WGY    Document 11    Filed 02/28/2005    Page 1 of 1    ☑002

781 279 1493



# *District Council 35*

IUPAT, AFL-CIO
25 Colgate Road
Roslindale, MA 02131

*Serving Maine, Massachusetts, New Hampshire, Rhode Island and Vermont*

## Ralph Harriman
Secretary - Treasurer - General Business Manager

**Boston Office**
Phone: 617-522-0520
Fax: 617-524-6716

**Springfield Office**
413-733-3961

**Maine**
207-439-2704

**New Hampshire**
603-227-0799

**Vermont**
802-766-4113

**Representing**
• Protective and Decorative Coatings Applicators •
• Wallcoverers •
• Drywall Finishers •
• Painters •
• Decorators •
• Glaziers •
• Architectural Metal & Glass Workers •
• Scenic Artists •
• Designers •
• Civil Service Workers •
• Shipyard Workers •
• Maintenance Workers •
• Building Cleaners •
• Metal Polishers •
• Metalizers •
• Public Employees •
• Clerical Workers •
• Professional Employees •
• Security Guards •
• Safety Engineers •
• Bridge Painters •
• Riggers •
• Tank Painters •
• Marine Painters •
• Containment Workers •
• Waterblasters •
• Vacuum Cleaners •
• Sign Painters •
• Sign & Display Workers •
• Bill Posters •
• Convention & Show Decorators & Builders •
• Paint Makers •
• Sandblasters •
• Lead Abatement Workers •
• Floorlaying & Decorative Coverings Workers •
• Journeymen & Apprentice Commercial, Industrial, Highway, Residential Construction Workers •

November 27th, 2002

Mr. Gary Shay, Operations Manager
Clear Channel Outdoor
89 Maple St.
Stoneham, MA    02180

Sent via FAX# 781-279-1493 and US Postal

Dear Gary:

Thank you for forwarding the proposed Drug and Alcohol Control Program and the Motor Vehicle Point Systems Program.

However, District Council #35 must advise you that the referenced issues contained therein were subject matter of our current agreement negotiations.

Therefore, your proposal is rejected.

Sincerely,

Charles E. Fogell
Business Representative
District Council #35
I.U.P.A.T., AFL-CIO

cc:    Ralph Harriman, D.C.#35 Bus. Mgr./Sec/Treas.
William Doherty, D.C.#35 Business Representative
Bargaining Unit Members
Michael Feinberg, D.C.#35 Legal Counsel

~~EMPLOYER~~ → uNioN

EXHIBIT NO. ___3

# CLEARCHANNEL
### OUTDOOR

December 5, 2002

Charles Fogel
Business Representative
IUPAT, AFL-CIO, District Council 35
25 Colgate Road
Roslindale, MA 02131

Dear Mr. Fogel:

This letter acknowledges receipt of your letter dated 11/27/02. You must have misunderstood the situation. I forwarded the two policies as a courtesy to you. They are not proposals, but are existing policies.

Thank you for your courtesy and cooperation.

Sincerely,

Gary Shay

EMPLOYER— union

EXHIBIT NO. 4

781 | 438 • 8880 Tel
279 • 1493 Fax

781 279 1493



# District Council 35

IUPAT, AFL-CIO
25 Colgate Road
Roslindale, MA 02131



*Serving Maine, Massachusetts, New Hampshire, Rhode Island and Vermont*

**Boston Office**
Phone: 617-522-0520
Fax: 617-524-0716
**Springfield Office**
413-733-3961
**Maine**
207-439-2704
**New Hampshire**
603-227-0799
**Vermont**
802-766-4113

**Representing**
• Protective and Decorative
Coatings Applicators •
• Wallcoverers •
• Drywall Finishers •
• Painters •
• Decorators •
• Glaziers •
Itectural Metal &
Glass Workers •
• Scenic Artists •
• Designers •
• Civil Service Workers •
• Shipyard Workers •
• Maintenance Workers •
• Building Cleaners •
• Metal Polishers •
• Metalizers •
• Public Employees •
• Clerical Workers •
• Professional Employees •
• Security Guards •
• Safety Engineers •
• Bridge Painters •
• Riggers •
• Tank Painters •
• Marine Painters •
• Containment Workers •
• Waterblasters •
• Vacuum Cleaners •
• Sign Painters •
Sign & Display Workers •
• Bill Posters •
• Convention & Show
Decorators & Builders •
• Paint Makers •
• Sandblasters •
.e... ..batement Workers •
Floorlaying & Decorative
Coverings Workers •
Journeymen & Apprentice
Commercial, Industrial,
Highway, Residential
Construction Workers •

Ralph Harriman
Secretary - Treasurer - General Business Manager
December 16, 2002

Via Fax and Regular Mail

Fax: 781-279-1493

Gary Shay, Operations Manager
Clear Channel Outdoor
89 Maple St.
Stoneham, MA 02180

Dear Mr. Shay:

First and foremost I would like to thank you for your courtesy in forwarding your Drug and Driving policies as stated in your letter of December 5, 2002.

In an attempt to avoid any misunderstanding, the implementation of these policies will be viewed as a unilateral change in the collective bargaining agreement and the Union may be forced to take the appropriate legal action against the company and its representatives.

As a representative in the collective bargaining process you are aware that these subjects were present during our discussions.

Thank you again for your courtesy and anticipated cooperation.

Sincerely,

Charles E. Fogell
Business Representative
District Council #35
I.U.P.A.T., AFL-CIO

cc:  Ralph Harriman, D.C. #35 Bus. Mgr./Sec-Treas.
William Doherty, D.C. #35 Business Rep.
Michael Feinberg, D.C. #35 Legal Counsel
Drew Hoffman, V.P. Clear Channel Outdoor

~~EMPLOYER~~ UNION

EXHIBIT NO. 5

FORM NLRB-501

FORM EXEMPT UNDER 44 U.S.C. 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
## CHARGE AGAINST EMPLOYER

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 1-CA-39670 | 1/28/2002 |

INSTRUCTIONS
File an original and 4 copies of this charge with NLRB Regional Director for
the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Number of workers employed |
|---|---|---|
| AK MEDIA/MA | | |

| c. Address (street, city, state, ZIP code) | d. Employer Representative | e. Telephone No. |
|---|---|---|
| 89 Maple Street, Stoneham, MA 02180 | Drew Hoffman | |

| f. Type of Establishment (factory, mine, wholesaler, etc.) | g. Identify principal product or service |
|---|---|
| Factory | Fabrication and installation of signs. |

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a),
subsections (1) and  of the National Labor Relations Act, and these unfair labor practices are unfair practices
affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Since on or about November 27, 2001, the above-named Employer has unlawfully
refused and failed to execute the collective bargaining agreement negotiated between
the parties.

By the above and other acts, the above-named employer has interfered with, restrained, and coerced
employees in the exercise of the rights guaranteed in Section 7 of the Act.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

Painters & Allied Trades District Council No. 35

| 4a. Address (street and number, city, state and ZIP code) | 4b. Telephone No. |
|---|---|
| 25 Colgate Road, Roslindale, MA 02131 | (617) 522-0530 |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed
by a labor organization.

International Union of Painters & Allied Trades

## 6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By  _Michael S. Feinberg_ | Title   Attorney |
|---|---|
| Signature of representative or person making charge   Michael A. Feinberg | |
| Address   Feinberg, Campbell & Zack, P.C.      Telephone No. | Date |
| 177 Milk Street, Boston, MA 02109      (617) 338-1976 | January 25, 2002 |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT
(U.S. CODE, TITLE 18, SECTION 1001)

ORIGINAL

If the General Counsel determines that deferral of this charge to arbitration is unwarranted, the case will be remanded to me for appropriate action. But if the General Counsel sustains my decision, the case will be remanded to me for deferral as set forth herein.

It is also my intention to inquire as to the status of this dispute periodically, and no later than 90 days hence, and to accept and consider at any time requests and supporting evidence submitted by any party to this matter for dismissal of the charge, for continued deferral of administrative action on the charge, or for issuance of a complaint.

It is my intention to dismiss the charge in the event the Charging Party does not promptly submit the dispute underlying the charge to the contract arbitration procedures, or in the event the Charging Party notifies me in writing that it does not intend to submit the dispute to arbitration.

It is my intention to revoke my decision to defer and to resume processing of the charge in the event the Employer, by conduct inconsistent with its expression of a willingness to arbitrate, prevents or impedes the prompt resolution of the underlying dispute through the contract grievance-arbitration procedures.

If the dispute underlying the charge is not resolved under the grievance procedure, and resort to arbitration proves necessary, the Charging Party may obtain a review of the arbitrator's final award by addressing a request for review to this office. The request should be in writing an contain a statement of the facts and circumstances bearing on whether the arbitral proceedings were fair and regular, whether the unfair labor practice issues which gave rise to the charge were considered and decided by the arbitrator, and whether the award is consistent with the purposes and policies of the Labor Management Relations Act.

In order to assist me in monitoring the status of the arbitral process and to facilitate my review of the arbitrator's award, if necessary, the parties are requested to sign and submit to the arbitrator the enclosed "Notice to Arbitrator" which requests the arbitrator to forward a copy of the arbitrator's award to me at the same time it is sent to the parties.

Very truly yours,

Rosemary Pye

Rosemary Pye
Regional Director

Encl.:  Notice of Appeal Forms
        Notice to Arbitrator

cc:     See Attachment




# *District Council 35*

IUPAT, AFL-CIO
25 Colgate Road
Roslindale, MA 02131

*Serving Maine, Massachusetts, New Hampshire, Rhode Island and Vermont*

**Ralph Harriman**
Secretary - Treasurer - General Business Manager

**Boston Office**
Phone: 617-522-0520
Fax: 617-524-0716

**Springfield Office**
413-733-3961

**Maine**
207-439-2704

**New Hampshire**
603-227-0799

**Vermont**
802-766-4113

Representing
· Protective and Decorative
  Coatings Applicators ·
  · Wallcoverers ·
  · Drywall Finishers ·
   · Painters ·
   · Decorators ·
   · Glaziers ·
  · Architectural Metal &
   Glass Workers ·
   · Scenic Artists ·
    · Designers ·
· Civil Service Workers ·
 · Shipyard Workers ·
· Maintenance Workers ·
 · Building Cleaners ·
  · Metal Polishers ·
   · Metalizers ·
 · Public Employees ·
 · Clerical Workers ·
· Professional Employees ·
 · Security Guards ·
 · Safety Engineers ·
 · Bridge Painters ·
  · Riggers ·
 · Tank Painters ·
 · Marine Painters ·
· Containment Workers ·
 · Waterblasters ·
 · Vacuum Cleaners ·
 · Sign Painters ·
· Sign & Display Workers ·
 · Bill Posters ·
 · Convention & Show
 Decorators & Builders ·
  · Paint Makers ·
  · Sandblasters ·
· Lead Abatement Workers ·
· Floorlaying & Decorative
  Coverings Workers ·
· Journeymen & Apprentice
 Commercial, Industrial,
 Highway, Residential

May 19, 2003

<u>Via Fax and Regular Mail</u>

Mr. Drew Hoffman
Clear Channel Outdoor
89 Maple St.
Stoneham, MA  02180

Re:    Step 2 Grievance
       Unilateral Implementation of Driving and Drug Rules

Dear Mr. Hoffman:

This letter shall serve as notification that the Union is grieving the
implementation of the driving and drug rules recently implemented by the
Company.

Please contact my office in accordance with Step Two of Article 18 so that
we may arrange a meeting in an attempt to adjust the grievance.

Sincerely,

Charles E. Fogell
Business Representative
District Council #35
IUPAT, AFL-CIO

Cc:    R. Harriman, B.M./S.T.
       W. Doherty, B. R.
       M. Feinberg, Legal Counsel
       Union Stewards

~~EMPLOYER~~ *Joint*

**EXHIBIT NO.** *4*



# *District Council 35*

IUPAT, AFL-CIO
25 Colgate Road
Roslindale, MA 02131



*Serving Maine, Massachusetts, New Hampshire, Rhode Island and Vermont*

Ralph Harriman
Secretary - Treasurer - General Business Manager

**Boston Office**
Phone: 617-522-0520
Fax: 617-524-0716

**Springfield Office**
413-733-3961

**Maine**
207-439-2704

**New Hampshire**
603-227-0799

**Vermont**
802-766-4113

**Representing**
• Protective and Decorative
 Coatings Applicators •
 • Wallcoverers •
 • Drywall Finishers •
  • Painters •
  • Decorators •
  • Glaziers •
 Architectural Metal &
  Glass Workers •
  • Scenic Artists •
  • Designers •
 • Civil Service Workers •
 • Shipyard Workers •
 • Maintenance Workers •
  • Building Cleaners •
  • Metal Polishers •
  • Metalizers •
  • Public Employees •
  • Clerical Workers •
 • Professional Employees •
  • Security Guards •
  • Safety Engineers •
  • Bridge Painters •
   • Riggers •
  • Tank Painters •
  • Marine Painters •
 • Containment Workers •
  • Waterblasters •
  • Vacuum Cleaners •
  • Sign Painters •
 • Sign & Display Workers •
  • Bill Posters •
 • Convention & Show
 Decorators & Builders •
  • Paint Makers •
  • Sandblasters •
  ad Abatement Workers •
  ⎽oorlaying & Decorative
   Coverings Workers •
 • Journeymen & Apprentice
 Commercial, Industrial,
 Highway, Residential

June 27th, 2003

Via Fax and Regular Mail

Mr. Drew Hoffman
Clear Channel Outdoor
89 Maple Street
Stoneham, MA   02180

RE:   Step 2 Grievance
      *Unilateral Implementation of Driving and Drug Rules*

Dear Mr. Hoffman:

As a result of our inability to resolve our dispute over the implementation of the drug and driving rules at our Step 2 grievance meeting, the Union shall submit the matter to arbitration in accordance with Step 4 of the grievance procedure as indicated at our Step 2 meeting.

Sincerely,

Charles E. Fogell
Business Representative
District Council #35
I.U.P.A.T., AFL-CIO

CC:   Ralph Harriman, D.C.#35 Sec.Treas./Bus. Mgr.
      William Doherty, D.C.#35 Bus. Representative
      Michael Feinberg, D.C.#35 Legal Counsel
      Union Stewards

# JAMES S. COOPER

**ATTORNEY AT LAW**
8 WINCHESTER STREET
BOSTON, MASSACHUSETTS 02116
(617) 482-2377    FAX (617) 482-0629
jcooper@mdbostonlaw.com

January 28, 2005

Ms. Rosemary Pye
Regional Director
Region 1, National Labor Relations Board
10 Causeway Street, 6th Floor
Boston, MA 02222-1072

Re:    Clear Channel Outdoor and Painters & Allied Trades, District Council No. 35
       Case No. 1-CA-40671

Dear Regional Director Pye:

In accordance with your deferral letter dated April 28, 2003, the above parties submitted the matter to me as arbitrator of their contractual dispute. As requested, I am hereby enclosing a copy of my Opinion and Award.

Very truly yours,

James S. Cooper

6173

xc:  Glenn E. Plosa, Esq. (via the American Arbitration Association)
     Jonathon M. Conti, Esq. (via the American Arbitration Association)

ENCLOSURE

American Arbitration Association

*Dispute Resolution Services Worldwide*

*New England Labor Center*

January 31, 2005

133 Federal Street, 11th Floor, Boston, MA 02110-1703
telephone: 617-451-6600 facsimile: 617-451-0763
internet: http://www.adr.org/

Michael A. Feinberg, Esq.
Feinberg, Campbell & Zack, P.C.
177 Milk Street
Boston, MA 02109

Glenn E. Plosa
The Zinser Law Firm
150 Second Avenue North
Suite 410
Nashville, TN 37201

Re: 11 300 02584 03
    Painters & Allied Trades District Council No. 35
    and
    Clear Channel Outdoor

Grievances:    Drug Policy and Driving Rules

Dear Parties:

By direction of the Arbitrator, we herewith transmit to you the duly executed Award and Opinion in this matter.

We also enclose the Arbitrator's bill for services rendered in the above-captioned matter. When paying the Arbitrator, checks should be prepared and mailed directly to the Arbitrator, not to the American Arbitration Association. Your cooperation in this matter is greatly appreciated.

The American Arbitration Association, in its publications *Summary of Labor Arbitration Awards, Arbitration in the Schools* and *Labor Arbitration in Government,* reports arbitration decisions in labor arbitration cases. These monthly publications have a wide distribution and are used by practitioners in the field as well as for educational and research purposes. We would like to consider the enclosed case of yours for reporting in a forthcoming issue.

Unless we hear from you to the contrary within one (1) month from the date of this letter of transmittal, we will assume your have no objection to our doing so. Objections to the use of this decision should be sent directly to the Publications Department, AAA, 335 Madison Avenue, 10th Floor, New York, NY 10017.

Thank you for choosing the services of the American Arbitration Association.

Very truly yours,

Jessica R. Coco
Case Manager
617 695 6056
Cocoj@adr.org

Enclosures
cc:    James S. Cooper, Esq.
       Painters & Allied Trades District Council No. 35
       Gary Shea

# American Arbitration Association
## VOLUNTARY LABOR ARBITRATION TRIBUNAL
### Case No. 11 300 02584 03

In the Matter of the Arbitration between:

### CLEAR CHANNEL OUTDOOR

-and-

### PAINTERS & ALLIED TRADES DISTRICT COUNCIL NO. 35

### AWARD OF ARBITRATOR

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named Parties on June 21, 2002 and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

For the reasons set forth in the attached Opinion and Award, the Company violated the Agreement when it unilaterally implemented its drug and alcohol policy and its motor vehicle point system. The Company's Drug and Alcohol Control Program and the Motor Vehicle Point System are hereby declared null and void *ab initio*.

Date:  January 28, 2005

James S. Cooper

AMERICAN ARBITRATION ASSOCIATION
Voluntary Labor Arbitration Association
Case No. 11 300 02584 03
James S. Cooper, Arbitrator

| | | |
|---|---|---|
| In the Matter of Arbitration between: | ) ) ) | |
| **CLEAR CHANNEL OUTDOOR** | ) ) | |
| and | ) ) | **OPINION AND AWARD** |
| **PAINTERS AND ALLIED TRADES, DISTRICT COUNCIL NO. 35** | ) ) ) ) | |

Introduction

    AK Media/MA d/b/a Clear Channel Outdoor ("Company") and District Council #35, International Union of Painters and Allied Trades, AFL-CIO ("Union") are parties to a collective bargaining agreement ("Agreement") dated June 21, 2002 which provides in Article 18, Section 2 for final and binding arbitration of grievances. On October 5, 2004 the Company, represented by attorney Glenn E. Plosa, and the Union, represented by attorney Jonathon M. Conti, presented this matter in arbitration. The parties filed post-hearing Briefs on or before December 10, 2004. The parties have agreed to extend the due date of this Award.

Issues

    The parties stipulated to the following issues in dispute:

1. Did the Company violate the Agreement when it unilaterally implemented its drug and alcohol policy and its motor vehicle point system?

2. If so, what shall the remedy be?

<u>Facts leading to the Current Arbitration</u>

      With the exception of one fact, the parties are in complete agreement on what happened leading up to this arbitration dispute. The factual dispute is not critical to the outcome of this matter and will be explained in due course.

      The Company and the Union negotiated the current agreement which was signed on June 21, 2002.[1]  On November 18, 2002, Gary Shay, Operations Manager for Clear Channel Outdoor[2] forwarded to the Union's Business Representative Charles Fogell copies of a "Drug and Alcohol Control Program"[3] and a "Motor Vehicle Point Systems Policies."[4]  Fogell responded by letter dated November 27, 2002 thanking Shay for sending him the "proposed Drug and Alcohol Control Program and the Motor Vehicle Point Systems Program" but then advised that "the referenced issues contained therein were subject matter of our current agreement negotiations" and "your proposal is rejected."  Shay shot back on December 5, 2002: "[y]ou must have misunderstood the

---

[1] The Union negotiated the Agreement with AK Media/MA. The Agreement is effective from August 1, 2001 to July 31, 2005. AK Media/MA was purchased by Clear Channel on July 15, 2001. According to the Union's Business Representative Charles Fogell, AK Media initially refused to sign the negotiated agreement and the Union filed charges with the National Labor Relations Board ("NLRB" or "Board") on January 25, 2002. On March 6, 2002 NLRB Regional Director Rosemary Pye issued a Complaint and Notice of Hearing [Case No. 1-CA-3967] alleging that AK Media/MA's refusal to sign the negotiated agreement violated Sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. §151 *et seq.* for the Company's failure to sign the Agreement. Upon Motion by the General Counsel filed on May 17, 2002, the case was transferred to the Board for a hearing on a Summary Judgment. AK Media/MA d/b/a Clear Channel Outdoor signed the Agreement on June 21, 2002.

[2] The Preamble to the Agreement names the Employer as "AK Media/MA (a division of the Ackerley Group)." The title page of the Agreement, however, lists the Employer as "AK Media/MA (d/b/a Clear Channel Outdoor)." Although not stipulated on the record, the parties have implicitly agreed that Clear Channel Outdoor/ Boston Division is the successor to AK Media/MA (a division of the Ackerley Group) and is bound by the Agreement as executed by AK Media/MA.

[3] The Drug and Alcohol Control Program ("Program") which is also referred to as the "Clear Channel Outdoor Corporate Substance Abuse Program" is an eighteen page document which will be described more fully later in this Opinion and Award. The Program is divided into nine subsections including: I. Purpose; II. Scope; III. Definitions; IV. Prohibited Activities; V. Drug and Alcohol Testing; VI. Employee Assistance Program (EAP); VII. Drug and Alcohol Testing Guidelines; VIII. Communication and Training;; IX. Disciplinary Action. The specifics of these sections will be set forth as discussed elsewhere herein.

[4] The Motor Vehicle Points System ("System") is a nine page document which will also be described later herein. The System provides a Purpose, Scope, Procedure, Quarterly Reports, Pre-Employment and Insurance Requirements for Personal Vehicles.

situation. I forwarded the two policies as a courtesy to you. They are not proposals, but are existing policies." Fogell immediately challenged Shay stating that "the implementation of these policies will be viewed as a unilateral change in the collective bargaining agreement."

On February 12, 2003 the Union filed a Charge of Unfair Labor Practice with the Board alleging that the Company unilaterally changed the terms and conditions of employment in violation of Sections of 8(a)(1) and (5) of the Act [Case No. 1-CA-40671]. On April 28, 2003 the Board deferred further action on the Union's charge pending the outcome of this arbitration per Collyer Insulated Wire, 192 NLRB 837 (1971). The Union filed the instant grievance on May 19, 2003[5] and the matter was submitted to arbitration.

The Collective Bargaining Agreement

The Agreement signed by AK Media/MA and assumed by the Company provides in Article 20, Alcoholism and Drug Abuse, that alcoholism and drug abuse are to be recognized by the Company as a health problem and to be treated as any other health problem by the parties, provided the employee accepts assistance.[6] The Company and the Union have also incorporated in their Agreement various addenda, including one entitled "AK MEDIA – EMPLOYEE WORK RULES & DISCIPLINE" which provides

---

[5] Some members of the bargaining unit hold commercial drivers licenses issued by the Commonwealth of Massachusetts. The Union does not contest, either in arbitration or before the Board, the Company's drug and alcohol testing as required by the United States Department of Transportation pursuant to the Department's regulations.

[6] Article 20 – Alcoholism and Drug Abuse provides as follows:

> SECTION 1: Alcoholism and, drug abuse and emotional illness are to be recognized by the EMPLOYER as health problems and are to be treated by the parties as any other disease, provided the employee accepts assistance. However, the EMPLOYER shall have the right to terminate an employee so afflicted who refuses to acknowledge such a health problem and accept assistance, or who has received assistance for two treatments after the effective date of this Agreement and yet continues to demonstrate signs of active alcoholism or substance abuse. Provided such a health problem significantly impairs such an employee's work performance and the UNION is satisfied that the employee was made aware of his condition and refused assistance, the UNION shall not challenge the EMPLOYER'S termination of such an employee. Any employee shall have the right to refuse to work with another employee who is under the influence of alcohol or drugs.

3

that "reporting to work under the influence of alcohol or drugs" will be "normally …
enforced by immediate discharge."[7]

The work rules previously recited with respect to reporting for work under the
influence drugs or alcohol (see footnote 7) were adopted by the parties under auspices of
Article 17 of the Agreement which provides, *inter alia*, that the Company has the right to
post reasonable rules and regulations which are not in conflict with the Agreement and
which also deals with an employee's inability to drive a motor vehicle due to the
suspension or loss of license or because the Company's liability insurer insisted.[8]  In

---

[7] AK MEDIA – EMPLOYEE WORK RULES & DISCIPLINE provides in part as follows:

> The following work rules have been promulgated for a safe, orderly and efficient work
> atmosphere. Because rules cannot be issues [sic] to cover every conceivable work
> situation, the following concern only those issues that the parties have identified for
> mutual understanding and application. The EMPLOYER may establish other work rules
> as it deems necessary, provided, however, that the Union will be given prior notice or at
> least one week prior to the implementation of any new work rule and may discuss and
> negotiate the new work rule with the EMPLOYER prior to implementation.
> Unsatisfactory performance of work will be treated on a case by case basis.

> \*          \*          \*

> Category C Infractions & Rules. Violation of any of the following work rules will
> normally be enforced by immediate discharge:

>> 1.…
>> 3. Reporting to work under the influence of alcohol or drugs.

[8] ARTICLE 17 – WORK RULES, DISCIPLINE, DISCHARGE provides in pertinent part as
follows:

> SECTION 1: The EMPLOYER shall have the right to post reasonable rules and
> regulations provided they are not in conflict with the terms of this Agreement.

> \*          \*          \*

> SECTION 6:  In the event it becomes necessary to prohibit an employee from operating a
> COMPANY vehicle per a demand of same by EMPLOYER'S liability insurance carrier
> or, an employee loses his drivers license, the EMPLOYER agrees to use every reasonable
> effort to assign such an employee to a non-driving assignment. In the event no such
> assignment is available, then the EMPLOYER shall have the right to suspend such an
> employee for the period of prohibition and/or such loss of license and until ther is an
> open and available position for the employee to return to. The UNION will not challenge
> the EMPLOYER'S right to invoke such a work-availability suspension provided the

addition to the specifically negotiated provision for work rules in Article 17, the Company and the Union agreed on Article 6, Management Rights which grants the Company the right to "demote, suspend, discharge or otherwise discipline employees for just cause," and to "promulgate and enforce all reasonable rules relating to safety, operations, and other matters not inconsistent with the terms of this Agreement."[9]

In addition to the articles covering alcoholism and drug abuse, work rules and management rights, the parties also negotiated Article 11, Safety, which creates a Safety Committee, makes the Company responsible for OSHA compliance and other safety related items.[10] Finally, for the purposes of the case at hand, the parties negotiated a

---

EMPLOYER was in fact unable to reassign the employee to a non-driving position after reasonable efforts to do so as above.

In the event that an employee loses his/her license or had his/her license suspended, he/she must report it immediately to his/her supervisor. Failure to do so will result in disciplinary action in accordance with the Work Rules and Discipline section of this Agreement.

[9] ARTICLE 6 – MANAGEMENT RIGHTS provides in pertinent part as follows:

SECTION 1: Except as specifically limited by the express provisions of this Agreement, the Company retains exclusively to itself all rights to manage and operate the business, and to direct, plan and control the operation of the facilities; the right to change, alter… introduce new materials … and procedures in general; … the right to demote, suspend, discharge, or otherwise discipline employees for just cause…; the right to promulgate and enforce all reasonable rules relating to safety, operations; and other matters not inconsistent with the terms of this Agreement… and otherwise to take such measures as management may determine to be necessary for the orderly, safe, and efficient conduct of its business….

[10] ARTICLE 11 – SAFETY provides in part as follows:

SECTION 1: In the interest of promoting safety, the EMPLOYER and the UNION agree to form a "Safety Committee" composed of one (1) bargaining unit employee designated by the UNION from each major department (Construction, and Billposting) together with the EMPLOYER'S Safety Director (or management designee). The Safety Committee will meet on company time at times mutually convenient, but in no event less often than once every month. The COMPANY will supply dates and notice of meetings January 1st of each year of the Agreement. The garage mechanic shall attend monthly meetings only when requested by the Safety Committee.

The Committee shall endeavor to develop plausible solutions for whatever safety problems are brought to the attention of same either by employees input or from any other source. The Safety Committee shall full access to all EMPLOYER records

zipper clause which recognized that the parties had full opportunity to "make demands and proposals with the [sic] respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement."[11]

---

concerning safety and accidents. The Business Manager or designee of the UNION shall be permitted to attend meetings of the Safety Committee.

Adequate Safety Committee meeting minutes shall be taken and maintained on EMPLOYER files.

SECTION 2: Notwithstanding Section 1 above, in accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the responsibility of the EMPLOYER as opposed to the UNION to insure the safety of its employees and compliance by them with any safety rules contained herein or established by the EMPLOYER. Nothing in this Agreement will make the UNION liable to any employee or to any other persons in the event that work related disease, sickness, death, injury or accident occurs.

SECTION 3: The EMPLOYER shall at all times provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of the crew chief, the crew's tolls, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the crew's employees shall not be required to work with such tools, materials and equipment under such conditions unless or until they are made safe....

SECTION 4: It shall be the duties of the employees to report unsafe conditions to their supervisor who shall advise the Safety Director, who will then report to the Committee of the same and post such report in a noticeable location in the shop.....

[11] ARTICLE 45 – COMPLETE AGREEMENT AND WAIVER provides as follows:

This Agreement superseded and cancels al prior practices and agreements, whether written or oral, unless expressly stated to the contrary herein, and together with any letters of understanding executed in writing concurrently (or after) with this Agreement constitutes the complete and entire agreement between the parties, and concluding collective bargaining (except as provided for in the grievance procedure) for its term.

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Therefore, the COMPANY and the UNION, for the life of this Agreement, voluntarily and unqualifiedly waive the right, and agree that the other shall not be obligated, to bargain collectively with the [sic] respect to any subject matter referred to or

6

Summary of Testimony at Arbitration Hearing

Charles Fogell testified at the hearing that he negotiated the Agreement on behalf of the Union and that Gary Shay attended the negotiations on behalf of the Company. On direct examination, Fogell testified that the Company put forth no written proposals about drug and alcohol testing, but "there was a brief discussion across the table on how the Company would like to be able to have the ability to test all employees with respect to drugs." [Tr. 33] Fogell testified: "[W]e just simply stated across the table that we had no interest in that. We feel as though we have adequate provisions in the contract and that the people that have the got the DOT licenses undergo random testing in accordance with those procedures now." [Tr. 33-34]

When asked on cross-examination to compare the Company's Drug and Alcohol Control Program with the provisions in the Agreement dealing with alcoholism, drug abuse and the disciplinary rule prohibiting an employee from reporting to work under the influence of drugs or alcohol, Fogell testified that there was no specific provision in the Agreement which prohibited the Company from conducting random drug tests or from drug testing based on reasonable suspicion or from taking blood, hair or saliva tests. Fogell also testified that there was no specific provision in the Agreement prohibiting the Company from examining personal property based on reasonable suspicion that the property contained [illegal] drugs.[12] Similarly, upon examination of the Company's

---

covered by in this Agreement, or with respect to any subject matter not specifically referred to or covered in this Agreement, even though subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

[12] The Company's Drug and Alcohol Control Program is divided into nine sections. While it will not be reproduced herein, a summary outline of the program follows:

I.    Purpose – The document sets forth the Company's policy regarding the use and/or abuse of drugs and alcohol by employees and contractors. The Company recognizes that its success depends upon "the physical and mental health of its employees, and the moral obligation to protect the health of their employees. The Company maintains an Employee Assistance Program which provides referrals for drug or alcohol abuse, but that employees "are financially responsible for their own care and treatment."

II.   Scope – The substance abuse program is the Company's current policy and it can be changed at any time. The substance abuse program "does not change or

7

supersede any collective bargaining agreement between the Company and any labor union."

III.     Definitions - "Controlled Substances" and "Drugs" includes all substances and/or medications that can affect one or more mental and/or physical functions (e.g. coordination, reflexes, vision, mental capacity or judgment) and includes prescription and over-the-counter drugs. "Under the influence" includes an employee reporting to work or working with alcohol, intoxicating beverages, illegal drugs, narcotics or controlled substances in their system with said substance appreciably affecting the nervous system, brain muscles or other parts of a person's body, or creating in them any perceptible abnormal mental or physical condition. "Impairment… any intoxicating beverage, illegal drug, narcotic, controlled substance, or legal product that has the ability to appreciably affect the central nervous system, brain muscles or other parts of the body, creating a perceptible abnormal or physical condition. "Reasonable suspicion" – any facts, circumstances, physical evidence, physical signs signs/symptoms, or a pattern of performance/behavior that would cause a prudent person to reasonably conclude that an employee may be "under the influence" of a prohibited substance or has used a prohibited substance which appears to be affecting their job performance. "Contraband Inspections" – the Company may conduct unannounced inspections for illegal drugs, alcohol, firearms, weapons, or any other item classified as "contraband" by the Company. "Failed Test"- failure of test for prohibited drug or other substance the Company deems unacceptable to the employee's system.

IV.     Prohibited Activities – Unlawful use, possession, sale, etc. of controlled substances; the misuse of any legal drub (prescribed or over the counter), the use of any legally obtained drug is prohibited to the extent such use may affect the safety of the employee, co-workers or the Company's property; the use, possession, purchase, sale, transfer or transportation of alcoholic beverages at work; reporting to work while under the influence of alcohol, intoxicating beverages, illegal drugs, narcotics or controlled substances; failure to cooperate during searches.

V.      Drug and Alcohol Testing- Urine, blood, saliva or hair may be used for testing; Post-accident vehicle testing; post-accident injury testing; post-accident property damage testing; random testing; unannounced group or area testing; reasonable suspicion testing; post-treatment testing; return to duty testing.

VI.     Employee Assistance Program – an employee who comes forward on a voluntary basis, prior to notification of testing and/or before disciplinary action is taken, will receive reasonable accommodation including unpaid leave for treatment; Company will provide programs and information to all employees; Company will conduct "Post Treatment" testing.

VII.    Drug and Alcohol Testing Guidelines- an appropriately certified laboratory will perform all tests; an alternate more sensitive method of testing will confirm all "positive" laboratory results. Individuals testing positive will be given an opportunity to explain and provide information to Company.

VIII.   Communication and Training – copy of policy distributed; additional training provided. Company may update policy at any time.

IX.     Disciplinary Action – any employee found to have engaged in any prohibited activity, without an explanation satisfactory to the Company, will be subject to disciplinary action up to an including termination.  Should a prohibited substance

Motor Vehicle Points System,[13] Fogell testified that there was nothing in the Agreement which specifically prohibited the Company from implementing the motor vehicle points system. On re-direct examination, Fogell testified that there was nothing in the Agreement which expressly permits the Company to conduct drug testing of employees or permits the Company to institute a disciplinary point system with respect to motor vehicle driving regulations.

Operations Manager Shay testified that the Company constructs billboards and thereafter places advertising on them. The Company operates using two divisions, the construction division which builds or rotates the various size billboards and the posting division which posts new advertising on existing billboards. The billboards range in size with the smallest one being 12 feet by 20 feet. The billboards are also built at a wide range in heights from 12 to 100 feet off the ground. The Company also has a garage mechanic who repairs the Company's vehicles.

Shay testified that he was at the negotiations which lead to the current agreement and he never heard the Company make an oral proposal about a drug policy, although he admitted that he was only at two of the six bargaining sessions that lead to the Agreement. He testified that the Company operates by sending bill posters or construction crews out in Company owned vehicles and the Company wants to make sure

---

be detected, the Company reserves the right to discipline the employee up to and including termination.

[13] The Company's Motor Vehicle Point System will not be reproduced herein, but a summary follows.

Purpose: Insurance carriers require that employees that operate motor vehicles in the course of their work be excluded from coverage if they do not meet underwriting standards.
Scope : To determine if an employee is eligible to operate a motor vehicle in the course and scope of their job requirement;
Procedure: [Alternative Point systems to be selected by Company local management]. Company will complete a Motor Vehicle Report quarterly and determine whether employee eligible to operate motor vehicle.
Quarterly Reports: All employees who drive company owned vehicles must have quarterly reports with point tabulations.

Point System 2
1.  Violations with assigned points (e.g. reckless driving – willful and wanton… 6 points)
2.  Point accumulation (e.g. 6 points within one year – written warning; 8 points within one year ineligible for driving, etc).

that employees drive safely. The bill posters and most of the construction crews drive vehicles that weigh less than 26,000 pounds which means they may use a personal driver's license. If the Company requires a crane truck or larger vehicle on a job, the driver must have a Commercial Drivers License since those trucks weigh in excess of 26,000 pounds.

Shay testified that he worked on the construction crew in the mid-1990's and he observed employees have a couple of beers at lunch and then go back to work or drive a Company owned vehicle. Shay could not give any specifics other than that this was not an isolated incident and the last time he observed such conduct was in approximately 1995.

Shay testified that after Clear Channel purchase AK Media/MA, Clear Channel's Safety Director, Jim Poage, trained Shay and Michael Auterio, assistant operations manager, on the drug policy and motor vehicle point system prior to the time when the Company implemented them. This training involved Poage meeting with Auterio and Shay for a week. Auterio further testified that since Clear Channel has taken over, there has been a greater emphasis on safety including a weekly safety meeting at which various topics are discussed. Auterio stated that safety training has been more intense than under AK Media/MA and that its top priority is safety in the work place.

Positions of the Parties

Union's Arguments

The Union argues that the Drug and Alcohol Control Program and the Motor Vehicle Point System are mandatory subjects of bargaining. As such, the parties most recently negotiated the Agreement which addressed drug and alcohol abuse as well as restrictions on driving privileges. The Union points out that the parties mutually agreed that each of the parties waived all rights to bargain with respect to subjects "referred to or covered by this Agreement." Since these subjects were referred to or covered, the Union argues that the Company cannot now avoid the consequences of the Agreement by calling these subjects "reasonable work rules."

The Union also argues that the Company's implementation of the Drug and Alcohol Control Program and the Motor Vehicle Point System amount to significant changes in the employees' terms and conditions of employment and as such must be

bargained, rather than unilaterally imposed. These changes include the Company's right to insist on ten different drug testing situations (e.g. random, group or area, reasonable suspicion, etc.); to test on the basis of urine, blood, saliva, and hair; the right to determine what entails reasonable suspicion (e.g. excessive absenteeism or deteriorating job performance); to terminate employees for refusal to submit to testing. The Union argues each of these actions involves an employee's privacy, discipline and safety – all major terms and conditions of employment.

The Union argues that the Motor Vehicle Points System is also a significant change in working conditions. Unlike anything previously required, the Union points out that the Company is now making a background evaluation of each employee's driving record and judging the employee's fitness to drive a Company vehicle on the basis of his or her past driving history – notwithstanding any involvement of an insurance carrier. The Union argues that since most of the Company's employees are required to drive to billboard locations, the Motor Vehicle Point System may lead to their suspension of driving ability and ultimately their jobs. The Union argues that such actions clearly and directly affect the employee's terms and conditions of employment.

The Union claims that the Company cannot implement an entire change in working conditions as set forth in the Drug and Alcohol Control Program and the Motor Vehicle Point System under the guise of a change in work rules. Finally the Union argues that if the policies are found to be work rules, they are not reasonable. The Union argues that its grievance should be sustained.

Company's Arguments

The Company argues that the Management Rights clause provides the Company with broad powers to manage the enterprise, including the "right to promulgate and enforce all reasonable rules relating to safety … not inconsistent with the terms of this Agreement." In this case the Company claims it did precisely that, namely it promulgated reasonable rules related to safety through its Drug and Alcohol Control Program and Motor Vehicle Point System, and these programs are not inconsistent with the terms of the Agreement. Furthermore, the Company has candidly and forthrightly stated that if an inconsistency should arise in the Drug and Alcohol Abuse Control Program, "the collective bargaining agreement will govern."

The Company points out that the Safety Article, Article 11, provides the Company with independent authority under OSHA to "insure the safety of its employees and compliance by them with any safety rules contained herein or established by the" Company. Indeed the Company points out that in the parties' Agreement the Union has garnered an agreement that the Union *shall not* be held liable "to any employee or to any other persons in the event that work related disease, sickness, death, injury, or accident occurs." This makes it clear, the Company argues, that the Company alone suffers from any monetary damage caused by an accident and therefore its powers must be far more pervasive to insure the safety of employees and other persons; hence the polices at issue here amount to work rules designed to limit the Company's liability for accidents.

In Article 20, Alcoholism, Drug Abuse, the parties have agreed that an employee "shall have the right to refuse to work with another employee who is under the influence of alcohol and drugs." If the employee can unilaterally make such a drastic decision, then the Company argues, there is implicit authority on the Company's part to make every effort that its employees do not have to face such an inherently dangerous situation – hence the Drug and Alcohol Control Program is authorized and consistent with this agreed upon language.

The Company similarly points out that in Article 17, Work Rules, Discipline and Discharge, Section 6 the parties agree that if the Company's insurance carrier prohibits an employee from operating a motor vehicle the Company will deal with that situation. The purpose of the Motor Vehicle Point System is consistent with that purpose. The difference is that the Company's rule, like the Drug and Alcohol Control Program, seeks earlier intervention, thereby preventing the situation set forth in Article 17 from arising.

Given this broad contractual authority, the Company argues that the Union's only witness in this matter candidly admitted that there is nothing in the Agreement which explicitly prohibits the Company from implementing either the Drug and Alcohol Control Program or the Motor Vehicle Point System. In the absence of such explicit prohibitions, the Company argues the congruence of purposes between the Agreement's provisions concerning drug and alcohol abuse as well as with assuring that its motor vehicles are operated by safe drivers, the Company argues that the grievance should be denied.

12

Discussion

The only factual dispute is whether the Company's predecessor made an oral proposal at bargaining to amend Article 20 of the Agreement to add drug testing and that the Union rejected this proposal and the Company withdrew it. In the context of this arbitration, whether such colloquy occurred is not significant in terms of the outcome of this matter. What is important are the terms of the Agreement as finally signed by the parties on June 21, 2002.

There is no doubt that how an employer deals with alcohol abuse, drug abuse or an employee's ability to safely drive an employer owned vehicle (or an employee owned vehicle on the employer's behalf) are terms and conditions of employment and, upon demand, must be collectively bargained between an employer and a certified or recognized union. In this case, the parties have collectively bargained an agreement that deals with these issues. Examination of Article 20, Section 1 and Article 17, Section 6 show that there has been minimal concern between the parties on alcoholism and drug abuse or safe driving by employees. While the Company may now trivialize these provisions, the fact of the matter is that this was the extent of AK Media/MA's concern with the problem. AK Media/MA gave employees who were alcoholics or drug abusers great leeway in terms of coming to grips with their individual problems.[14] The Company's approach was to encourage an employee to voluntarily seek assistance. It was only the employee who refused assistance or had received "two treatments" that the Company could terminate the employee. The Union even agreed to stand aside if the employee refused assistance and the employee's condition significantly impaired the employee's work performance.

Even a cursory reading of the Company's Drug and Alcohol Control Program reveals that the current employer comes at this problem from a very, very different angle. A careful reading shows that there is almost nothing consistent between the provisions of Article 20 and the Drug and Alcohol Control Program. The Company's Drug and Alcohol Program imposes its right to invade an employee's body looking for illegal and

[14] It should also be noted that Article 20 also provides similar treatment for "emotional illness" which in recent years has also surfaced as a problem in terms of employee and customer safety. This is being raised as an example of AK Media/MA's approach to individual employee problems which may surface at the workplace.

even legal drugs (i.e. Part IV, §2 "Misuse of Legal Drugs"[15]) and defines reporting *under the influence* to include "[a]ny presence of a substance that has the ability to impair an employee's abilities will be considered by the Company to be sufficient evidence of impairment and grounds for disciplinary action."[16]  The Drug and Alcohol Control

---

[15] Drug and Alcohol Control Program, Part IV, Prohibited Activities

> 2.  Misuse of Legal Drugs
>
> The misuse of any legal drug (whether prescribed or over the counter) is prohibited. Misuse includes, but it not limited to, use or possession of any drug for which a prescription is required but for which an employee does not have a valid prescription, or use or possession of a prescribed drug in quantities greater than the amount prescribed.
>
> An employee who either operates or is subject to operating  (1) a Company motor vehicle, heavy-vehicle requiring a commercial drivers license on public roads or elsewhere, or (2) machinery, power tools or other equipment or (3) who handles, uses, directs or supervises; [sic] the use or handling of cranes, heavy equipment, forklifts, power tools, moveable stages, stationary stages, scissor-lifts, jack-hammer, nail-guns, pneumatic tools, and/or who works above ground, mechanic/repairman for above equipment/tools; in field work on any job site, must report to their supervisor prior to performing such work, if they are taking any prescribed drugs or over the counter medication that would or could affect the safe performance of such work.
>
> The use of any legally obtained drug by any employee while performing Company business or while in a Company facility is prohibited to the extent such use may affect the safety of the employee, co-workers, the general public, or the safety of the Company facility, equipment, or property. Employees are required to advise their supervisor whenever they report to work while taking any medication that may have adverse effects. An employee can continue to work while taking legal drugs/prescription medication, if Management has determined, after consulting a healthcare professional, that the employee using the medication does not pose a threat to their own safety, the safety of fellow employees, or significantly impact the employee's job performance. Otherwise, the employee may be required to take a leave of absence or comply with other appropriate action as determined by Management.
>
> If requested by a supervisor the employee shall be required to provide written, signed documentation from their doctor verifying that the medication is not and will not impair their ability to perform their job.
>
> Any employee called to work on scheduled time off (i.e. off hours, weekends, holidays, scheduled days off, etc.), will notify the calling party and/or the on duty supervisor if a prescription drug, over-the-counter drug, alcohol, or other potentially impairing substance has been taken that would or could affect the safe performance of their job.

[16] Drug and Alcohol Control Program, Part IV, § 4, last paragraph provides:

Case 1:05-cv-10380-WGY    Document 1-18    Filed 02/28/2005    Page 15 of 17

Program is not limited to dealing with drugs or alcohol – but also prohibits the possession of "contraband" which includes "firearms, weapons and any other item classified as 'contraband' by the Company" all of which the Company has the right to search for by "unannounced inspections" of "personal vehicles, lockers, lunch packs/pails, etc."[17]

The Drug and Alcohol Control Program also gives the Company complete discretion to determine when there is "reasonable suspicion" to demand a drug test when there is such "objective signs" of an employee using prohibited drugs such as "skin lesions, unreal self-perception, paranoia, confusion, time distortion, rapid speech and/or movement, mood and/or energy swings."[18]  Reasonable suspicion may also be triggered

---

Any presence of a substance that has the ability to impair an employee's abilities will be considered by the Company to be sufficient evidence of impairment.

[17] Drug and Alcohol Control Program, Part III, § 10 provides:

The company may conduct unannounced inspections for illegal drugs, alcohol, firearms, weapons, or any other item classified as "contraband" by the Company, in Company facilities, property, or areas of work.

Inspections of employees and their personal property, including personal vehicles, lockers, lunch packs/pails, etc., may be conducted when there is reasonable suspicion to believe that the employee or employees are in violation of this policy.

Inspections of employees and their personal property may be otherwise conducted when circumstances or workplace conditions justify them.

An employee's consent to inspection is required as a condition of employment and the employee's refusal to consent may result in disciplinary action up to and possible including termination, even for first time refusal.

Inspections of Company property, facilities, or work areas can be conducted at any time and do not have to be based on reasonable suspicion.

[18] Drug and Alcohol Control Program, Part V, § 10, ¶ b).

10. Reasonable Suspicion Testing: The Company will further require employees to submit to drug/alcohol testing when it determines, in its sole discretion, that reasonable suspicion, other than the above conditions, exists that an employee or employees are engaged in activities prohibited by this policy.

REASONABLE SUSPICION shall mean: Facts, circumstances, physical evidence, physical signs/symptoms, or a pattern of performance and/or behavior that would cause a prudent person to reasonably conclude that an employee may be "under the influence" of a prohibited substance or has used a prohibited substance which is, or appears to be, affecting their job performance.

by "high individual accident experience, excessive absenteeism, observed erratic behavior or impairment, and/or deteriorating job performance as determined by the Company."[19]

The contrast between Article 20 of the Agreement and the Drug and Alcohol Control Program extends to the situation when an employee who has voluntarily entered a treatment program and returns to work. Under Article 20 the employee who is returned to work following treatment has a second opportunity for treatment before the Company may terminate him or her. The Drug and Alcohol Control Program requires first that following treatment the employee must have a test showing "no detectable amount of a substance prohibited by the policy," must participate in a drug/alcohol testing program monitored by the Company and must agree to a signed letter accepting "new terms of continued employment."[20]

---

Each and every situation will be considered individually to determine if REASONABLE SUSPICION, for the purpose of drug testing, does in fact exist. Reasonable suspicion includes, but not limited to:

a)...
b)   Observable, objective signs of an employee having used a prohibited substance, which may include but are not limited to, the following: unsteady gait, slurred speech, odor of alcohol, abnormal eye findings (reddish eyes, watery eyes, dilated or constricted pupils, heavy or overly alert eyes, swollen eyelids), skin lesions, unreal self-perception, paranoia, confusion, time distortion, rapid speech and/or movement, mood and/or energy swings.

[19] Drug and Alcohol Control Program, Part V, § 10, ¶ c).

c)   High individual accident experience, excessive absenteeism, observed erratic behavior or impairment, and/or deteriorating job performance as determined by the Company.

[20] Drug and Alcohol Control Program, Part V, § 11, ¶¶ a) and b).

Post-Treatment Testing:  Any individual with an alcohol or drug abuse problem who *voluntarily* comes forward *before* a disciplinary problem occurs, or notification of a testing situation, and who thereafter cooperates with the Company for treatment and rehabilitation will NOT be subject to disciplinary action for doing so. However, creating a threat to safety by failure to satisfactorily complete/successfully participate in treatment, or withdrawal from treatment before completion, will result in disciplinary action up to and including termination.

The issue of employee driving was also of little concern to AK Media/MA. Article 17, Section 6 shows that the Company wanted the employees to be able to drive except when either the Company's insurance carrier demanded that the Company prohibit an employee from driving (an event which Shay admitted never occurred during his 6 years as Operations Manager or Assistant Operations Manager with the Company or its predecessor [Tr.67-68]) or the employee's license was suspended. Even under those circumstances, the Company's focus was to keep the employee on the job by finding a way to "assign such an employee to a non-driving assignment."

The Company Motor Vehicle Point System, however, takes the approach that you will not be permitted to drive unless you measure up under the Company's subjective evaluation[21] of your driving record, whether or not the Company's insurance carrier or the Court's of the Commonwealth are concerned about you driving record. It does not take much to discern that the Company's Motor Vehicle Point System removes the employee's ability to drive if he or she has two speeding tickets within one year for driving in excess of 15 miles per hour over the posted speed limit. Two fender benders produce the same result.[22] Moreover, once the driving privileges are suspended, the

---

a) One an individual has successfully completed a treatment program, they will participate in a drug/alcohol testing program monitored by the Company. These and other conditions will be provided to the employee in written form, (see attached LETTER OR AGREEMENT) and the employee will be required to sign this agreement as NEW TERMS OF CONTINUED EMPLOYMENT.

b) Prior to the employee returning to full duty, they will provide (at the lab/facility of the Company's choice) at least one drug/alcohol test that reveals no detectable amount of a substance prohibited by this policy.

[21] While the application of the point system may be completely objective, the assignment of the points to the various types of driving faults and the rate of accumulation of the points was completely discretionary and therefore subjective by the Company.

[22] Motor Vehicle Point System, Point System 2, p.2.2

| 1. Violations | Points |
|---|---|
| a)… | |
| b)… | |
| … | |
| d) Unlawful speed – more than 15 mph over posted speed limit | 4 |
| f) … | |
| g) All other moving violations not resulting in an accident | 3 |
| … | |
| k) All other moving violations resulting in an accident | 4 |